**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID E. SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **No. 08 C 2413** |
| **PUBLISHERS CLEARING HOUSE LLC,** | ) | |
| | ) | **Judge Dow** |
| | ) | **Mag. Judge Cox** |
| | ) | |
| **Defendant.** | ) | |

**PUBLISHERS CLEARING HOUSE LLC'S LOCAL RULE 56.1(a)(3)
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule of Civil Procedure 56.1(a)(3), Publishers Clearing House LLC ("PCH") submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

LIST OF EXHIBITS

Exhibit A        Complaint

Exhibit B        Docket Sheet – State Court Action

Exhibit C        Declaration of Christopher Lyle Irving, Assistant Vice President,
                 Consumer & Legal Affairs of PCH

Exhibit D        <u>Vollmer, et. al. v. Publishers Clearing House and Campus
                 Subscriptions, Inc.</u>, Civil No. 99-434-GPM (S.D. Ill. Feb. 18,
                 2000)("the Final Order")

Exhibit E        Second Amended Class Action Stipulation of Settlement and
                 Exhibit C Release and Covenant Not to Sue in <u>Vollmer, et. al. v.
                 Publishers Clearing House and Campus Subscriptions, Inc.</u>

Exhibit F        <u>Stahl v. Publishers Clearing House, et al.</u>, C/A No. 00-CP-26-289,
                 (S.C. Ct. of Common Pleas, Horry County, Sept. 22, 2000)
                 (unpublished Order dismissing, <u>inter alia</u>, breach of contract, unfair
                 trade practices, and statutory and common law fraud claims)

Exhibit G        <u>Honekman v. Publishers Clearing House</u>, No. BC 229959, (Ca.
                 Sup. Ct., Los Angeles County, August 28, 2000) (Transcript
                 affirming Tentative Order dismissing, <u>inter alia</u>, statutory and
                 common law fraud claims)

Exhibit H        <u>Rasheed-Bey v. Aiken</u>, 1 F.3d 1244, 1993 WL 299358 at *3 (7th
                 Cir. 1993) (unpublished disposition)

## I.    PLAINTIFF'S COMPLAINT

1.      On or about February 13, 2008, Plaintiff commenced this action against PCH by filing a complaint in the Circuit Court of Cook County, in the State of Illinois, bearing Number 2008L001657. [Complaint, attached as Exhibit A; Docket Sheet, attached as Exhibit B.]  The Complaint was never properly served.

2.      Plaintiff alleges that he won the Publishers Clearing House Sweepstakes in July 1997, November 1997, September 1998, October 1998 and November 1998, but that PCH withheld his prize money. [Complaint, attached as Exhibit A]

3.      Plaintiff also vaguely alleges that PCH committed fraud in connection with letters PCH mailed to Plaintiff on these dates:  "letters are falsified with words like should you be the winner) documents may fraud organization propaganda as provided your entry reach our office on time [sic]."  [Id.]

## II.    THE PUBLISHERS CLEARING HOUSE SWEEPSTAKES

4.      Plaintiff did not win the Publishers Clearing House Sweepstakes. [Affidavit of Christopher Lyle Irving, Assistant Vice President, Consumer & Legal Affairs of PCH ("Irving Aff."), attached as Exhibit C.]

5.      Christopher Irving, who is Assistant Vice President, Consumer & Legal Affairs of PCH, conducted and supervised a search of the records of PCH to determine which promotional sweepstakes or "giveaways" were being offered by PCH during the time period covered by Plaintiff's complaint (viz. July 1997 to November 1998) and the names of the winners of prizes of $1,000,000 or more in such giveaways. [Id.]

6.      Plaintiff does not appear on those records as the winner in any of these giveaways. [Id.]

### III.    THE VOLLMER ACTION

7.    In <u>Vollmer, et. al. v. Publishers Clearing House and Campus Subscriptions, Inc.</u>, Civil No. 99-434-GPM (S.D. Ill. Feb. 18, 2000)("the <u>Vollmer</u> Action"), a federal class action, plaintiffs asserted claims for money damages allegedly resulting from common law and statutory fraud in connection with PCH's direct mail advertisements. [<u>See</u> Exhibit D.]

8.    The crux of plaintiffs' allegations in the <u>Vollmer</u> Action was that PCH's mailings purportedly contain misleading representations about winning in order to induce consumers to make purchases. [<u>Id</u>. at ¶ 10, pp. 5-6.]

9.    In addition, plaintiffs sought monetary damages based upon misrepresentations by PCH which they claimed misled Class Members to believe they had won the sweepstakes' large cash prize. [<u>Id</u>.]

10.    As certified, members of the Settlement Class in the <u>Vollmer</u> Action were defined as "all persons in the United States who received a PCH solicitation between February 3, 1992 and June 30, 1999." [<u>Id</u>. at ¶ 3.]

11.    The Vollmer Action was settled and the settlement was approved by a final order of the United States District Court for the Southern District of Illinois. <u>Vollmer, et. al. v. Publishers Clearing House and Campus Subscriptions, Inc.</u>, Civil No. 99-434-GPM (S.D. Ill. Feb. 18, 2000). [<u>Id</u>.]

12.    As approved by the <u>Vollmer</u> Court, the settlement of the <u>Vollmer</u> Action included a Release in which Class Members, including the Plaintiff in the instant case, agreed to release PCH from all past, then present and future monetary and equitable claims, based on statutory, common law tort and contract claims, which in any way

involved PCH's direct mail solicitations, promotional sweepstakes, business practices, advertising campaigns and telemarketing efforts. [Second Amended Class Action Stipulation of Settlement, attached as Exhibit E and Exhibit C Release and Covenant Not to Sue thereto.]

13.    The Final Order entered by the Vollmer Court provides that it "shall forever be binding on and shall have res judicata and preclusive effect in all pending and future lawsuits maintained by or on behalf of Plaintiffs therein or any other Members of the Settlement Class." Vollmer, et. al. v. Publishers Clearing House and Campus Subscriptions, Inc., Civil No. 99-434-GPM, at ¶ 4, pp. 57-58 (S.D. Ill. Feb. 18, 2000). [Attached as Exhibit D.]

14.    The Vollmer Court also entered a permanent anti-suit injunction judicially prohibiting all Class Members from pursuing any additional claims. [Id. at ¶¶ 116-119, pp. 52-54.]

15.    Christopher Irving, the Assistant Vice President, Consumer & Legal Affairs of PCH, personally conducted a search of the records of PCH pertaining to those persons who filed claims in and who "opted out" of the federal class action settlement (the "Vollmer Settlement") approved by the Final Order in the Vollmer Action. [Irving Aff., attached as Exhibit C.]

16.    Plaintiff David E. Smith does not appear on such records to have opted out of settlement class for the Vollmer Settlement. [Id.]

17.    On the contrary, those records show that one David E. Smith, 6546 So. Stewart Avenue, Chicago, IL 60621, filed a claim in the Vollmer Settlement and was paid $411.72 in settlement of his claim. [Id.]

Dated: May 5, 2008                    Respectfully submitted,

                                      BRYAN CAVE LLP


                                      By: _____/s/ M. Angela Buenaventura_____
                                      Steven R. Smith
                                      M. Angela Buenaventura
                                      161 North Clark St., Suite 4300
                                      Chicago, Illinois 60601
                                      Telephone: (312) 602-5000
                                      Facsimile:  (312) 602-5050

                                      *Attorneys for Publishers Clearing House
                                      LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certify that on the 5th day of May, 2008, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system.  The undersigned hereby certifies that on the same date a copy of the foregoing document was sent via prepaid overnight delivery to the following non-CM/ECF participant:

David E. Smith
6546 S. Stewart Ave.
Chicago, IL 60621


By: _____/s/ M. Angela Buenaventura_____
        M. Angela Buenaventura

Exhibit A

2008L001657
CALENDAR/ROOM V

PLAINTIFF's STATEMENT OF COMPLAINT FRAUDE  00:00
Fraud

Defendant (s) Ignored chance to settle          Plaintiff file Case No.2007 CONSC-
fraudulently acts of prepaganda loop holes      00198708 no avail.
that continues to hinder payment of
monies won by plaintiff,

As defendant (s) reject our godly conduct to solve matters
it's necessary to help our cause by appealing to governments
and ,Plaintiff request & pray that THE CIRCUIT COURT COOK
COUNTY ILLINOIS Take jusisdiction over Case No.07

Now comes Plaintiff pearsonally negatiating my claim,from 1997 until 2008 defendant (s)

have sent out many prize checks all over this country for millions of dollars; However

plaintiff for the same time peoriod hasn't received one award check from defendant (s)

allthough plaintiff is winner of five month or date for the five July 1997,November 21,1997
(awards)
Sepember 1998,about October 14,1998,November 16,1998 1.$3-5 million dollars, 2.$10-million

dollars 3. $5-million dollars , 4.$5,376,600.00 , 5.$13,614,543.00.,I am holding two winning

numbers that match defendant ' (s) winning numbers,i am not sure about  the other three

winning numbers,numbers that I have is for $3-5million dollars , $10,-million dollars

all letters including one dated  January 16,2008 letters are falsefied with words like

should you be the winner)  documents may fraud organization propaganda as provided your entry
(be )
reach our office on time.,However no letter or document from 1997 until today 2-7-08 denied

the fact that Plaintiff did win April 13,1998  giveaway No.525 for $3-5 million dollars

and on or about November 21,1997  Plaintiff was reality winner of giveaway No.375 for

$10,-million dollars cash.

Plaintiff Hereby request the court to Defentant (s)  to send certified to my home at
(order)
6546 South Stewart Avenue Chicago,Illinois 60621-3140 or as the court seefit ,pay court

cost attorney fee if any.          Subscribed and  sworn  be before me

Respectively submitted            this 13u day of Jan  20 08
By                                at Chicago, County of Cook State of Illinois.
DAVID E SMITH 773-488-3829
David E Smith                     Notary Public

"OFFICIAL SEAL"
Yolanda Booker
Notary Public, State of Illinois
Commission Expires 3/28/2011

C4316Wa

## PUBLISHERS CLEARING HOUSE

# COMPUTER AUDIT FORM

| Giveaway No.: | Prize to be awarded: |
|---|---|
| 525 | $3,500,000.00 CASH AT ONCE |

FOR JULY
'97 ENTRY

**Contender Status:**
1ST PLACE CONTENDER RIGHTS EXTENDED

**Contender's Name & Address:**

| Prize No.: | Verified By: |
|---|---|
| 79 3028 2140 | |

***** 5-DIGIT 60621
:393                    19
DAVID E SMITH
6546 S STEWART AV
CHICAGO IL  60621-3140

**Award Date:**
OCTOBER 15, 1998

D.a.

**Award Time:**
7:00 PM

**ALERT!
PRIZE CLEARANCE
VERIFIED.**

FOR INFORMATION SERVICES USE ONLY

Do not write in this space.

REPORT COPY – KEEP FOR YOUR RECORDS.

DORO___ ___ ___
CLERK OF CIRCUIT COURT
LAW DIVISION

FILED
08 FEB -3 PM 4:35

# OFFICIAL RULES

All entries received from this Bulletin by April 3, 1998 will be eligible for all Giveaways listed below. You may receive multiple entry opportunities in our ongoing Giveaways.

**Why you were selected to receive this Bulletin.** Since we can't mail to everybody, we set up certain qualifications as to what groups we will send Bulletins to and when. (All customers and friends with at least one merchandise order per year or one magazine order in the last 3 months or who write to us requesting admission gain annual membership in our President's Gold Club.) Within each category we then select specific people based on the interest they've shown in receiving our mail. Thousands are eliminated when we go through this process because they do not meet the standards. But you did! That's why you're receiving the enclosed documents that could make you a millionaire!

**How you could be selected a winner.** You could win our $10 Million, $3.5 Million or $1 Million SuperPrizes™ (Giveaway Nos. 555, 525 and 450) if you have the matching winning number and return it by the deadline. We'll take a special early look for the winning number for the $3.5 Million SuperPrize® (Giveaway No. 525) right after the entry deadline and announce the winner on April 15, 1998 should the number come in from this Bulletin. If the winning number for any matching number Giveaway is not returned by the applicable deadline, we will award the base $1 Million prize to an alternate winner in a second chance random drawing among all eligible entrants. In the unlikely event a winning number is duplicated, there will be a random drawing among such duplicated numbers to determine the winner. The winner of the 1998 Ford Expedition or $45 Thousand cash (Giveaway No. 505) will be selected in a random drawing from among all eligible entries at Giveaway end. The winners of Giveaway No. 597 will be selected in random drawings from among all eligible entries at Giveaway end. Odds of winning depend on the number of entries received.

**How our prizes pay out.** Win $10,000,000.00 and you will receive $500,000.00 the first year, $250,000.00 a year thereafter, and $2,500,000.00 in the 30th year. Win $3,500,000.00 and you will receive one lump sum payment. Win $1,000,000.00 and you will receive $50,000.00 the first year, then $25,000.00 a year thereafter, plus a final payment of $250,000.00 in the 30th year. Present value of Giveaway Nos. 555, 525 and 450 will vary depending on interest rates and market conditions at the time of the award. All other prizes will be paid in full by check at time of award.

**How to enter our Giveaways.** Simply follow the instructions in this Bulletin and mail your entry by the deadline to be eligible. You may write in as often as you like to enter our current, ongoing Sweepstakes. Just mail each request separately. We do not accept entries from a third party nor entries sent in bulk. We are not responsible for lost, delayed or misdirected mail.

Our Prize Patrol will notify winners of prizes of $10,000.00 or more in person. We'll contact winners of prizes under $10,000.00 by mail. The entrant named on the winning entry form will be considered the winner. We must locate any winner and have him or her execute an Affidavit of Eligibility within 30 days or we will select an alternate winner. Acceptance of prize, unless otherwise noted, constitutes permission to use winner's name and photograph in television commercials and for other promotional purposes.

**Giveaway Supervisors' decisions are final.** Taxes are the winner's responsibility. Sweepstakes is open to residents of the U.S., the U.K., and Canada. Principals and employees of Publishers Clearing House, its affiliates, contest processors, their immediate families and Giveaway Supervisors are not eligible. All federal, state and local laws apply.

To receive future Sweepstakes opportunities, or to obtain our most recent list of winners, just write to us at the address below and let us know.

**ALL PRIZES GUARANTEED TO BE AWARDED**
**NO PURCHASE NECESSARY TO WIN**

### GIVEAWAYS PROMOTED IN THIS BULLETIN

| PRIZE | GIVEAWAY NUMBER | ENDING DATE | WINNER SELECTED BY: |
|---|---|---|---|
| $ 10 Million | 555 | 1/31/99 | Winning Number |
| $ 3.5 Million | 525 | 7/31/99 | Winning Number |
| $ 1 Million | 450 | 7/31/99 | Winning Number |
| $ 45 Thousand | 505 | 4/22/98 | Random Drawing |
| $ 8,660.00 | 597 | 4/22/98 | Random Drawing |

(2 @ $3,500.00, 3 @ $350.00, 16 @ $35.00)
*Prize may be awarded earlier at our option.



PUBLISHERS CLEARING HOUSE
® 101 WINNERS CIRCLE • PORT WASHINGTON, NEW YORK 11050

## PUBLISHERS CLEARING HOUSE

## COMPUTER AUDIT FORM

| Giveaway No.: | Prize to be awarded: |
|---|---|
| 525 | $5,000,000.00 |

**FOR SEPTEMBER '98 ENTRY**

**Contender Status:**
1ST PLACE CONTENDER RIGHTS EXTENDED

**Contender's Name & Address:**

***** 5-DIGIT 60621
423          17

David E Smith
6546 S Stewart Av
Chicago IL 60621-3140

**Prize No.:**
47 4892 4049

**Verified By:**
D.A.

**Award Date:**
DECEMBER 15, 1998

**Award Time:**
7:00 PM

CU0121295-32900121317

**ALERT!
PRIZE CLEARANCE
VERIFIED.**

**FOR INFORMATION SERVICES USE ONLY**

Do not write in this space

REPORT COPY – KEEP FOR YOUR RECORDS.

FILED
08 FEB -3 PM 4:34
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION



# PUBLISHERS CLEARING HOUSE

®

# $3,500,000.00 PRIZE PAYMENT METHOD REQUEST

*Please return this form by 4/13 so I can get
things started if you have the winning
number. Also, please consider ordering
something this time. We've got some
really great deals and I know the
Prize Patrol would feel a lot better
giving the prize to a customer.*

*Dan*

Official Entry For:  David E. Smith

SuperPrize:  $3,500,000.00 for Giveaway No. 525

SuperPrize Number:  5570 4829 5210

David E. Smith, please check below which method of prize payment you would
prefer should you win $3,500,000.00 when we take an early look at your entry
and SuperPrize Number on April 15:

[✓] Certified Check        [ ] Wire Transfer to your bank

At this time, you may request up to 4 items and receive 14-Day Free Inspection
Privileges although no purchase is necessary to win any prize. All orders
also receive Express Order Processing.

Please sign below.  Thank you.

Sign here: *David E Smith*          3-18-98 *Returned*
              David E. Smith

| PLACE 1ST ORDER STAMP HERE | PLACE 2ND ORDER STAMP HERE | PLACE 3RD ORDER STAMP HERE | PLACE 4TH ORDER STAMP HERE |
|---|---|---|---|

---

**OFFICE USE ONLY:**                                        K0032  I0059Fc 98-35

PAYMENT            ORDER

C [ ]   W [ ]      0 [ ]  1 [ ]  2 [ ]  3 [ ]  4 [ ]

                                                    I.D. NUMBER

04                 DAVID E. SMITH                   66 1085 2651
                   6546 S STEWART AV
                   CHICAGO, IL 60621

                                    Date: ____/____/____

**Farmers State Bank**  *GUARANTEED CASH WINNER*

| Transferring Account | Accounts Generating Funds |
|---|---|

**Publishers Clearing House**     PCH Giveaways No. 525 & No. 599

**Amount of Funds Being Transferred:** | **Name & Address of Individual Eligible to Receive Funds:**

$5,376,600.00
(See information below)

```
                              **** ECRLOT ** C045
                              546                 4
        DAVID E SMITH
        6546 S STEWART AV
        CHICAGO IL  60621-3140
```

**Contest Status:**

**Guaranteed Cash Winner**

**Special Notes and Information:**

As an official financial agent for Publishers Clearing House, Farmers State Bank has been informed that you, David E. Smith, have been selected for a guaranteed Sweepstakes cash prize.

Accordingly, this bank has begun the process of preparing to withdraw prize monies from the Publishers Clearing House account so we can transfer a cash prize to you.

PLEASE NOTE: To claim your cash award, **you must complete and return the Contest Documents that will arrive under separate cover.** This Bulletin will be delivered to 6546 S Stewart Av within the week.  I urge you to respond to it immediately.

Failure to act on these documents will cancel this planned cash transfer. Obviously, it would be well within your interest to be aware that your Contest Documents are coming soon.  Thank you for your attention, and good luck.

Clark Vollan
Executive Vice President
Farmers State Bank

FILED 08 FEB -3 PM 4:34 CLERK OF CIRCUIT COURT LAW DIVISION



☖ PUBLISHERS CLEARING HOUSE ☖          F1841

# WINNERS DOCUMENT

## Prize Acceptance Affidavit

*By affixing the label below, I do hereby testify and confirm that I am in all ways eligible to accept the $10,000,000.00 SuperPrize from Publishers Clearing House and I understand that I will be declared the*

**FINAL ROUND**
GIVEAWAY No. 375
ENDS 1/20/98

### WINNER OF
# $10,000,000.00

*provided this document arrives in Port Washington, New York, on or before January 20, 1998 and my entry is chosen as the winner.*

**Therefore,** I hereby state and affirm that to the best of my knowledge all information as presented below is true and accurate:

I am not related to any employee of Publishers Clearing House.

I know of no impediments to my eligibility to accept the $10,000,000.00 prize.

I understand that acceptance of prize constitutes permission to broadcast my winning moment live on television January 25th at the conclusion of the Super Bowl™ on NBC TV and I will receive an additional payment of $5,000.00 for this.

**I prefer my $10,000,000.00 prize be paid:**
☐ Certified Bank Checks
☒ Direct deposit via electronic transfer into my bank account.
   (Please wait until January 25, 1998 to supply actual account number.)

Furthermore, I'd be happy to say my winning entry contained an order. Therefore please send me the following and grant me *On The House* privileges on any magazine I may order below. I also understand that an order now will upgrade my Customer Status.

**PRIZE ACCEPTANCE**          SU139

DAVID E SMITH
6546 S STEWART AV
CHICAGO IL 60621

54  0062 1812

**GREAT VALUE!**
**ASTROLOGY** & ISS.
YOUR DAILY HOROSCOPE
YOUR PRICE $10.97
$2⁷⁴  U&BV M

PLACE 2ND
ORDER STAMP
HERE

04

SUPERPRIZE
AMOUNT  **$10,000,000.00**

PLACE 3RD
ORDER STAMP
HERE

PLACE 4TH
ORDER STAMP
HERE

Signed _David Smith_          9610
F1841

# PUBLISHERS CLEARING HOUSE
101 WINNERS CIRCLE • PORT WASHINGTON, NEW YORK 11050

**IMPORTANT FOR YOUR RECORDS**

## David E. Smith's PCH Prize Shareholder Report

| Address: | SuperPrize® Numbers: | Date Prepared |
|---|---|---|
| 6546 S STEWART AV<br>CHICAGO IL 60621 | 48 4187 3387 11<br>43 4135 0035 21 | November 16, 1998 |



### Current Status:

D. Smith, you have achieved Gold Club Status and are a potential PCH Prize Shareholder. An entry now registers your claim to collect your share of prizes from this Bulletin, including:

**$10,000,000.00** SuperPrize Payout
**$3,500,000.00** SuperPrize Payout (to begin 48 hours after we process the Winning Entry)
**$100,000.00**
**$10,000.00**
**$4,543.00**

### Total Prize Eligibility:

**$13,614,543.00**

### How To Claim Your Share:

In order to register a claim for your share of the major prizes in this Bulletin, David E. Smith, you must complete, sign and mail your Prize Shareholder Claim Certificate to arrive by November 16, 1998.

### Special Prize Payout Instructions:

As a potential PCH Prize Shareholder, David E. Smith, it is your right to declare how you would like to collect your share of the major prize payouts should you be our winner. You have the option of receiving your payouts in one of two ways. Please tell us which method of payment you prefer by affixing one of the Prize Payout labels below to the enclosed Prize Shareholder Claim Certificate before mailing.

> **THE UNDERSIGNED HEREBY ATTESTS AND VERIFIES, AS CONTEST DIRECTOR, THAT ALL STATEMENTS IN THIS PCH PRIZE SHAREHOLDER REPORT ARE CORRECT.**
>
> *Dorothy Addeo*
> Dorothy Addeo, Contest Director

▲ Tear off here and retain top portion for your records. ▲

IMPORTANT: Please declare your prize payout option by affixing one of the labels at right on the return the enclosed Prize Shareholder Claim Certificate before mailing.

**PRIZE PAYOUT OPTION #1**

David E. Smith, declare to collect share of major prize payouts in form of ELECTRONIC FUNDS TRANSFER (EFT)

**PRIZE PAYOUT OPTION #2**

I, David E. Smith, declare to collect my share of major prize payouts in the form of CASHIER'S CHECK



# PUBLISHERS CLEARING HOUSE
# MILLIONAIRES AND MULTIMILLIONAIRES

### GIVEAWAY No. 450
## FATHER MIKE BERNER, EARLING, IA
### August, 1998 Winner - $1,000,000.00

( D )

**GIVEAWAY No. 375**
K.J. Macalister, Edmonton, AB
January, 1998 Winner - $10,000,000.00

**GIVEAWAY No. 365**
Raulton B. Thomas, Lutz, FL
July, 1997 Winner - $1,000,000.00

**GIVEAWAY No. 270**
Beata Sankiewicz, Sudbury, ON
January, 1997 Winner - $10,000,000.00

**GIVEAWAY No. 245**
Martha McMillen, Louisiana, MO
July, 1996 Winner - $1,000,000.00

**GIVEAWAY No. 230**
Patricia DiNardo, Worthington, PA
January, 1996 Winner - $10,000,000.00

**GIVEAWAY No. 201**
Mildred Hyde, Chatham, NJ
July, 1995 Winner - $1,000,000.00

**GIVEAWAY No. 200**
Maryann Brandt, Phoenix, AZ
January, 1995 Winner - $10,000,000.00

**GIVEAWAY No. 192**
Joyce Griffey, Conneaut, OH
August, 1994 Winner - $1,000,000.00

**GIVEAWAY No. 125**
Alfred Slivnik, St. Cloud, MN
January, 1994 Winner - $10,000,000.00

**GIVEAWAY No. 163**
Joseph LaViu Jr., Walpole, MA
July 1993 Winner - $1,000,000.00

**GIVEAWAY No. 160**
Diane Malcolm, Waterford, MI
April 1993 Winner - $1,000,000.00

**GIVEAWAY No. 110**
Pamela Barton, Dickinson, TX
January 1993 Winner - $10,000,000.00

**GIVEAWAY No. 110**
George Hardie, Whitsett, NC
October 1992 Winner - $1,000,000.00

**GIVEAWAY No. 110**
Glenna Sue King, Childress, TX
March 1992 Winner - $1,000,000.00

**GIVEAWAY No. 110**
Bill Perkins, Sun City Center, FL
October 1991 Winner - $1,000,000.00

**GIVEAWAY No. 87**
David Knobs, Miami, FL
January 1991 Winner - $10,000,000.00

**GIVEAWAY No. 110**
John Cotter, Fort Worth, TX
October 1990 Winner - $1,000,000.00

**GIVEAWAY No. 110**
Mary Peterson, Salt Lake City, UT
July 1990 Winner - $1,000,000.00

**GIVEAWAY No. 110**
Katherine Jackson, Dallas, TX
May 1990 Winner - $1,000,000.00

**GIVEAWAY No. 74**
Leroy Scarbrough, Bessemer, AL
March 1990 Winner - $1,000,000.00

**GIVEAWAY No. 75**
Artis Eldridge, Mojave, CA
August 1989 Winner - $1,000,000.00

**GIVEAWAY No. 96**
Robert Castleberry, Denton, TX
March 1989 Winner - $10,000,000.00

**GIVEAWAY No. 65**
John Yancy, Austin TX
August 1988 Winner - $1,000,000.00

**GIVEAWAY No. 57**
Ann Bishop, Jeffersontown, KY
March 1988 Winner - $1,000,000.00

**GIVEAWAY No. 53**
James MacPherson, Encinitas, CA
March 1987 Winner - $1,000,000.00

**GIVEAWAY No. 50**
Barbara Armellino, Belleville, NJ
January 1987 Winner - $10,000,000.00

**GIVEAWAY No. 44**
Pat Keys, Midland, PA
April 1986 Winner - $2,000,000.00

FILED
08 FEB -3  PM 4:34
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION

**PUBLISHERS CLEARING HOUSE**

CUSTOMER SERVICE
101 WINNERS CIRCLE
PORT WASHINGTON, NEW YORK 11050

1-800-645-9242

January 16, 2008

David E. Smith
6546S Stewart Av
Chicago, IL 60621

FILED
08 FEB -3 PM 4:33
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION

Dear David Smith:

Thank you for contacting Publishers Clearing House. We are pleased to have this opportunity to share important information with you regarding our sweepstakes.

Our mailings are opportunities for a chance to win, and provide clear information that the recipient has not yet won any prize, must enter by the deadline, and must be chosen to win. In order to win, an entry must be selected by random drawing or match the winning number selected. Please remember that while we receive entries from all across the land, only one individual can actually win each giveaway. All PCH prizes of $500 or greater are awarded by either certified mail or in person by our famous Prize Patrol. These awards are done as soon as all winning entries and prizes are matched.

While we have promoted our famous sweepstakes for over 40 years as a way to draw attention to our unbeatable magazine deals and value-based merchandise offerings, no purchase is ever necessary to enter or win. You may be interested to know that a majority of our major prize winners have not ordered with their winning entry. Of course, if you do choose to order, our guarantee policy allows you to return any product or cancel a magazine subscription if you are not happy with your order.

All promotional mailings from Publishers Clearing House carry a prominent "Sweepstakes Facts" insert that among other information states the prize value and odds of winning. The insert reminds all recipients that:

> You Have Not Yet Won. All Entries Have The Same Chance Of Winning. The winner has not been identified. We don't know who the winner is. If you enter our Sweepstakes, your entry will have the same chance to win as every other entry.

> Enter For Free. You don't have to buy anything to enter. Just

*From Our House to Your House*

mail the entry form included in this mailing or follow the instructions in the Official Rules.

Enter As Often As You Like. You don't have to wait for us to mail you an entry form. You may submit additional entries simply by writing to us at Publishers Clearing House, 101 Winners Circle Port Washington, NY 11050. Each time you write to us you will be entered once in each ongoing Sweepstakes. Each entry request must be mailed separately.

Buying Won't Help You Win.  Your chances of winning without a purchase are the same as the chances of someone who buys something. It would not be lawful to give any advantage to buyers in a Sweepstakes.

At Publishers Clearing House your satisfaction is our number one priority.  If we can be of further assistance, please contact us toll-free at 1-800-645-9242 or visit our website at www.pch.com.

                    Cordially,

                    Director,Customer Service

AMC UMB
civ

**CLEARING HOUSE**
CUSTOMER SERVICE
101 WINNERS CIRCLE
PORT WASHINGTON, NEW YORK 11050

® 1-800-645-9242
www.pch.com

September 17, 1999

David E. Smith
6546 S. Stewart Av
Chicago, IL 60621

Order Number: 1026-5441-1805

Dear David Smith:

Thanks for contacting us.  We are always glad to hear from our
customers.

The winner verification process is not complete.  Right now our Prize
Patrol is eagerly awaiting the opportunity to call on our next big
winner in person.  If you are that lucky person, the Prize Patrol,
headed by Dave Sayer, will use all their resources to locate you and
present you with your prize.

At Publishers Clearing House your satisfaction is our number one
priority.  If we can be of further assistance in the future, please
don't hesitate to contact us toll-free at 1-800-645-9242.  Our lines
are open Monday through Friday, 8:30 a.m. - 8:30 p.m. Eastern time.

Cordially,

Anjie McGuire
Director, Customer Satisfaction

AMC PSL
rrm

*From Our House to Your House*

Exhibit B



*Dorothy Brown*

# CLERK *of the*
## CIRCUIT COURT
*Cook County*

Case Information Summary for Case Number

**2008-L-001657**

Filing Date: 2/13/2008

Division: Law Division

Ad Damnum: $10000000.00

Case Type: FRAUD

District: First Municipal

Calendar: V

## Party Information

| **Plaintiff(s)** | **Attorney(s)** |
|---|---|
| SMITH DAVID E | PRO SE |

| **Date of Service** | **Defendant(s)** | **Attorney(s)** |
|---|---|---|
| | PUBLISHERS CLEARING HOUSE | |

## Case Activity

Activity Date: 2/13/2008                    Participant: SMITH DAVID E

FRAUD COMPLAINT FILED

Court Fee: 294.00                    Attorney: PRO SE

Activity Date: 2/13/2008                    Participant: SMITH DAVID E

CASE SET ON STATUS CALL

Date: 5/13/2008                    Judge: MCDONALD, BARBARA A

Court Time: 0930

Activity Date: 2/13/2008                    Participant: SMITH DAVID E

CASE SET ON INDIVIDUAL CALENDAR

Activity Date: 4/11/2008                    Participant: SMITH DAVID E

NOTICE OF MOTION FILED

Date: 5/1/2008                                    Attorney: PRO SE
Court Time: 0930


Activity Date: 4/11/2008                          Participant: SMITH DAVID E

PROOF OF SERVICE FILED

Attorney: PRO SE


Activity Date: 4/11/2008                          Participant: SMITH DAVID E

MOTION FILED

Attorney: PRO SE


Activity Date: 4/11/2008                          Participant: SMITH DAVID E

MOTION SPINDLED

Date: 5/1/2008                                    Attorney: PRO SE
Court Time: 0930


Activity Date: 4/29/2008                          Participant: PUBLISHERS CLEARING HO

CERTIFICATE FILED

Attorney: BRYAN CAVE LLP


Activity Date: 4/29/2008                          Participant: PUBLISHERS CLEARING HO

EXHIBITS FILED

Attorney: BRYAN CAVE LLP


Activity Date: 4/29/2008                          Participant: PUBLISHERS CLEARING HO

NOTICE OF REMOVAL TO FEDERAL COURT - FILED -

Attorney: BRYAN CAVE LLP


Activity Date: 5/1/2008                           Participant: SMITH DAVID E

ORDER STRIKING MOTION FROM CALL - ALLOWED -

Judge: MCDONALD, BARBARA A

---

Please note: Neither the Circuit Court of Cook County nor the Clerk of the
Circuit Court of Cook County warrants the accuracy, completeness, or the currency
of this data. This data is not an official record of the Court or the Clerk and may

not be represented as an official court record.

If data does not appear in a specific field, we likely do not have the responsive data in our master database.

Return to Search Page

Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DAVID E. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 08 C 2413 |
| PUBLISHERS CLEARING HOUSE LLC, | ) | Judge Dow |
| | ) | Mag. Judge Cox |
| | ) | |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF CHRISTOPHER LYLE IRVING

CHRISTOPHER LYLE IRVING, being duly sworn, declares as follows:

1. I am Assistant Vice President, Consumer & Legal Affairs, of Publishers Clearing House ("PCH"). I have been employed by PCH since 1994, and I have personal knowledge of the facts set forth herein, except where specifically stated.

2. I have been caused a search to be made of the records of PCH to determine which promotional sweepstakes or "giveaways" were being offered by PCH during the time period covered by Plaintiff's complaint (viz. July 1997 to November 1998) and who were the winners respectively of prizes of $1,000,000 or more in such giveaways. The search was conducted under my supervision and at my direction.

3. The giveaways in question, and the respective winners of such prizes in each of them, are shown on the records of PCH to be as follows:

| Giveaway | Winner | Prize Awarded |
|---|---|---|
| Giveaway # 375 | K. J. McAllister<br>Box 184<br>Wembley, AB T0H 35O<br>Canada | $10,000,000 |
| Giveaway # 450 | Fr. Mike Berner<br>P.O. Box 225<br>Earling, IA 51530 | $1,000,000 |
| Giveaway # 525 | Ereleine Ferrara<br>P.O. Box 687<br>Greenfield, CA 93927 | $1,000,000 |
| Giveaway # 555 | Beverly Cook<br>600 N. Main Street<br>Stewartsville, NJ 08886 | $10,000,000 |

4.    Plaintiff David E. Smith does not appear on those records as the winner in any of these giveaways.

5.    In addition, I have personally conducted a search of the records of PCH pertaining to those persons who filed claims in and who "opted out" of the federal class action settlement (the "Vollmer Settlement") approved by final order of the United States District Court for the Southern District of Illinois in <u>Vollmer, et. al. v. Publishers Clearing House and Campus Subscriptions, Inc.,</u> Civil No. 99-434-GPM (S.D. Ill. Feb. 18, 2000).

6.    Plaintiff David E. Smith does not appear on such records to have opted out of settlement class for the Vollmer Settlement.

7.    On the contrary, those records show that one David E. Smith, 6546 So. Stewart Avenue, Chicago, IL 60621, filed a claim in the Vollmer Settlement and was paid $411.72 in settlement of his claim.

I DECLARE UNDER PENALTY OF PERJURY UNDER
THE LAWS OF THE UNITED STATES OF AMERICA
THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on May 2, 2008 at Port Washington, New York.

Christopher Lyle Irving

- 2 -

Exhibit D

FILE

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THOMAS G. VOLLMER, PEGGY R. POSPESHIL, MARY KENNAH, PHILLIP INGRAM, ALBERT F. DIX, STEVE MALLIA, MICHELLE COLLINS, BARBARA BUCHANAN, H. DUANE KUNDERT, and DR. ROBERT ROSENTHAL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | CIVIL NO. 99-434-GPM |
| PUBLISHERS CLEARING HOUSE and CAMPUS SUBSCRIPTIONS, INC., | ) ) ) | |
| Defendants. | ) | |

*FILED*
FEB 18 2000
G. PATRICK MURPHY,
DISTRICT JUDGE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS, ILLINOIS

## MEMORANDUM AND ORDER

MURPHY, District Judge:

### INTRODUCTION

This matter is before the Court for final approval of the proposed settlement of this class action and to certify a nationwide Settlement Class. On June 30, 1999, this Court conditionally certified the Class for settlement purposes and granted preliminary approval of the proposed settlement. (Docs. 22 and 23). Since that time, the Court has entered numerous orders concerning various matters, including administration of claims and communications with Class Members concerning the proposed settlement. In addition, this Court has held frequent hearings to receive status reports from the parties, to provide guidance to the parties concerning administrative matters, and to resolve other issues that have arisen in connection with the proposed settlement.

EXHIBIT 1

The Court has received and considered voluminous submissions from the parties, from objectors, and from other interested persons and entities concerning the proposed settlement. A Final Fairness Hearing was held on January 25, 2000, at which the parties and objectors were given an opportunity to be heard. This Court has carefully reviewed the entire record in this matter, including but not limited to all of the testimony, exhibits, affidavits, charts, correspondence, briefs, comments, arguments, and objections that have been submitted to the Court. Having fully considered all of the factors relevant and necessary to the evaluation of the approval of class action settlements, the Court finds that all of the requirements of Federal Rule of Civil Procedure 23 have been met; that the members of the Settlement Class have been adequately represented at all times; and that the proposed settlement of this class action is fair, reasonable, and adequate. Consequently, for the following reasons, the Settlement is approved.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**The Parties and Their Counsel**

1.     Defendant Publishers Clearing House ("PCH") is a New York limited partnership headquartered in Port Washington, New York. (Affidavit of Deborah Holland, dated January 15, 2000, Doc. 184 ("Holland Aff.") at ¶ 3). PCH is in the business of selling magazine subscriptions and various types of merchandise through direct mail marketing. (Holland Aff. ¶¶ 5-6). In connection with its marketing efforts, PCH operates the "Publishers Clearing House Sweepstakes" ("Sweepstakes"), in which PCH offers chances to win prizes of cash or merchandise. (Holland Aff. ¶¶ 7-9). Many times each year, PCH sends mass mailings of envelopes containing Sweepstakes entry materials and offers for magazine subscriptions and merchandise to millions of people across the United States. (Holland Aff. ¶ 11). Some of PCH's mailings are computer personalized to refer

2

to the specific recipient's name, address, home town, and the like. PCH's advertising often features the company's "Prize Patrol," which makes unannounced visits to Sweepstakes winners' homes to present the winner with flowers, balloons, champagne, and large prize certificates.[1]

2.      Defendant Campus Subscriptions, Inc., is a wholly-owned subsidiary of PCH that markets magazine subscriptions and merchandise on college campuses throughout the country.[2]

3.      The Settlement Class encompasses all persons in the United States who received a PCH solicitation between February 3, 1992, and June 30, 1999 (the "Class Period"). Defendants estimate there may be hundreds of millions of people in the Settlement Class. (See Defendant's Memorandum In Support of Motion for Order Approving Notice Plan, Doc. 28). The Settlement Class includes a Subclass consisting of Class Members who purchased magazines and/or merchandise from Defendants during the Class Period.[3] Defendants estimate that there may be tens of millions of people in the Subclass. (See id.). Excluded from the Settlement Class and the Subclass are any parents, subsidiaries, affiliates, or controlled persons of Defendants, as well as Defendants' officers, directors, agents, or employees and their immediate family members. Also excluded from the Settlement Class are any judges assigned to handle this matter and their employees. (Doc. 22).

4.      The representative Plaintiffs ("Named Plaintiffs") are ten individuals who reside in eight different states. All are members of the Settlement Class and all but one are members of the

---

[1]      PCH should not be, but frequently is, confused with its competitor, American Family Publishers, whose spokespersons are Ed McMahon and Dick Clark.

[2]      Defendants shall be referred to collectively herein either as "Defendants" or "PCH."

[3]      The foregoing are paraphrases of the formal definitions of the Class and Subclass. The formal definitions of the Class and Subclass are set forth in the Final Order section at the end of this Memorandum and Order.

Subclass. Named Plaintiffs Thomas G. Vollmer ("Vollmer") and Peggy R. Pospeshil ("Pospeshil") reside in Illinois. Named Plaintiff Mary Kennah ("Kennah") resides in Missouri. Named Plaintiff Phillip Ingram ("Ingram") resides in New Mexico. Named Plaintiff Albert F. Dix ("Dix") resides in California. Named Plaintiff Steve Mallia ("Mallia") resides in Texas. Named Plaintiffs Michelle Collins ("Collins") and Barbara Buchanan ("Buchanan") reside in Indiana. Named Plaintiff Duane Kundert ("Kundert") resides in Wisconsin. Named Plaintiff Dr. Robert Rosenthal ("Rosenthal") resides in New Jersey. (Second Amended Complaint, Doc. 4).

5.      The Named Plaintiffs and the Settlement Class are represented by Steven A. Katz, Judy L. Cates, and Douglas R. Sprong of Carr, Korein, Tillery, Kunin, Montroy, Cates, Katz & Glass of Belleville, Illinois ("Class Counsel"). Defendants are represented by Morgan, Lewis & Bockius LLP of New York, New York, and Bryan Cave LLP of St. Louis, Missouri ("Defendants' Counsel").

### History of the Litigation Prior to Removal

6.      In a series of highly publicized incidents in late 1997 and early 1998, several elderly individuals responded to a sweepstakes promotion they received in the mail from PCH's competitor, American Family Publishers ("AFP"), by traveling to AFP's headquarters in Florida to collect what they believed were sweepstakes winnings. Within a week of the publicity surrounding these events, dozens of lawsuits were filed against AFP around the country.[4] During that time period, several putative class action lawsuits against PCH, including this one, were commenced, five of which were filed by Class Counsel. (Affidavit of Steven A. Katz, dated January 17, 2000, Doc. 173 ("Katz Aff.") at ¶¶ 2-5, 9, 12, and 14; Affidavit of David Leichtman, dated January 15, 2000, Doc. 182

---

[4]      Eventually, more than fifty lawsuits against AFP were consolidated in Multi-District Litigation in the United States District Court for the District of New Jersey. Class Counsel is co-lead class counsel in the AFP litigation.

("Leichtman Aff.") at Ex. Q).

7.    This class action ("the *Vollmer* action") was commenced against AFP and PCH on February 3, 1998, in the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois.

8.    The state court issued an order severing Plaintiff Vollmer's claims against AFP from the claims against PCH, and on June 18, 1999, the *Vollmer* state court complaint was amended to add additional Named Plaintiffs Pospeshil, Kennah, Ingram, Dix, Mallia, Collins, Buchanan, Kundert, and Rosenthal (some of whom were representative plaintiffs in Class Counsel's other class actions against PCH) and to add additional named Defendant Campus Subscriptions, Inc. ("Second Amended Complaint").  The Second Amended Complaint was also amended to allege violations of federal racketeering laws as well as violations of state consumer protection laws.

9.    On June 21, 1999, the *Vollmer* action was removed to this Court pursuant to this Court's federal question jurisdiction.  (Doc. 1).

**Allegations in the Second Amended Complaint**

10.    In the Second Amended Complaint (Doc. 4), Plaintiffs allege that PCH's Sweepstakes promotions were deceptive in that they led consumers to believe that their chances of winning a prize in the Sweepstakes would be increased if they made purchases, when in fact, purchasing did not increase the odds of winning a prize.  Plaintiffs allege that PCH thereby enticed consumers to purchase magazines and merchandise they otherwise would not have bought but for this mistaken belief.  Plaintiffs allege that PCH misled customers into believing, among other things, that:

(a)    PCH personnel were taking measures to ensure that the mailing recipient would be a winner;

(b)    purchasing a magazine subscription or merchandise would improve

5

the customer's status and/or relationship with PCH and, therefore, their

likelihood of winning a prize;

(c)     by ordering, they would gain admission into special clubs or select

and/or limited groups of customers who had a better chance of winning

prizes; and

(d)     by continuing to make purchases, they were surviving a series of

"winnowing down" processes and getting closer to winning millions of

dollars in prize money.

11.     Plaintiffs also contend that PCH "targeted the elderly" in that the form and content

of PCH's mailings were likely to be especially deceptive to elderly customers and that PCH knew or

should have known that its practice of sending multiple mailings to repeat customers resulted in a

disproportionate number of solicitations being sent to the elderly.

12.     Plaintiffs allege that PCH engaged in multiple acts of mail fraud and wire fraud

pursuant to 18 U.S.C. §§ 1341 and 1343, constituting a "pattern of racketeering activity" under the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).

Plaintiffs allege that PCH, Campus Subscriptions, Inc., and various third-party contractors engaged

by PCH to assist it in preparing and mailing solicitations constitute an association-in-fact and an

"enterprise" within the meaning of the RICO statutes.

13.     Plaintiffs also assert that the same alleged conduct violates the New York Consumer

Protection From Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349 *et seq.*, and the

consumer protection statutes of other states.

14.     Plaintiffs seek general and special compensatory money damages, statutory damages,

6

punitive damages, attorneys' fees and costs, and entry of a permanent injunction prohibiting defendants from engaging in the alleged misconduct.

**Defendants Deny Plaintiffs' Allegations**

15.    Defendants strongly deny engaging in any deceptive conduct or wrongful acts. Defendants' Answer denies the material allegations of the Second Amended Complaint and asserts numerous affirmative defenses (Doc. 12).

**Preliminary Approval of the Settlement and Conditional Class Certification**

16.    Following arm's length negotiations between Class Counsel and PCH, the parties entered into a Class Action Stipulation of Settlement ("Stipulation"), which was filed under seal with the Court on June 23, 1999 (Doc. 9). The Stipulation is a compromise of disputed claims, not an admission of liability by PCH. Pursuant to the Stipulation, Subclass Members, again defined as members of the Settlement Class who purchased magazines and/or merchandise from PCH during the Class Period, who do not request exclusion from the Class are provided the opportunity to obtain a refund of any purchases they made from Defendants during the Class Period by following certain claims procedures. The entire Settlement Class, again defined as all persons who received solicitations from PCH during the Class Period, whether or not they made purchases, will receive the benefit of a number of Remedial Undertakings, as described below in paragraph.

17.    In its June 30, 1999, Conditional Class Certification Order (Doc. 22), this Court conditionally certified a class for settlement purposes pursuant to Federal Rule of Civil Procedure 23 and appointed Class Representatives and Class Counsel. Also on that date, the Court filed a Memorandum and Order, in which the Court, among other things, granted preliminary approval of

7

the Stipulation and entered a preliminary antisuit injunction (Doc. 23).[5]

**Terms of the Settlement**

18.     The terms of the Stipulation have evolved.  The current terms are set forth in the

Second Amended Stipulation of Settlement dated January 14, 2000 (Doc. 176).  Most significantly,

Defendants have agreed to uncap what was initially a $10 million capped fund.  The total value of the

Settlement now exceeds $30 million.

19.     On November 9, 1999, Defendants filed their Notification of Pro Rata Rate,

representing a commitment to fund the Settlement at 100 percent of all allowed claims, regardless of

the total amount of the claims.  (Doc. 120).  Participating Class Members are thus eligible to receive

a full refund of purchases over a seven and one-half year period, a result the Court believes is

unprecedented in this type of litigation.  The payout to claimants is expected to total $18-21 million.

Claims will not be reduced by the costs of notice and administration nor by an attorneys' fee award

to Class Counsel.  Refunds of fully processed and accepted claims will be sent to claimants within 30

days after the "Effective Date" of the Settlement.  The "Effective Date" of the Settlement is the day

following the date on which this Order is no longer subject to an appeal.  There is currently an appeal

docketed in the Seventh Circuit Court of Appeals that may affect the timing of the payment of

refunds.

20.     The Stipulation also provides for Remedial Undertakings (as more fully set forth in

the Stipulation (Doc. 176)), which PCH has agreed to perform for a period of five years following

---

[5]     After making minor amendments to the Stipulation, the parties filed a First Amended
Class Action Stipulation of Settlement ("First Amended Stipulation") on July 29, 1999, again under
seal (Doc. 26).  The First Amended Stipulation was preliminarily approved on August 3, 1999 (Doc.
32).  The original Stipulation, the First Amended Stipulation, and the Second Amended Stipulation
(Doc. 176) are referred to herein as the "Stipulation."

the Effective Date of the Settlement and which will become mandatory and subject to enforcement in this Court. First, PCH will provide an "Ironclad Guarantee" in the Official Rules included in solicitation materials containing Sweepstakes entry materials mailed to residents of any state of the United States. The Ironclad Guarantee will include statements beyond those required by law further advising consumers that no purchase is necessary to enter a PCH Sweepstakes. It will also provide additional information, including an estimate of the average entrant's odds of winning each prize, PCH's cancellation and refund policies, and ways to obtain additional Sweepstakes entry opportunities. PCH will also revise its business practices and procedures to provide, among other things, additional assurances that consumers fully understand the character of its promotions and, in particular, that ordering is not necessary to win a PCH Sweepstakes. Further, PCH will furnish consumer assistance and education services designed to protect the public from persons or entities who commit sweepstakes fraud and to assist persons whose family members or friends may be responding inappropriately to sweepstakes promotions. Many measures that PCH already voluntarily undertakes will become mandatory under the Settlement and enforceable by this Court.

21.     In addition, as "benefit of the bargain" relief, the Stipulation provides for PCH to give members of the Subclass automatic entries into future Sweepstakes. Pursuant to the Stipulation, within two years following the Effective Date, PCH will give Subclass Members at least three automatic entries into selected, nationally promoted cash Sweepstakes offered by PCH in the ordinary course of its business until the sum of the prizes awarded in such Sweepstakes equals or exceeds $30 million.

### Notice and Administration of the Settlement

22.     The administration of the proposed settlement, which included the largest individual

notice campaign in class action history, has been a monumental task. On August 3, 1999, the Court entered its Order Approving Notice Plan (Doc. 32), in which the Court approved the form and content of a Notice of Class Action, Proposed Settlement and Final Fairness Hearing ("Notice") and a notice plan including both individual and publication notice. Between August 3, 1999, and the date of the Final Fairness Hearing, which was held on January 25, 2000, Class Counsel and Defendants' Counsel engaged in thousands of hours of extensive, costly, and time-consuming work to administer the notice plan and the claims process. The work included preparing and mailing approximately 42.5 million individual Notices, processing thousands of claims, and undertaking numerous initiatives to answer Class Members' questions concerning the proposed settlement and the claims process to help Class Members prepare claims and/or cure incomplete claims and to process other responses to the Notice. In addition, this Court has entered numerous Orders to address a multitude of issues that have arisen during the course of the litigation.

23.     Defendants agreed to administer the Notice and to advance its cost. The Court's August 3, 1999, Order Approving Notice Plan (Doc. 32) ordered PCH to provide individual notice of the pendency and proposed settlement of the class action to all persons who could be identified as members of the Subclass. In addition, the Court ordered PCH to notify members of the Settlement Class and Subclass of their rights and of the terms of the proposed settlement by publication notice to be published in *The Wall Street Journal* and *USA Today*. The Notice was also to be posted on PCH's website.

24.     Between August 14, 1999, and August 23, 1999, PCH mailed almost 42.5 million individual Notices to persons identified as Subclass Members. The Notice effort began with the creation by PCH of a datatape of 42,456,723 names and addresses of persons identified as members

10

of the Subclass and the assignment of a unique Control Number to each.[6] Under PCH's supervision, outside vendors printed, addressed, and mailed the Notices. (Affidavit of Steven J. Kelly, dated January 15, 2000, Doc. 183 ("Kelly Aff.") at ¶¶ 4-24 and Ex. A).

25.    On three consecutive Fridays (August 20, August 27, and September 3, 1999), a summary Notice was published in *The Wall Street Journal* and *USA Today*. *The Wall Street Journal* has an average Friday circulation of approximately 2 million, and *USA Today's* average Friday circulation is approximately 2.5 million. (Kelly Aff. ¶¶ 43-47 and Exs. D-E). Beginning August 20, 1999, PCH also posted the summary Notice on its website. The class action portion of PCH's website was frequently updated thereafter with important information, documents, and deadlines. (Kelly Aff. ¶¶ 48-52 and Ex. G). The parties estimate that the total cost of the notice campaign, including the supplemental notice efforts described below, was approximately $8 million (Kelly Aff. ¶¶ 12, 24, 27, 35, 38, 42, 47, 52, 56, and 64; Leichtman Aff. ¶ 37; Katz Aff. ¶ 36).

26.    Shortly after the original Notice was mailed, the parties approached the Court with a comprehensive plan for administering responses to the Notice, including claims, requests for exclusion (opt-outs), and other correspondence. As a result, the Court entered its September 9, 1999, Order Regarding Administration of Claims and Other Class Communications ("First Administrative Order") (Doc. 38). The First Administrative Order was followed by several subsequent administrative orders, specifically, Second Order Regarding Administration of Claims and Other Class Communications, dated October 6, 1999 ("Second Administrative Order") (Doc. 90); Third Order Regarding Administration of Claims and Other Class Communications, dated October

---

[6]    Due to the way in which PCH's records are maintained, the actual number of Subclass Members is estimated to be somewhat fewer than this number. (Kelly Aff. ¶¶ 7, 11, 71, and 72).

15, 1999 ("Third Administrative Order") (Doc. 98); Fourth Order Regarding Administration of Claims and Other Class Communications, dated November 1, 1999 ("Fourth Administrative Order") (Doc. 109); Fifth Order Regarding Administration of Claims and Other Class Communications, dated November 23, 1999 ("Fifth Administrative Order") (Doc. 130); and Sixth Administrative Order Regarding Class Communications, dated February 17, 2000 ("Sixth Administrative Order") (Doc. 224) (collectively, "the Administrative Orders").

27.    Pursuant to and in compliance with the Administrative Orders, the parties undertook extraordinary efforts to administer all of the responses to the Notice and to provide supplemental notice and other assistance to members of the Settlement Class.

28.    By agreement of the parties and pursuant to the Administrative Orders, several supplemental notice efforts were undertaken. An informational mailing from Class Counsel in a "question and answer" format ("Q & A letter"), accompanied by a claim form, was mailed to approximately 32,500 class members. (Katz Aff. ¶ 36). The Q & A letter and claim form were also posted on PCH's website. (Kelly Aff. ¶ 49). A Supplemental Notice, consisting of a letter, a claim form, and a copy of the original Notice, was mailed to approximately 177,500 members of the Subclass whom Defendants could identify as having spent $1,000 or more in any calendar year during the Class Period. (Kelly Aff. ¶ 25-35 and Ex. B). In addition, PCH mailed a Spanish language translation of the original English language Notice to 5,088 Subclass Members who had received PCH mailings in Spanish in the past. (Kelly Aff. ¶¶ 36-42 and Ex. C). Additionally, in response to Defendants' Notification of Pro Rata Rate, Defendants sent via first class mail a Notice of Right to Revoke Prior Request for Exclusion from the Proposed Class Action Settlement (the "Notice of Right to Revoke"). The Notice of Right to Revoke, accompanied by a claim form, was sent to all persons

12

identified by the parties or the Court to have timely excluded themselves from the action to inform them that, in light of Defendants announcement that accepted claims would receive a 100 percent refund, the Claims Made Period would be reopened solely for the limited purpose of allowing persons who previously excluded themselves to revoke their prior requests for exclusion and to make claims against the settlement fund.[7]  (Kelly Aff. ¶¶ 57-64).

29.    A toll-free "hotline," funded by PCH but operated under Class Counsel's direction and control, was established to field calls about the proposed settlement and to help callers make claims. Class Counsel trained the hotline operators and the Court approved the hotline operators' script. (Second Administrative Order, Doc. 90).  The hotline received approximately 15,500 calls regarding the proposed settlement.  (Leichtman Aff. ¶¶ 35-37).

30.    . The overall reaction of the Class to the Notice campaign is described at paragraphs 80-83 below.

**This Court Has Subject Matter Jurisdiction over Plaintiffs' Claims**

31.    The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs allege in paragraphs 13 and 40-45 of the Second Amended Complaint (Doc. 4) that Defendants engaged in a scheme to defraud that violates the federal racketeering statutes, 18 U.S.C. §§ 1962(c) and (d).

32.    The Court has supplemental jurisdiction over Plaintiffs' state law claims.  The state

---

[7]    Pursuant to the Sixth Administrative Order (Doc. 224), Defendants are sending an amended Notice of Right to Revoke to persons who have timely excluded themselves from the Settlement Class but that were erroneously omitted from the December 1999 mailing. For those persons, the Claims Made Period has been reopened until March 20, 2000, solely for the limited purpose of allowing those persons to revoke their prior requests for exclusion and to make claims against the settlement fund.

13

and federal claims are part of the same case or controversy under Article III of the United States Constitution because they "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). All of Plaintiffs' claims are premised upon an alleged common course of conduct by Defendants, all relate to the same alleged fraudulent scheme, and all are based on the same allegedly deceptive mailings sent by Defendants. Therefore, the state law claims are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Asserting jurisdiction over Class Members with state law claims in a class action containing exclusive federal claims presents circumstances "as powerful for the exercise of pendent party jurisdiction as can be imagined." *Weinberger v. Kendrick*, 698 F.2d 61, 76 (2d Cir. 1982), *cert. denied*, 464 U.S. 818 (1983).

### The Court has Personal Jurisdiction over All Plaintiffs, Present and Absent

33.    This Court has personal jurisdiction over all Class Members. A court may exercise personal jurisdiction over out-of-state members of a class, provided that members receive "minimal procedural due process protection." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985). Such protection consists of the "best practicable" notice, the opportunity to be heard, an opportunity to "opt out" of the monetary aspects of the class action, and adequate representation at all times.

34.    In this case, the Court has already found that the notice provided to Class Members "constitutes valid, due and sufficient notice . . . and . . . complies fully with the requirements" of Rule 23 and due process. (Doc. 32 at ¶ 3). Class Members received actual individual notice, not simply publication or group notice. This extraordinary individual notice campaign, when taken together with all the supplemental notice efforts and publicity, far exceeds the requirements of Rule 23(c)(2).

14

35.   The Notice, which was modeled on sample notices found in the *Manual For Complex Litigation* 3d and *Newberg on Class Actions*, is carefully structured to ensure that it is neutral, legally comprehensive, and clear to lay readers. The Notice provides detailed information on each of the key settlement features it was required to address, including: (1) the background of the lawsuit; (2) membership in the Settlement Class and Subclass; (3) the terms of the proposed settlement, including how to participate; (4) the right to be heard and to object; (5) the right to be excluded from the monetary portion of the settlement; and (6) other means of learning more information about the lawsuit and proposed settlement. (Kelly Aff., Ex. A).

36.   The Notice is written to facilitate reader comprehension of a complex legal document. At the beginning of the Notice is an introductory box which provides the reader with a clear index of key topics of interest, along with their location by section number in the document. The introductory box directs the reader to such key information as: "To learn whether you are a member of the Settlement Class, see Section I," and "To learn where to obtain more information concerning the settlement, see Section V." (Kelly Aff., Ex. A).

37.   Cognizant that the average reader may be discouraged from reading a lengthy document, the Notice does not burden the reader with unnecessary information. Instead, it clearly directs the reader who may want or require additional information about the lawsuit or the proposed settlement to other sources of information. For example, the name and address of Class Counsel is clearly set out in the Notice, and in Section V, the reader is specifically instructed to contact Class Counsel with any questions. The Notice also advises how additional information can be obtained from PCH's website and how those wishing to inspect full copies of the Stipulation, Release, and other documents relating to the lawsuit may do so.

15

38.    The notice provided to Class Members in this case clearly provided the procedural due process protection required under *Shutts*. Additionally, Class Members had the right to file to file any objections to the proposed settlement with the Court, and any objectors were given an opportunity to be heard during the January 25, 2000, Final Fairness Hearing. Because members of the Settlement Class were afforded due process protection, all Class Members who did not timely opt out of the Settlement Class are subject to this Court's personal jurisdiction. The Court's analysis of the adequacy of representation is described below at paragraphs 48-51.

**The Class Should be Certified for Settlement Purposes**

39.    Because Plaintiffs seek both equitable relief and damages, the Court will certify a "hybrid" Settlement Class, that is, a Settlement Class that is mandatory under Rules 23(b)(1) and 23(b)(2) with respect to the equitable relief and that is an opt-out class under Rule 23(b)(3) with respect to claims for damages. The Seventh Circuit Court of Appeals has held that certification of hybrid classes is proper under these circumstances. *See, e.g., Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898-99 (7th Cir. 1999); *Williams v. Burlington Northern, Inc.*, 832 F.2d 100, 103 (7th Cir. 1987), *cert. denied*, 485 U.S. 991 (1988).

40.    Generally, to maintain a class action under Rule 23, plaintiffs must satisfy all of the prerequisites of Rule 23(a) and at least one of the requirements of Rule 23(b). However, when a class is certified for purposes of a settlement, the Court need not consider the issue of whether the action meets the manageability requirement of Rule 23(b)(3)(D). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997). In determining whether to certify a class, the supporting allegations are taken as true and the Court should not delve into the merits of the case. *Eisen v. Carlisle and Jacqueline*, 417 U.S. 156, 177-78 (1974).

41.     In *Amchem*, the Supreme Court reinforced the propriety of Rule 23 certification for relatively small dollar consumer cases such as this one. The Court noted that the Rule 23 Advisory Committee "had dominantly in mind the vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." 521 U.S. at 617. The Court went on to quote, with approval, the following language from the Seventh Circuit opinion *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997):

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry recoveries into something worth someone's (usually an attorney's) labor.

*Amchem*, 521 U.S. at 619.   Under *Amchem*, consumer cases such as this one are particularly appropriate for Rule 23(b)(3) certification, in contrast to the "mass accident" cases rejected for certification in *Amchem*.

42.     This action provides perhaps the quintessential set of facts making nationwide class certification appropriate. The case involves tens of millions of Class Members with relatively small dollar claims, all arising out of Defendants' nationwide marketing practices. *See In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998) (Prudential's alleged "widespread sales abuse" on a nationwide scale provided a sufficient basis for certification of a nationwide settlement class), *cert. denied*, 119 S. Ct. 890 (1999). Further, individual litigation of the issues involved in this action would be a gross misuse of judicial resources. Adjudication of this controversy through the class action mechanism ensures that the claims of all Class Members are resolved efficiently, uniformly, and at a manageable cost to the parties, in fact, at virtually no cost to the Class Members in this case.

**Rule 23(a) Requirements - Numerosity, Commonality, Typicality, and Adequacy**

43. Rule 23(a) provides that one or more members of a class may sue or be sued as representative parties on behalf of all if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. The Court finds that the prerequisites to class certification imposed by Rule 23(a), often referred to as numerosity, commonality, typicality, and adequacy of representation, are met in this action.

### Numerosity

44. The proposed class must be comprised of members that are so numerous that "joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The Settlement Class consists of tens of millions of PCH customers from February 3, 1992 to June 30, 1999. The impracticability of joining so many Plaintiffs is obvious.

### Commonality

45. Rule 23(a)(2) requires that there be questions of law or fact common to the class. For a class certified under Rule 23(b)(3), the Court must find that these common questions "predominate." Where the requirements of Rule 23(b)(3) are met, the lesser standard of Rule 23(a)(2) is met as well. *Amchem*, 532 U.S. at 609.

46. It is undisputed that Class Members were subject to the same conduct, specifically, they received Defendants' mailings, although the number of mailings each received varied. Likewise, members of the Subclass share the same alleged damages, specifically, purchases made on the basis of Defendants' alleged fraudulent marketing practices, although the amount varies among Subclass

18

Members. "[C]ourts have readily found a common nucleus of operative facts when the defendants are alleged to have directed standardized conduct toward the putative class members." *Garner v. Healy*, 184 F.R.D. 598, 601 (N.D. Ill. 1999). Defendants' marketing techniques and mailings form the common nucleus of operative facts for every cause of action in the Second Amended Complaint, and, therefore, common questions predominate.

### Typicality

47.     Rule 23(a)(3) requires that the Named Plaintiffs' claims or defenses be typical of those of the Class at large. The question of typicality is closely related to the question of commonality. *Rosario v. Livaditas*, 963 F.2d 1013, 1018 (7th Cir. 1992), *cert. denied*, 506 U.S. 1051 (1993). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). Under this test, the Named Plaintiffs' claims (as discussed below in paragraph 50) are typical of, and not antagonistic to, the claims of the remainder of the Settlement Class.

### Adequacy of Representation

48.     Rule 23(a)(4) requires that interests of absent class members be fairly and adequately protected. Adequate representation has two components: (1) adequacy of the named plaintiffs and (2) adequacy of the named plaintiff's attorney. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993).

49.     The first component of the adequacy inquiry serves to uncover conflicts of interest between the named parties and the class they seek to represent. *Amchem*, 521 U.S. at 625. Representatives must be part of the class and possess the same interest and suffer the same injury as

19

the class members. *Id.* Here, the Named Plaintiffs as a group comprise a representative cross-section of the Class. They range in age from Thomas Vollmer, who is in his thirties, to Peggy Pospeshil and Barbara Buchanan, who are both over sixty-five. Their levels of customer activity range in frequency, such that Duane Kundert has a claim for $75; Mary Kennah and Peggy Pospeshil have claims worth $1,180 and $825, respectively; and Barbara Buchanan has a claim worth over $2,000. (Katz Aff. ¶31). They are residents of various states around the country, including states whose consumer fraud laws allow for heightened damage awards and special awards where the elderly are involved. None has a conflict of interest with the Class and all share the same incentives as absent Class Members to maximize overall recovery. The Court finds that the Named Plaintiffs are adequate representatives of the Class.

50.    The second component of the adequacy requirement requires an assessment of the adequacy of representation of the Class by Class Counsel. The representative attorney must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously. *Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D., 302, 309 (N.D. Ill. 1995).

51.    Class Counsel are experienced and competent to handle complex class action litigation. (Katz Aff. ¶¶ 23-24). They have thoroughly investigated the claims and conducted vigorous negotiations on behalf of the Class. Class Counsel's investigation of the sweepstakes industry began in 1997. The investigation included interviewing hundreds of PCH customers and reviewing PCH mailings, meeting with members of the Florida Attorney General's office concerning its investigation of AFP, reviewing files that the Florida Attorney General had accumulated, meeting with the Illinois Attorney General, and discussing the case with a national expert on marketing psychology and direct mail marketing. (Katz Aff. ¶¶ 2-7). Class Counsel ultimately determined to

20

bring suit against all of the major sweepstakes companies. Class Counsel's involvement in the AFP Litigation increased their sophistication and knowledge of the industry. (Katz Aff. ¶¶ 9, 12, 14 and 18). In addition, after entering into a Court-approved Protective Order, Class Counsel was given access to thousands of pages of documents containing internal and proprietary PCH information. PCH also produced numerous officers and employees to answer questions about its internal operations, customer purchasing histories, composition and conduct of mailings, computer and database issues, and customer contacts and complaints. (Katz Aff. ¶ 21; Leichtman Aff. ¶¶ 48-49). Consequently, Class Counsel was sufficiently informed about the facts and the law to enter into a fair and reasonable settlement in this case. Class Counsel's zealous representation of the interests of the Class Members is evidenced by the substantial recovery in this case, including 100 percent refunds for Subclass Members and far-reaching remedial relief for all Settlement Class Members. Accordingly, the Court finds that the requirements of Rule 23(a)(4) are satisfied.

### Rule 23(b)(1) - "Inconsistent Results and Incompatible Standards of Conduct"

52.     Rule 23(b)(1) authorizes certification of a class where the requirements of Rule 23(a) are met and "the prosecution of separate actions . . . would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would create incompatible standards of conduct." In this case, the requirements of Rule 23(b)(1) are met because adjudications in different courts of Defendants' obligations under the laws, including RICO and various state consumer fraud laws, would establish incompatible standards of conduct for Defendants.

### Rule 23(b)(2) - "Final Injunctive Relief for the Class as a Whole"

53.     Rule 23(b)(2) allows the maintenance of a class action where the requirements of Rule 23(a) are met and "the party opposing the class has acted or refused to act on grounds generally

applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." In this case, a major component of the relief requested in the Second Amended Complaint and incorporated into the Stipulation is injunctive. Because Plaintiffs seek an injunction to require Defendants to change business practices, certification under Rule 23(b)(2) is appropriate. *See Ingersoll Int'l*, 195 F.3d at 896. The relief sought by Plaintiffs requires, among other things, various disclosures by PCH that it allegedly failed to provide prior to the Settlement and various changes to the challenged business and marketing practices. These facts satisfy the requirements of Rule 23(b)(2).

### Rule 23(b)(3) - "Predominance" and "Superiority"

54.     Rule 23(b)(3) permits class certification in situations that do not fit within Rule 23(b)(1) or (2), but where a class action "may nevertheless be convenient and desirable." *Amchem*, 521 U.S. at 615. Rule 23(b)(3) requires that common questions predominate over individual questions, and that the class action procedure be superior to other means of adjudicating the controversy. The predominance requirement of Rule 23(b)(3) is met if there is a "common nucleus of operative facts" relative to the dispute. *Rosario*, 963 F.2d at 1018. When the common questions represent a significant aspect of the case which can be resolved for all members of the class in a single adjudication, they predominate. *Joseph v. General Motors*, 109 F.R.D. 635, 641 (D. Colo. 1986).

55.     Factors to consider in the Court's analysis of the predominance of the common questions and superiority of the class action procedure include: (1) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular

forum; and (4) the difficulties likely to be encountered in the management of a class action. *Mars Steel Corp. v. Continental Bank N.A.*, 834 F.2d 677, 682 (7th Cir. 1987). However, in the context of settlement, the issue of whether the action meets the manageability requirement of Rule 23(b)(3)(D) is irrelevant. *Amchem*, 521 U.S. at 619. In this case, considering these and other factors, the class action is not only the superior method for adjudicating this controversy, it affords the vast majority of Class Members their only practical avenue of redress.

Interest of Individual Class Members in Controlling the Action

56.    Class Members do not have a strong interest in controlling the prosecution of separate actions, and they have little incentive or ability to prosecute individually their claims against Defendants. The average claim thus far is approximately $775. (Leichtman Aff. ¶ 33 and Ex. F). This is the type of relatively low-dollar consumer case to which Rule 23(b)(3) was intended to apply. *Amchem*, 521 U.S. at 617-18; *see also* FED. R. CIV. P. 23 ADVISORY COMMITTEE NOTES; 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1779 at 557 (1986) (observing that "a group composed of consumers or small investors typically will be unable to pursue their claims on an individual basis because the cost of doing so exceeds any recovery they might secure").

Extent and Nature of Existing Litigation

57.    Prior to the filing and settlement of this case, no significant amount of litigation had been commenced against PCH. (Leichtman Aff. ¶¶ 50-56 and Exs. P-Q; Katz Aff. ¶ 13). As of the date of preliminary approval, there were only fourteen other private actions pending against PCH for the conduct complained of herein, only seven of which were putative class actions and four of which have now been effectively subsumed in this action. (Leichtman Aff. Ex. Q). None of the other class

23

actions has been certified, and no other private case has proceeded even to the discovery stage. The existence of so few other private actions demonstrates the lack of interest that individual members of the Class have in controlling the action and presents no impediment to certification of this nationwide class action.

### Desirability of Concentrating the Claims in this Forum

58.     Concentrating nationwide claims against Defendants in a class action in this federal forum is desirable for several reasons. It will ensure that all claims against Defendants are resolved uniformly in one proceeding, thereby eliminating the risks of inconsistent judgments and the burdens of judicial inefficiency presented by the prosecution of a multitude of lawsuits in scattered forums around the country. Furthermore, where, as here, the claims of class members are relatively modest, consolidation of those claims in a single forum furthers the goals that Rule 23 and the class action mechanism were intended to accomplish. (*See* paragraphs 42-43, above). Nothing would be gained, and significant judicial resources would be wasted, in multiple litigations adjudicating identical issues.

### Evaluation of the Fairness of the Settlement

59.     On a motion for final approval of a class action settlement agreement, the court must make a rigorous determination of whether the settlement is fair, reasonable, and adequate for the members of the class. *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982); *Williams v. General Elec. Capital Auto Lease*, No. 94 C7 410, 1995 WL 765266, at *1 (N.D. Ill. Dec. 26, 1995). In the Seventh Circuit, factors relevant to this determination are: (1) the strength of the case for plaintiffs on the merits, balanced against the extent of the settlement offer; (2) the complexity, length, and expense of further litigation; (3) the substance and extent of opposition to the settlement by the class members; (4) the reaction of class members to the settlement; (5) the opinion of competent counsel;

24

and (6) the progress of the proceedings. *Mars Steel*, 834 F.2d at 683-84; *Gautreaux* , 690 F.2d at 631; *see also Armstrong v. Board of Sch. Dirs.*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds, Felzen v. Andreas*, 134 F.2d 873 (7th Cir. 1998).                                    6 0 .

        In considering approval of a class action certified for settlement purposes only, the Court is mindful of its role as a fiduciary to the Settlement Class. *See, e.g., Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 846 (1975). The Court also gives considerable weight to the overriding public interest in settling litigation. *See, e.g., Weinberger*, 698 F.2d at 73. In class actions, "a fair settlement need not satisfy every concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits. [T]he essence of settlement is compromise . . . a solution somewhere between the two extremes." *Alliance to End Repression v. City of Chicago*, 91 F.R.D. 182, 195 (N.D. Ill. 1981); *see also Handschu v. Special Servs. Div.*, 605 F. Supp. 1384, 1394 (S.D.N.Y. 1985), *aff'd*, 787 F.2d 828 (2d Cir. 1986).

### The Strength of the Case on the Merits Balanced Against Potential Damages

61.     In *Mars Steel*, the Seventh Circuit Court of Appeals set out a rough method for calculating whether a class action settlement is substantively fair, finding that "[a] settlement is fair to the plaintiffs in a substantive sense . . . if it gives them the expected value of their claim if it went to trial, net of the costs of trial." 834 F.2d at 682. This rough calculus is then measured against the probability of success and, assuming "risk neutrality," an examination of whether the class would be better off settling for the amount in the proposed settlement or taking its chances at trial. *Id.*

62.     Applying this method, the Court finds that the proposed settlement is fair. The settlement, a total package valued at more than $30 million, will provide all eligible claimants with a 100 percent recovery – the expected value of their claims, with no deduction for the costs of trial.

To date, there are approximately $18 million in claims, and it is projected that the total amount of claims alone could reach as high as $21 million. (Leichtman Aff., Ex. F). It is difficult to imagine a better settlement in a case with an uncertain potential for recovery. In monetary terms alone, the Class would be in no better position by taking its chances at trial, and, by doing so, it could be in a significantly worse position.

63.    For numerous reasons, there is a substantial possibility that if this case were litigated to a final judgment, the Class would recover nothing or substantially less than the full monetary recovery available to them in this settlement. First, there is PCH's history of litigation success. (Leichtman Aff. ¶ 50 and Exs. P1-P9). No court has ever held in a case litigated on the merits that PCH misled customers in violation of any federal or state law. Numerous judicial decisions have rejected, as a matter of law, claims that the bulletins were misleading or deceptive. *See, e.g., Haskell v. Time, Inc.*, 857 F. Supp. 1392 (E.D. Cal. 1994) (granting PCH's motion to dismiss in part); *Haskell v. Time, Inc.*, 965 F. Supp. 1398 (E.D. Cal. 1997) (granting PCH's motion for summary judgment); *see also Fozard v. Publishers Clearing House*, No. 1:98CV00149 (M.D.N.C. Apr. 29, 1999) (granting motion to dismiss), *aff'd mem.*, No. 99-1740 (4th Cir. Feb. 8, 2000); *Mains v. Publishers Clearing House*, Civ. No. 98-158 (E.D. Ky. March 8, 1999) (granting motion to dismiss); *Rich v. Publishers Clearing House*, No. 4:98 CV 178-C (W.D.N.C. Nov. 18, 1998) (granting motion to dismiss); *Kiss v. Publishers Clearing House*, No. Civ. 97-542-AA, 1998 WL 476448 (D. Or. June 1, 1998) (granting motion for summary judgment); *Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997) (upholding grant of summary judgment); *Dandar v. Publishers Clearing House*, No. 95-0128 (W.D. Pa. Dec. 28, 1995) (granting motion to dismiss), *aff'd mem.*, No. 96-3024 (3d Cir. July 31, 1996); *McGaha v. Publishers Clearing House*, No. C.A. 99-CP-39-127

26

(S.C. Ct. Common Pleas July 7, 1999) (granting motion to dismiss); *cf. LeWary v. Publishers Clearing House*, No. 98-C-65 (E.D. Wis. Feb. 8, 2000) (dismissed for failure to prosecute).

64.    Through their investigation, as well as through communications they have received from Class Members since the announcement of the settlement, Class Counsel believes that there is ample factual support for their allegations and that they would have a substantial likelihood of succeeding on the merits if this case were litigated. However, Class Counsel acknowledge that they faced an uphill battle. To prevail against Defendants, which is something that no one else has accomplished, would take years of costly and hard-fought litigation.

65.    In addition to PCH's record of success in litigation, the Court takes note of a 1994 Assurance of Voluntary Compliance ("AVC"), which PCH entered into with 14 State Attorneys General in 1994 to resolve claims very similar to those in the Second Amended Complaint in this case. (Holland Aff. ¶¶ 71-78). The Court finds persuasive the fact that prior to the filing of the *Vollmer* action, no State Attorney General had instituted litigation against PCH or argued that PCH's mailings failed to comply with the AVC. *Id.*

66.    Class Counsel concede that their investigation did not show that PCH intentionally directs its mailings to senior citizens or any particular age group. *See* The Class's Memorandum In Support of Its Motion for Final Approval of Class Action Settlement (Doc. 190 at p.13); *see also Lee v. Time, Inc.*, Case No. C-98-21275-JF, slip op. at 4-5 (N.D. Cal. June 8, 1999); *Mains v. Publishers Clearing House*, No. 98-158, slip op. at 6 (E.D. Ky. Mar. 8, 1999). PCH has presented evidence showing that it selects persons to receive mailings from its records on the basis of transactional characteristics, known as the "Recency-Frequency-Monetary Value" ("RFM") analysis traditionally used by the direct marketing industry as a whole for this purpose, as well as product line associations

27

or "affinity." (Holland Aff. ¶¶ 33-39). The Court finds nothing in the record supporting allegations that PCH "targets the elderly." (*See also* Holland Aff. ¶¶ 54-70).

67.     PCH is firmly convinced that it would succeed on the merits, but it recognizes that some people were confused as to the nature of its Sweepstakes and has chosen to compromise these disputed claims.

68.     The Court need not decide whether Plaintiffs or Defendants would prevail on the merits at this particular juncture. It is the very uncertainty of the outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The Court's function is not to reach any ultimate conclusion on contested issues of fact and law underlying the merits of the dispute. *Isby v. Bayh*, 75 F.3d 1191, 1197 (7th Cir. 1996). Rather, the Court's role is primarily to determine whether the settlement is substantively fair, reasonable, and adequate for the members of the class.

69.     As previously stated, the monetary value of the claims, which may reach as high as $21 million when all claims have been processed, is more than fair and adequate, particularly when balanced against the costs and risks of trial. In addition to the value of direct refunds to claimants, the total value of the settlement includes several million dollars worth of additional quantifiable benefits. Since the provision of notice to class members is the obligation of plaintiffs, and not of defendants, *Eisen*, 417 U.S. at 178, the fact that PCH has paid for the class notice is an enormous Class-wide benefit worth approximately $8 million. (Kelly Aff. ¶¶ 12, 24, 27, 35, 38, 42, 47, 52, 56, and 64; Leichtman Aff. ¶ 37). The administrative cost of implementing the settlement and the claims procedures, an estimated $1 million (Kelly Aff. ¶¶ 73, 86, 93, 99, 102, 105, 107, and 108; Leichtman Aff. ¶¶ 14 and 42), is also properly considered a benefit to the Class. *See In re McDonnell Douglas*

*Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 734 (S.D.N.Y. 1993); *see also Ohio Pub. Interest Campaign v. Fisher Foods, Inc.*, 546 F. Supp. 1, 11-12 (N.D. Ohio 1982).

70.     While the Court will more thoroughly consider Class Counsel's application for fees and expenses (*see* below at paragraphs 121-23), the $3 million maximum amount that may be requested under the Stipulation is also a benefit to the class.   If the case were litigated, Class Members would have to pay their own attorneys' fees and litigation expenses.  Even if liability were found and statutory fees, if available, were awarded, PCH would not have to pay such costs until after judgment, and the members of the Class would have to "front" the costs of the litigation. Accordingly, PCH's agreement not to contest the amount of fees and expenses up to a limit of $3 million is a significant benefit to the Class.

71.     The Automatic Sweepstakes Entries relief, also known as the "benefit of the bargain" relief (Katz Aff. ¶¶ 16 and 29), while difficult to quantify, also confers a benefit on the Settlement Class.  The relief provides a specific remedy for a specific claim that is central to this litigation, namely, that people bought items from PCH because they thought that purchasing the items would give them a better chance to win the Sweepstakes.  By giving each member of the Subclass additional entries over and above any entries he or she may already have in future Sweepstakes, members of the Subclass are getting what they thought they were getting by making purchases.

72.     The quantifiable monetary benefits of this Settlement alone, totaling approximately $30 million to date, are enormous, even without considering the value of the injunctive relief and the Automatic Sweepstakes Entries.

### The Complexity, Length, and Expense of Further Litigation

73.     In making the determination of whether to grant final approval of a proposed class

29

action settlement, the complexity, length, and expense of further litigation are also factored into the balancing test.   Here, Plaintiffs would bear tremendous costs if they were to proceed to trial. Defendants agreed to the certification of a class for settlement purposes, but they would have opposed class certification in litigation.  Obviously, contesting class certification would add expense and risk to Plaintiffs' case.  The Court expresses no opinion as to whether it would certify a class for litigation purposes, but assuming, *arguendo*, that it would, Plaintiffs would then bear the costs of notice to the Class.

74.     Assuming a class action were certified for litigation purposes, Plaintiffs would incur enormous expenses to litigate the case to a resolution.  Further pretrial discovery and motion practice, trial, post-trial motions and appeals would be expensive, time consuming, and burdensome.  Even if (1) such costs were desirable, (2) the case were not dismissed as a matter of law, and (3) a fact-finder found one or more of Defendants' mailings to be misleading, Class Counsel would still have the burden of proving causation and damages with respect to each of the tens of millions of Subclass Members. Separate trials or hearings on causation and damages, which would be necessary if the Plaintiffs prevailed on liability, make little sense when the proposed settlement provides all members of the Subclass with the ability to make a claim by simply stating that they were confused or misled and by stating which items they purchased but did not want or need.  Class Counsel acknowledge that litigating and managing a class of tens of millions of individuals would be complex, time consuming, and might cost more money than the millions of dollars that have been devoted to the parties' settlement efforts.

75.     Even assuming a total victory for the Class, litigating this matter would introduce substantial delay in the disbursement of refund checks to Class Members.  The Court notes, for

example, that in the *Haskell* case, nearly three years passed between the time the partial motion to dismiss the claims against PCH was granted and the subsequent grant of summary judgment. This factor alone weighs heavily in favor of approval of the proposed settlement.

76.     The Court is mindful of the anecdotal evidence indicating that many Class Members are elderly, which is even more reason to resolve this litigation without delay. *In re Armored Car Antitrust Litig.*, 472 F. Supp. 1357, 1369 (N.D. Ga. 1979) (where full scale litigation might outlive many of the persons involved, its costs might consume any final recovery, and individual or statewide actions would burden the judiciary and the parties, settlement was favored).

### The Opinion of Competent Counsel

77.     Courts recognize that the opinion of experienced and informed counsel supporting a class action settlement is entitled to considerable weight. *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("the fact that experienced counsel involved in the same case approved the settlement after hard-fought negotiations is entitled to considerable weight"), *aff'd*, 661 F.2d 939 (9th Cir. 1981). Class Counsel, who adequately represent the Class, have expressed the opinion that the settlement is fair and recommend approval. (Katz. Aff. ¶¶ 25-31 and 46).

78.     The Court weighs Class Counsel's opinion in favor of approval. The particular lawyers from the Carr, Korein firm involved in this litigation have developed a specialty in handling class actions, especially large scale consumer fraud cases. (Katz Aff. ¶¶ 23-24). They have developed expertise in litigating cases against companies that use sweepstakes in direct mail marketing campaigns and have been chosen as co-lead class counsel in a Multi-District Litigation proceeding against AFP where over 50 cases have been filed. (Katz Aff. ¶¶ 9, 12, 14, and 18). Accordingly, the Court finds persuasive Class Counsel's recommendation that the settlement be

31

approved.

### The Progress of the Proceeding

79.     The progress of the proceeding also favors approval. This case had proceeded much further than any other involving PCH at the time of the Court's preliminary approval orders. (Docs. 23, 32). In particular, no private case against PCH had advanced beyond the preliminary motion stage, no discovery had been taken, and, where motions were filed, PCH often prevailed. (Leichtman Aff. ¶¶ 50-56 and Exs. P-Q). The *Vollmer* action was filed over 16 months before the settlement was reached and, given the fact that the proposed settlement achieves a result that no litigation against PCH has ever approached, the Court finds the Settlement to be a fair, reasonable, and adequate compromise of the claims of the members of the Class.

### Class Members' Reaction to the Settlement

80.     The Court also considers the overall reaction of the members of the Class and the substance and extent of opposition as favoring approval of the Settlement in this case. As discussed above, the allowed claims of over 20,000 members of the Subclass (as of the date of the Final Fairness Hearing) will result in a direct monetary benefit expected to reach as high as $21 million. (Leichtman Aff. ¶ 33 and Ex. F). (For a discussion of claims that had not been allowed as of the date of the Final Fairness Hearing, see below at paragraph 102). Class Counsel report that the overwhelming responses of individuals with whom Class Counsel have communicated have been in favor of the proposed settlement. (Katz Aff. ¶¶ 40-45).

81.     Although nearly 49,000 Class Members timely opted out of the Settlement Class, some 40 percent of those who gave a reason for doing so explained that they had no claim against PCH or were otherwise opposed to being included. (Leichtman Aff. ¶ 41 and Ex. H; Katz Aff. ¶ 42). Only

a very small percentage stated that they intended to pursue litigation on their own. Accordingly, despite the vociferousness of some of the objections, which are more thoroughly addressed below at paragraphs 84 through 115, from a global perspective, the response to the Notice indicates that, at least among the Class Members, the litigation has not generated significant interest. This is essentially what Class Counsel projected after their pre- and post-filing investigation, based on their interviews with hundreds of their clients and their discovery of PCH. (Katz Aff. ¶¶ 40-41).

82.    A very small number of Class Members have filed objections or responded negatively to the settlement: less than .01 percent of the Settlement Class. (Leichtman Aff. ¶ 44; Report By Plaintiffs' to District Court Concerning Correspondence Deemed To Be Objecting To Terms Of The Settlement (Doc. 169). Even the small number of objections received are not wholly attributable to dissatisfaction with the terms of the settlement. Indeed, of the 310 letters and pleadings received by the Court as of the date of the Final Fairness Hearing, the two largest categories of objections relate either to the objector's perception that the *Vollmer* action is meritless (79) or that the maximum amount of attorneys' fees that may be requested is too high (122). (Leichtman Aff. ¶ 44). Only 61 objectors alleged that the monetary relief is insufficient. Objections to the amount of the fee request and the amount of the fund available to the Class have been addressed by the Second Amended Stipulation, specifically, attorneys' fees will not be subtracted from the Class's recovery.

83.    The remaining objections are quite small in number. Only forty-three Class Members were less than enthusiastic about the Remedial Undertakings. Thirty-one persons objected but stated no reason, and an equal number claimed that the claims procedure was too burdensome. Only eighteen disapproved of the Automatic Sweepstakes Entries and fifteen complained that the Notice was insufficient. Another eleven voiced miscellaneous other objections. Some of these objectors (for

33

example, the AARP objectors) have modified their stance, such that they now want the Court to approve the Stipulation but also ask the Court to order additional provisions by judicial fiat. As discussed next, this the Court cannot and will not do.

### The Merits of the Objections to the Proposed Settlement.

84.     Millions of Class Members received individual Notices mailed to their homes. Millions more learned of the proposed settlement through the many supplemental notice efforts, through publication notice, and through media coverage. Yet only a small fraction of the Class objected to the settlement. The percentage of Class Members opposing the settlement is much lower than the rates of opposition and exclusion in other class action settlements that have been approved by courts. *See, e.g., Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (the fact that "only" approximately 10 percent of class members objected "strongly favors settlement"); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (affirming district court's approval of class action settlement over opposition of 36 percent of class); *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982) (affirming district court's approval of class action settlement despite objection of class member who owned 50 percent of shares affected by settlement); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (approving settlement over objections of counsel purporting to represent nearly 50 percent of class). The low objection rate weighs in favor of approval of the proposed settlement.

85.     In reviewing the substance of the objections to the proposed settlement, this Court's role is not to determine whether the proposed settlement has achieved perfection. Something could be added to every class action settlement to make it more favorable to class members, but that is not the proper standard by which class action settlements should be measured. Rather, the task is to

34

determine whether the settlement provides adequate and reasonable relief to the Class. A proposed class action settlement is not to be judged against hypothetical or speculative measures of what might have been achieved. *See, e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981); *Cotton*, 559 F.2d at 1330 ("compromise is the essence of a settlement"); *Grunin*, 513 F.2d at 123-24.

86.     Rather, the Court's role is to approve or disapprove the settlement as negotiated by the parties, not to rewrite it to conform with the view of objectors as to what an ideal settlement would be. *Armstrong*, 616 F.2d at 315; *see also In re Warner Comm. Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986) ("it is not a district judge's job to dictate the terms of a class settlement; he should approve or [disapprove] a proposed agreement as it is placed before him and should not take it upon himself to modify its terms"); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 305 (N.D. Ga. 1993) ("The Court may only approve or disapprove the settlement as presented. . . . [it] may not rewrite the settlement as requested by numerous objectors"); *In re Xoma Corp. Sec. Litig.*, Civ. No. C-91-2252 (TEH), 1992 U.S. Dist. LEXIS 10502, at *10 (N.D. Cal. July 10, 1992) ("The Court must be concerned with ensuring fairness to the class as a whole, rather than with satisfying any particular plaintiffs' [sic] demands").[8]

---

[8]     For example, on November 12, 1999, twenty-one State Attorneys General submitted a document to the Court entitled "Objections and Comments of State Attorneys General to Proposed Class Action Settlement" (hereinafter, "Comments"). Although these states are not members of the Class, this Court received and considered the Comments and scheduled a special setting on December 20, 1999, at which State Attorneys General could address the Court concerning the proposed settlement. The special setting was attended by Assistant Attorneys General of Missouri, Iowa, Florida, Wisconsin, Arizona, Texas and Connecticut. Despite the fact that the Attorneys General had urged this Court to reject the proposed settlement in their written Comments, at the special setting they urged approval, but requested certain modifications that would require this Court to rewrite the terms of the settlement, which it may not do.

87.    Because the settlement of any class action involves a compromise of disputed claims, any effort to transform the Fairness Hearing into a trial on the merits is improper. A few objectors have attempted to do just that, raising issues concerning Defendants' mailings and/or business practices that they claim should affect this Court's analysis of the fairness of the proposed settlement. This Court need not discuss those issues in any detail, except to state that this Court shall not engage in a reevaluation of Defendants' potential liability because Class Counsel have already thoroughly evaluated the strength of the case against Defendants on the merits. *See Isby*, 75 F.3d at 1197 (rejecting objections which raise "essentially the same . . . issues raised by plaintiffs in their complaint" because "as a necessary consequence of settlement, the merits of these issues remain unresolved"); *see also In re Cuisinart Food Processor Antitrust Litig.*, M.D.L. 447, Civ. No. H81-196, 1983 WL 153, at *7 (D. Conn. Oct. 24, 1983) (rejecting objection that "assume[d] the truth of the allegations of the complaint" because "one of the advantages of . . . any settlement . . . is that plaintiffs need not prove their allegations").

### Objections Regarding the Alleged Targeting of the Elderly

88.    This Court will specifically address only one of the merits-related objections to the proposed settlement, which is the claim that PCH intentionally targets the elderly and that the elderly are therefore entitled to some type of additional relief. First, because every qualified claimant will receive a 100 percent refund, it is difficult to conceive what additional relief would be appropriate. Second, PCH established that it employs techniques common in the direct mail marketing industry to select persons to receive mailings whose purchasing history suggests that they might buy something offered in the mailing. (Holland Aff. ¶¶ 33-39). Third, numerous Class Members who identified themselves as senior citizens responded to the Notice by writing to say that they bought

36

merchandise and magazines from PCH because they wanted them and that they were insulted by insinuations of their incompetence. (*See, e.g.,* Leichtman Aff. Ex. I). Thus, allegations that PCH "targets the elderly" do not affect this Court's analysis of the fairness of the proposed settlement as to all Class Members. Accordingly, those objections are overruled.

### Objections Regarding the Monetary Relief

89.    Given the fact that the proposed settlement provides for all eligible claimants to receive checks for the full amount of their allowed claims, no matter how small or how large, this Court finds no basis for objections to the sufficiency of the monetary component of the proposed settlement. The gist of the remaining objections concerning the monetary value of the settlement is that the total value of Class Members' claims is small compared to PCH's revenues and that the proposed settlement measured against PCH's revenues is but a "token effort." This reasoning is wrong. The cost of this settlement to PCH is at least $30 million, which is by no means a token sum.

90.    Moreover, the total amount of Defendants' revenues during the Class Period is not an appropriate benchmark of potentially recoverable damages. Such a benchmark would assume that everyone who purchased anything from Defendants during the Class Period did so because they believed purchasing would increase their chances of winning the Sweepstakes or some other cash prize and that the purchaser neither used the items nor derived any benefit from them. This assumption is unreasonable. Class Counsel points out that the national average for magazine purchases is $40 per year and that only a fraction of Defendants' customer base purchased more than the national average in magazines during the Class Period. In addition, PCH also sells a wide variety of consumer products and household items at many different price points. (Holland Aff. ¶¶ 5-6 and Exs. A-B). The overwhelming majority of PCH customers make small purchases. (Holland Aff.

37

¶¶ 12-13). The more reasonable assumption is that only a fraction of PCH's customers made purchases for the "wrong" reasons.

91.    Courts have stated that the proper way to evaluate the adequacy of the monetary component of a settlement is to determine the range of possible damages that could be recovered at trial, and then, by evaluating the likelihood of prevailing at trial, determine whether the settlement is pegged at a fair range. *See, e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d at 213. Factors such as the statute of limitations, the possibility of no liability for portions of the class and "the ability of each class member to prove in Court the amount and nature of his purchases and the damage he sustained" must be taken into account. *Ohio Pub. Interest Campaign*, 546 F. Supp. at 10. As the court stated in *Ohio Pub. Interest Campaign*:

> The class recovery at trial might be *limited to a percentage of the purchases which all individual class members could prove.* Even ignoring the administrative problem that proof of each individual's damage would cause, it is obvious that a requirement of individual proof would further reduce the range of possible recovery for the class at trial.

*Id.* (emphasis added). Here, the Class Period of seven and one-half years is much longer than the majority of statutes of limitation under the laws of various states. Class Members who made claims were subjected to a standard of proof of liability and damages far less onerous than they would face should they have to prove their claims in litigation. The monetary relief in this settlement is better than adequate, and objections claiming otherwise are overruled.

92.    A small number of objectors claim that the settlement does not adequately "punish" PCH and that any settlement should provide for enhanced or punitive damages. Punitive damages are generally not appropriate to consider in determining the fairness and adequacy of a class action settlement. *See, e.g., City of Detroit v. Grinnell*, 495 F.2d 448, 458-59 (2d Cir. 1974) (finding that

38

it is not proper to consider potential statutory treble damages or statutory attorney's fees in measuring adequacy of a settlement offer because such consideration could hinder settlement), *overruled on other grounds as recognized by U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir. 1989); *see also In re Dennis Greenman Sec. Litig.*, 622 F. Supp. 1430, 1441 (S.D. Fla. 1985) ("potential treble recovery (or, for the same reason, punitive recovery) should not be superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed before leaving the station"), *rev'd on other grounds*, 829 F.2d 1539 (11th Cir. 1987). Accordingly, such objections are without merit and are similarly overruled.[9]

### Objections Regarding the Remedial Undertakings

93. Some objectors claim that the Remedial Undertakings are not extensive enough. To the contrary, the provisions for injunctive relief in this case achieve what the class action device is meant to achieve, specifically, changed conduct that improves the marketplace for consumers. *See, e.g., Williams*, 1995 WL 765266 at *6 ("Through the accumulation of small claims, class actions can effect reform of improper practices and thereby benefit consumers. Because the cost of litigation would far outstrip the recovery of small individual claims, and because the litigation of small claims would be ineffective to effect broad reforms, the class action motivates corporations to respond to legitimate consumer complaints"). PCH has agreed to make revisions to its business practices and

---

[9]    In *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 n.44 (7th Cir. 1979), the Seventh Circuit, in dictum, criticized the district court for not giving any weight to the possibility of punitive damages where there was substantial evidence that GM deliberately concealed the substitution of engines. That case cannot be compared to this one on any level. "Targeting" allegations, which Class Counsel investigated and found to be without foundation, do not provide any basis for such recovery, and PCH's voluntary institution of its unique High Activity Suppress Program (even before any investigations or class action lawsuits) demonstrates that PCH did not intend to take advantage of the impaired. (Holland Aff. ¶¶ 54-70).

procedures that go beyond what the law requires, and many of the measures PCH already voluntarily undertakes will become mandatory under the Settlement. This Court will retain jurisdiction to enforce PCH's compliance with the Remedial Undertakings for five years.

94. It is also important to note that the injunctive relief obtained in this case on behalf of the Class goes beyond what has been required of PCH in any of the agreements PCH has entered into with the Attorneys General of various states and that nothing in this settlement prevents any Attorney General from pursuing injunctive provisions in addition to the ones set forth in the Final Order section of this Memorandum and Order. The objections to the extent of the Remedial Undertakings raise no insurmountable concerns as to the fairness and adequacy of the proposed settlement, and they are hereby overruled.

95. A few objectors assert that Class Members should have been able to opt out of the injunctive component of the settlement as well as the monetary component. It is clearly proper to certify "hybrid" classes such as this one, which seek both equitable relief and damages, as mandatory classes under Rule 23(b)(2) with respect to equitable relief and as opt-out classes under Rule 23(b)(3) with respect to claims for damages. *See, e.g., Ingersoll Int'l Inc.*, 195 F.3d at 898-99; *Burlington Northern, Inc.*, 832 F.2d at 103. The hybrid certification in this case does not violate due process, and, consequently, those objections are overruled.

### Objections Regarding the Claims Process

96. Certain objectors complain that the Claims Made Period ended prior to PCH's announcement that it would pay allowed claims at 100 percent, rather than at some lower pro rata rate. The gist of this objection is that more people might have made claims had they known claims would be paid at 100 percent. First, the Notice only states that a pro rata payment was possible, not

certain. Second, based on the low number of claims made by persons who had previously requested exclusion from the proposed settlement and who were given a chance to make claims after the announcement of the pro rata rate, there is little factual support for the objection.  Of the approximately 49,000 people who opted out of the Class (a group of people who, rather than ignoring the Notice, took action in response to the Notice by sending in a request for exclusion), less than 300 made claims after learning that accepted claims would be paid at 100 cents on the dollar. (Leichtman Aff. ¶ 43).  Thus, it does not seem reasonable to assume that Class Members who did nothing in response to the initial Notice would have made claims if they had been aware that claims would be paid in full.

97.    Moreover, it is common in class action litigation for the opt-out period to end before the determination of each class member's actual pro rata share of the settlement fund. *See, e.g., In re Armored Car Antitrust Litig.*, 472 F. Supp. at 1397; *In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions*, 410 F. Supp. 706, 713 (D. Minn. 1975).  As a practical matter, in the typical class action, the pro rata share of a settlement fund that will be distributed to individual class members cannot be determined until the opt-out and claims processes are complete, which may not occur until after the settlement is approved. *See, e.g., In re Joint Eastern & Southern Dist. Asbestos Litig.*, 78 F.3d 764 (2d Cir. 1996); *In re Armored Car Antitrust Litig.*, 472 F. Supp. 1357.  As a matter of due process, disclosure of the actual pro rata share is not essential to fairly apprise class members of the terms of the proposed settlement and of their available options in connection with the proceedings. *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1993); *Weinberger*, 698 F.2d at 70.  Accordingly, objections based on the timing of the disclosure of the pro rata rate are overruled.

41

98.    Some objections relate to the claims process in this settlement. Some objectors dislike the fact that Class Members were required to do something to obtain refunds at all, arguing that PCH should be required to make "automatic" or "direct" refunds based on its records of Class Members' purchases.[10] Other objectors argue that Class Members should have been provided with a claim form or that the claims process was overly burdensome or unfair in other ways. The expectations of such objectors are unreasonable. It is simply unreasonable to expect any class action settlement to generate "free money" for all class members without imposing any burden on class members to prove the existence, amount, and validity of their claims. This Court finds that it was necessary to have a claims process and that the requirements for making a claim were minimal. This Court also finds that the claims process was fairly administered and that the process accomplished what it was designed to do, specifically, provide refunds to PCH's customers who bought magazines and merchandise they would not otherwise have purchased but for the mistaken belief that purchasing would enhance their chances of winning the Sweepstakes or other prizes.

99.    The requirements for making a claim were less onerous than the burden claimants would have borne at a trial. To make a claim, all that a claimant had to do was to write out on a piece of paper his or her name, address, control number, and the purchases he or she wanted canceled or rescinded. No particular form of claim was required. If claimants could return their merchandise, they were required to do so. If they could not return the merchandise, claimants were not required to provide documentation of their purchases. They were merely required to provide additional information about why they could not return the merchandise; to state that they did not realize all or

_____

[10]    According to the information presented to this Court, because of the extreme difficulty and expense that would be involved, it would not be reasonable for PCH to generate lists of purchases for each customer. (Kelly Aff. ¶¶ 109-16).

any material part of the value of the item through use, resale, or giving the item as a gift; and to represent that they made the purchases because they believed purchasing would increase their chances of winning a prize in a PCH promotional Sweepstakes.

100.　　The requirement that claims be notarized, which applied only to claims unaccompanied by merchandise returns, was appropriate and not unduly burdensome. Notarization of claims is routinely required in class action settlements "to assure that the fund [is] shared among proper and deserving claimants." *In re Armored Car Antitrust Litig.*, Civ. No. 78-139A, 1979 WL 1688 (N.D. Ga. Aug. 13, 1979); *see also In re Food Lion, Inc.*, 151 F.3d 1029 (Table), 1998 WL 322682, at *11 (4th Cir. 1998). Class Members who were unable to obtain the services of a notary were given the option to explain why, and their explanations were given the benefit of the doubt. PCH voluntarily waived the notarization requirement on all claims under $1,000. Far more burdensome claims processes in class action settlements, including full blown Alternative Dispute Resolution ("ADR") hearings, have been approved and endorsed by the courts. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 564-66 (D.N.J. 1997) (approving settlement that included ADR claims process), *aff'd*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 919 S. Ct. 890 (1999); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 78 (D. Mass. 1997) (same); *Franks v. Kroger Co.*, 670 F.2d 71, 72-73 (6th Cir. 1982) (affirming approval of employment discrimination class action settlement which required class members to prove that they had been discriminated against before receiving relief); *Carbone v. Gulf Oil Corp.*, Civ. No. 85-361, 1989 U.S. Dist. LEXIS 8805, at *5-10 (E.D. Pa. July 27, 1989) (approving settlement which required submission of "substantiated" proofs of claim showing entitlement to relief and approving rejection by the defendant of the unsubstantiated claims of certain class members).

43

101.    Nothing in class action jurisprudence requires claim forms to be provided to potential claimants.  Although claim forms were not provided with the initial Notice, claim forms were provided to all Class Members who requested them and to those Class Members with the highest potential claims, *i.e.*, those identified as having spent over $1,000 in any calendar year during the Class Period. (Kelly Aff.  ¶¶ 25-35; Katz Aff. ¶ 36).  With Court approval, the parties voluntarily extended the claim deadline and published the claim form in *USA Today* after issuing a press release to advise Class Members to look for it in that publication. (Kelly Aff. ¶ 46).  The claim form also was posted on PCH's website. (Kelly Aff. ¶ 49).  Last, but not least, a Claim Form Hotline was set up to assist Class Members with their claims.  (Katz Aff. ¶¶ 34-39 and 43-44; Leichtman Aff. ¶¶ 35-37; Katz Aff. ¶ 35).

102.    It is not a valid objection to say that PCH had too much discretion in the handling of the claims.  No PCH employee ultimately determined the fate of any claim. (Leichtman Aff. ¶¶ 13-14).  Every claimant whose claim was incomplete in some way either received an automatic cure or a letter indicating what to do to cure the claim.  (Leichtman Aff. ¶¶ 15-32 and Exs. C-E).  The information requested by the Notice was liberally construed in favor of allowing as many claims as possible in accordance with the guidance provided by the Court in its several administrative orders.  Even though, pursuant to the Stipulation, PCH had the right to reject claims at its discretion, only a small number of claims were rejected.  Claims were initially rejected if the database created for use in the class action indicated that the claimant was not a PCH customer, but such claimants were given an opportunity to provide further information or to opt out.  (Leichtman Aff. ¶ 30 and Ex. D; Kelly Aff. ¶¶ 71-72, 109-116).  Additionally, the Court's Administrative Orders, which were incorporated into the Second Amended Stipulation of Settlement, have limited PCH's discretion to reject claims

44

(Stipulation at ¶ III(3)(c)(v)). Specifically, Exhibits A and B to the Second Administrative Order (Doc. 90) set forth guidelines for the treatment of claims that were incomplete or deficient in some manner. As of the Final Fairness Hearing, only a small portion of those claims had been rejected and only after Class Counsel attempted to assist each claimant. (Leichtman Aff. ¶¶15-33 and Ex. F). Class Counsel continues to work with the small number of remaining claimants to attempt to cure their incomplete or deficient claims. Finally, a number of claims were received after the Court's November 5, 1999, deadline. The parties are in the process of determining whether those late claims should be allowed in accordance with the Court's Administrative Orders (Kelly Aff. ¶¶ 91-92). For the foregoing reasons, the objections raised regarding the claims process are overruled.

### Objections Regarding the Notice Campaign

103.    As set forth above, this Court has determined that the notice campaign in this action exceeded the requirements of due process and Federal Rule of Civil Procedure 23. Once these broad requirements have been met, the form and content of a notice of class action settlement is committed to the sound discretion of the court. *See In re Prudential*, 148 F.3d at 299. Nevertheless, objectors have raised a host of complaints about the form and content of the Notice which this Court will briefly address here, to the extent that they have not already been answered.

104.    Some objectors criticize the Notice as being both too detailed and not detailed enough. As the district court in *Prudential* noted, there is a natural "tension involved in drafting an appropriate class notice" between providing too much and too little information. 962 F. Supp. at 528. A class action notice need only fairly apprise class members of the terms of the settlement and include information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or to remain a member of the class and be bound by the final judgment.

45

*Gottlieb v. Wiles*, 11 F.3d 1004, 1012 (10th Cir. 1993); *In re Nissan Motor Corp. Antitrust Litig*, 552 F.2d 1088, 1105 (5th Cir. 1977).

105.    Some objectors claim that certain Class Members were confused by or incapable of comprehending the Notice.[11] Implicit in this criticism is the notion that class action notices must be tailored to the lowest level of comprehension. That is not the standard. Rather, a class action notice should be written so that it, "insofar as possible, may be understood by the average absentee class member." *In re Nissan*, 552 F.2d at 1104; *In re VMS Sec. Litig.*, No. 89 C 9448, 1992 WL 203832, at *4 (N.D. Ill. Aug. 13, 1992) ("Class notice is sufficient if it may be understood by the average class member" and if it is "comprehensible to reasonable and competent individuals" and "need not be reduced to a pablum [sic] to enable every class member to digest its impact") (internal quotations omitted); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 241 (D.N.J. 1997) ("Class notice is adequate if it may be understood by the average class member" and "if it will enable reasonable and competent individuals to make an informed choice") (internal quotations omitted).

106.    The Notice in this case was comprehensible to the average reader. Moreover, it directed class members, in bold capitals, to contact Class Counsel with any questions. In *In the Matter of VMS Ltd. Partnership Securities Litigation*, 26 F.3d 50, 51-52 (7th Cir. 1994), the Seventh

---

[11]    The AARP objectors state that AARP communicated with some of its members concerning the Notice and include in their objections a handful of allegedly representative complaints concerning the Notice. AARP has not provided the Court with the questions it asked or the methodology it used to select the "representative" comments. AARP admits that the "survey" was "not intended to serve as an authoritative polling of AARP's membership in accordance with accepted statistical survey methodology." (AARP objections, Affidavit of Barbara J. Smith, at ¶ 17). The survey is not persuasive evidence of significant problems with comprehension of the Notice. Thus, the Court rejects the survey. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 532 (D.N.J. 1997).

Circuit Court of Appeals made clear that, despite the argument that a class member did not understand a class action notice, which he claimed "contain[ed] five pages of small type" and "use[d] legal terms," it was unreasonable for the class member to fail to heed the clear instructions in the notice to contact class counsel with any questions regarding the litigation. Specifically, the Court found that "[t]he notice told him to present questions to class counsel. Understanding that advice did not require legal sophistication or following a thread of cross-references." *Id.*

107.    It is clear to this Court that both Class Counsel and Defendants' Counsel made extraordinary efforts to provide Class Members with information concerning the proposed settlement and assistance with making claims. General objections concerning the comprehensibility of the Notice are overruled.

108.    Objections to the format of the Notice are also overruled. Notices in the "self-mailer" style, which was used in this case, are commonly used in class actions. The self-mailer format was the most efficient, economical way to prepare more than 42 million Notices. Even so, the preparation and mailing, alone, of the individual Notices in this case cost PCH more than $7.3 million. (Kelly Aff. ¶¶ 12, 24). The use of self-mailers as class action notices have been expressly upheld by other courts. *See, e.g., In re Antibiotic Antitrust Actions*, 333 F. Supp. at 293. There is no requirement that a class action notice be colorful or eye-catching. *See In re United Telecomm., Inc., Sec. Litig.*, 151 F.R.D. 127, 129 (D. Kan. 1993) (overruling objection that class members may have thrown notice out and observing that "[t]he court knows of no case in which the self-mailer format was disapproved because it resembled 'junk mail'"). In fact, under Rule 23 and the Due Process Clause, the style and format of all class action notices, which issue in the name of the court, must be neutral and objective. *See Grunin*, 513 F.2d at 122; *accord In re Nissan*, 552 F.2d at 1104.

47

## Objections Regarding Miscellaneous Matters

109.    Other miscellaneous objections concerning the Notice warrant only brief attention. The inclusion of opt-out forms, a measure suggested by a few objectors, is generally disfavored. *See, e.g., Canel v. Lincoln Nat'l Bank*, 175 F.R.D. 517, 519 (N.D. Ill. 1997); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. at 554; *Roberts v. Heim*, 130 F.R.D. 416, 423 (N.D. Cal. 1988); *In re Prudential*, 962 F. Supp. at 531. It also is not necessary for a class action notice to disclose: (1) the existence of other pending cases, *Bell Atlantic v. Bolger*, 2 F.3d 1304, 1317-18 (3d Cir. 1993); *In re Prudential*, 962 F. Supp. at 529; (2) the exact pro rata rate at which claims will be paid, *see* cases cited above in ¶ 97; (3) every term of the Release, *In re NASDAQ Market Antitrust Litig.*, 187 F.R.D. 465, 482 (S.D.N.Y. 1998); *In re Prudential*, 962 F. Supp. at 528; or (4) the exact amount of attorney's fees that will be requested, *Torrisi*, 8 F.3d at 1375; *In re Intelligent Elec., Inc., Sec. Litig.*, No. 92-CV-1905, 1997 WL 786984, at *7 (E.D. Pa. Nov. 26, 1997).

110.    Some objectors assert in vague terms that the Release is too broad. This is not the case. There is nothing unusual about Defendants' interest in finality and their wish to be released from Class Members' claims, particularly after spending more than $30 million in a settlement and agreeing to make substantial legally enforceable changes in their business practices. The desire for repose is a legitimate goal of every settlement, and a settlement without a release of the settled claims would be of no interest to any defendant. *See, e.g., <u>Williams</u>*, 1995 WL 765266, at *7; *Richard's Lumber & Supply Co. v. United States Gypsum Co.*, 545 F.2d 18, 20 (7th Cir. 1976) (in rejecting claim that release in prior class action settlement did not apply to member of class in current litigation, court noted that "[a] general release, or broad covenant not to sue, is not ordinarily contrary to public policy"); *In re Prudential*, 962 F. Supp. at 558-59 (emphasizing the "need for finality on Prudential's

48

part" in rejecting challenge to scope of release by objector); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1996 WL 167347, at *2 (N.D. Ill. Apr. 4, 1996) (noting that "rather than finding repose in settlements, settling defendants would face new and widespread litigation based on the same course of conduct. Under such circumstances, settlement negotiations would simply not ensue").

111.    The Release is not a "general release." Rather, it releases Defendants from all claims relating to their solicitations containing Sweepstakes promotions based on the same facts and types of claims asserted in this action, regardless of legal theory. Thus, the Release is confined to resolving the issues presented in this lawsuit. In *Williams*, the Seventh Circuit Court of Appeals held that "a federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'" 159 F.3d at 273-74, *quoting Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992) (emphasis in original); *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377-78 (1996); *Grimes v. Vitalink Comm. Corp.*, 17 F.3d 1553, 1563-64 (3d Cir. 1994); *Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29, 34 (1st Cir. 1991); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 417 (S.D. Tex. 1999). Objections addressed to the scope of the Release are overruled.

112.    Some objectors claim that the Automatic Sweepstakes Entries violate public policy because they either promote Defendants' business and thus "send the wrong message" or violate the lottery laws. To the contrary, this component of the settlement provides "benefit of the bargain" relief to people who thought they were getting an extra chance to win the Sweepstakes. Offering additional entries to PCH's sweepstakes does not promote PCH. Entries are automatic and do not

49

require Class Members to conduct any business with PCH or indeed to take any action at all. In *In re Domestic*, the court rejected a similar claim by State Attorneys General, noting that a settlement consisting of coupons did not amount to a promotional campaign. 148 F.R.D. at 343-44; *see also Phemister v. Jovanovich, Inc.*, Civ. No. 77 C 39, 1984 WL 21981, at *8, 21 (N.D. Ill. Sept. 14, 1984) (approving settlement that included coupons and dismissing objections that discounts potentially benefit defendants). No public policy interests are threatened by the inclusion of the free Automatic Sweepstakes Entries in the proposed settlement, nor are the automatic entries a lottery.[12]

113.    Despite the fact that this settlement will result in the disbursement of more than $20 million directly to Class Members, one objector, Mr. Hawk, urges this Court to disapprove the proposed settlement because settlement negotiations allegedly were suspect. Hawk's counsel, Lynde Selden II and Robert H. Rosenthal, whose practices consist primarily of objecting to class action settlements, make no specific allegations of wrongdoing or conflict of interest, but raise vague claims that the timing of the settlement was somehow sinister and complain that they have not been allowed to conduct discovery into the settlement negotiations.[13]

114.    This Court has already found that the settlement was the product of an arm's length negotiation conducted by qualified Class Counsel who acted without conflict of interest. There

---

[12]    Past consideration is not valid consideration under the lottery laws. See, e.g., Haskell v. Time, Inc., 965 F. Supp. 1398, 1404-05 (E.D. Cal. 1997). The Automatic Sweepstakes Entries are not contemporaneous consideration for purchases because Class Members, who purchased PCH products during the last seven and a half years, did not make their purchases in contemplation of receiving free entries in a future class action settlement.

[13]    This Court previously found, after an extensive hearing, that Messrs. Selden and Rosenthal engaged in conduct sanctionable under Rule 11. Specifically, the Court found that their client was put forward and their pleadings were filed for the improper purpose of interfering with and delaying this litigation. (Doc. 88 at ¶¶ 6 and 9).

simply is no evidence to the contrary.  This Court's primary concern is whether the proposed settlement is substantively fair, reasonable, and adequate.  As the Seventh Circuit Court of Appeals has observed, "[r]ather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation, which was more favorable to the class than any class member could reasonably have expected.  The proof of the pudding was indeed in the eating."  *Mars Steel*, 834 F.2d at 684; *see also Weinberger*, 698 F.2d at 73; *In re Agent Orange Prods. Liab. Litig.*, 597 F. Supp. 740, 762, *aff'd in part and rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987).  If the terms of the proposed settlement are fair, then the court can assume that the negotiations were proper.  *In re Corrugated Container Anti-Trust Litig.*, 643 F.2d at 211-12 ("[i]t is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting.  If the terms themselves are fair, reasonable and adequate, the district court may fairly assume they were negotiated by competent and adequate counsel"); *see also Bowling v. Pfizer*, 143 F.R.D. 141, 152 (S.D. Ohio 1992).  Moreover, discovery into settlement negotiations is proper "only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive." *Mars Steel*, 834 F.2d at 684.  No such evidence has been adduced.

115.    There is no basis to allege that Class Counsel's investigation was inadequate.  Through their major role in this and other sweepstakes litigation, Class Counsel gained extensive knowledge of the sweepstakes industry in general.  After entering into a Protective Order approved by this Court, Class Counsel was given access to thousands of documents relating to PCH mailings, purchasing histories, marketing materials, name selection and solicitation protocols and guidelines, computer programming, mailing database information, other lawsuits and/or investigations against PCH, the

51

High Activity Suppress program, and customer contacts and complaints. PCH produced numerous officers and employees to answer Class Counsel's questions. The fact that Class Counsel's investigation consisted of obtaining informal discovery from PCH and obtaining information from third-party sources such as PCH's customers and the Florida Attorney General's office is no basis for objection. *See Handschu*, 605 F. Supp. at 1394 ("Knowledge is more important than its source. To hold otherwise would exalt form over substance"); *see also Weinberger*, 698 F.2d at 72 (the fact that negotiation preceded pretrial discovery did not preclude judicial approval of settlement); *In re Corrugated Container Anti-Trust Litig.*, 643 F.2d at 211 ("formal discovery [is not] a necessary ticket to the bargaining table").

### Antisuit Injunction

116.    By Memorandum and Order dated June 30, 1999, the Court entered a preliminary antisuit injunction enjoining the Named Plaintiffs, any and all members of the Settlement Class, or anyone acting on their behalf, and all persons with actual knowledge of the injunction from commencing, continuing, or prosecuting any actions of any kind, including any federal or state court actions, which assert any of the Settled Claims, pending the Court's final determination of whether the Settlement should be approved. (Doc. 23 at ¶ 10). In doing so, the Court found that such actions or proceedings "will substantially increase the cost of litigation, create a risk of conflicting results, could prevent class members from benefiting from any settlement already negotiated and thus . . . pose a significant threat of irreparable harm to the parties hereto and to the Court's jurisdiction." *Id.*

117.    In Defendants' motion for a permanent antisuit injunction and memorandum in support thereof, dated January 21, and January 24, 2000, respectively (Docs. 185 and 194), Defendants request that the Court permanently enjoin (1) any and all members of the Settlement Class who did

not exclude themselves from the Settlement, or anyone on their behalf, and all other persons with actual knowledge of the injunction from commencing, continuing or prosecuting any actions or proceedings of any kind, in which any of the Settled Claims against PCH or any other Settling Defendant are asserted; (2) any and all members of the Settlement Class, or anyone acting on their behalf, and all other persons with actual knowledge of the injunction from commencing, continuing, or prosecuting any actions or proceedings of any kind which seek injunctive relief relating to the matters set out in the "Remedial Undertakings;" and (3) State Attorneys General, and all other government entities, from commencing, continuing, or prosecuting any actions or proceedings which assert any of the Settled Claims against PCH or any other Settling Defendant, to the extent that such claims sound in restitution for Settlement Class Members.[14]

118.    The Court finds that a permanent antisuit injunction, to the extent it applies to any and all members of the Settlement Class, or anyone acting on their behalf, is necessary to continue this Court's jurisdiction over the class action settlement as finally approved and to protect and effectuate its rulings and judgments. Duplicative, wasteful, and costly litigation in other fora based upon the

---

[14]    In their June 23, 1999, Memorandum of Law in Support of Motion for an Antisuit Injunction Pending Final Approval of Settlement (Doc. 23), Defendants advised the Court that certain actions and proceedings by State Attorneys General were not the subject of their motion for a preliminary antisuit injunction at that time. In their January 21, 2000, submission in support of their motion for a permanent antisuit injunction, Defendants further advised the Court that they had failed to resolve their disputes with certain State Attorneys General, as they had hoped to do at the time of their earlier motion, and that State Attorneys General have continued to prosecute their actions and investigations against PCH. In fact, a number of new Attorney General actions against PCH were commenced after the proposed settlement of this matter was announced. Accordingly, Defendants seek to modify the preliminary antisuit injunction (Doc. 197) and also seek a permanent antisuit injunction (Doc. 185) to enjoin State Attorneys General, or any other government entities, from prosecuting actions or proceedings against PCH or any other Settling Defendant, to the extent that such actions or proceedings sound in restitution.

53

Settled Claims will substantially increase the cost of litigation, create a risk of conflicting results, unduly burden Defendants, distract resources from the expeditious provision of relief to Settlement Class Members, and undermine the finality of the settlement process. By preventing relitigation of matters already decided by this Court, this Court's entry of a permanent antisuit injunction will promote the policies of judicial economy and respect for the finality of federal court judgments.

119.    Absent class members will not suffer any hardship as a result of the entry of a permanent antisuit injunction because they have been provided with notice apprising them of their rights to appear, object, or exclude themselves from the Settlement. *See, e.g., Williams v. General Elec. Capital Automobile Lease, Inc.*, 159 F.3d 266, 275 (7th Cir. 1998), *cert. denied,* 119 S. Ct. 2392 (1999).

120.    Although the Court agrees with Defendants that the Eleventh Amendment is not a bar to this Court's ability to permanently restrain State Attorneys General and other government entities, acting in their representative capacities, from prosecuting actions or proceedings based upon Settled Claims to the extent that such actions or proceedings sound in restitution, *see In re Baldwin-United Corporation (Single Premium Deferred Annuities Insurance Litigation)*, 770 F.2d 328, 341-42 (2d Cir. 1985), as a matter of comity, the Court abstains from exercising that authority. However, the Court finds that, upon finality of this Order, it will serve as a bar to any actions commenced, continued, or prosecuted by State Attorneys General and all other government entities, to the extent that such actions seek restitution for Settlement Class Members. Accordingly, Defendants' motion for a permanent antisuit injunction (Doc. 185) is granted in part to the extent it applies to any and all members of the Settlement Class, or anyone acting on their behalf, and denied in part to the extent it applies to State Attorneys General and other government entities, and their motion to modify the

preliminary antisuit injunction (Doc. 197) is denied.

### Class Counsel's Application for Fees and Expenses

121.    On January 25, 2000, Class Counsel filed their Motion for Award of Attorneys' Fees and Costs (Doc. 218). Class Counsel seek an award in the amount of $3 million, which is roughly equivalent to 10 percent of the total fund created by this litigation. In calculating the total fund, Class Counsel include their requested fees and expenses because pursuant to the Settlement, the Class Members' recovery is not affected by the fee award. Additionally, Class Counsel request that the Court approve a $1,500.00 distribution, to be taken from Class Counsel's award, to each of the Named Plaintiffs for their time and expense in this matter. Defendants do not oppose Class Counsel's request.

122.    On February 2, 2000, one of the Class Members, Mr. Hawk, who also objected to the proposed settlement, filed his objections to Class Counsel's motion for fees and expenses (Doc. 219) and a motion for judicial notice of the accuracy of certain exhibits attached to support those objections (Doc. 220). Specifically, Mr. Hawk, through counsel Lynde Selden II and Robert H. Rosenthal, requests that Class Counsel be ordered to re-file their motion because their "common fund" theory is inappropriate and they failed to provide an itemization of hours and costs incurred in prosecuting this matter.

123.    As an initial matter, the Court grants Mr. Hawk's motion (Doc. 220) and takes judicial notice of the accuracy of the exhibits attached to his objections. In any event, the Court finds that, under the circumstances, the "common fund" theory is the most appropriate method for determining the reasonableness of Class Counsel's application for attorneys' fees and expenses. Even though the award technically will not be taken from a common fund, the Court finds it appropriate to consider

it as part of the total fund. The fact that the award has no impact on the Class Members' recovery makes it a benefit to the Settlement Class. While Class Counsel do not set forth an itemization of the time devoted to this matter, the result obtained from their efforts displays their vigorous representation of the Class Members. Additionally, the expenses incurred by Class Counsel to date and anticipated in the future exceed $150,000. Accordingly, the Court finds that Class Counsel's request is fair and reasonable. *See, e.g., In re Continental Illinois Sec. Litig.*, 985 F.2d 867, 868 (7th Cir. 1993). In light of the foregoing, Mr. Hawk's objections are overruled. Furthermore, the Court grants Class Counsel's motion (Doc. 218) and awards attorneys' fees and costs in the amount of $3 million to compensate Class Counsel for their work and expenses in this case, from which $1,500.00 shall be distributed to each of the Named Plaintiffs for their time and expense in this matter.

## FINAL ORDER

Based upon the full record of this Court and the foregoing Findings of Fact and Conclusions of Law,

**IT IS HEREBY ORDERED**:

1.    This Final Order incorporates herein and makes a part hereof the First Amended Stipulation of Settlement, and the Release included therein, dated July 29, 1999, as amended by the Second Amended Stipulation of Settlement, dated January 14, 2000, its exhibits, and all documents and previous Orders of this Court incorporated therein (together, the "Stipulation"). Unless defined herein, all capitalized terms in this Final Order shall have the meaning given in the Stipulation.

2.    On June 30, 1999, this Court conditionally certified, for purposes of settlement only, the Settlement Class defined in that Order. (Doc. 22). A class for settlement purposes is hereby

**FINALLY CERTIFIED**, consisting of all persons who received Solicitation Materials by mail from Defendants during the period from February 3, 1992, through June 30, 1999 (the "Class Period"). The Settlement Class includes a Subclass consisting of all members of the Settlement Class who responded by mail to Solicitation Materials received by mail from Defendants during the period from February 3, 1992, through June 30, 1999, by ordering and paying for magazines and/or merchandise from Defendants. Excluded from the Settlement Class and the Subclass are any parents, subsidiaries, affiliates or controlled persons of Defendants, as well as the officers, directors, agents, or employees of Defendants, and the immediate family members of such persons. Also excluded from the Settlement Class are any judges assigned to handle this matter and their employees. Subject to review by the Court, within 120 days of the Effective Date, the parties shall file, under seal, a final list of those persons who have timely excluded themselves from the Settlement Class. As more fully set forth above in the Court's Findings Of Fact and Conclusions Of Law, the Court hereby confirms that all of the requirements of Rule 23 of the Federal Rules of Civil Procedure for certification of a Settlement Class have been met.

3.    On June 30, and August 3, 1999, this Court preliminarily approved the proposed settlement. (Docs. 23 and 32). The Court now finds that the Stipulation was entered into in good faith and is non-collusive, fair, reasonable, and adequate as to, and in the best interests of, each of the settling parties and members of the Settlement Class and that the Settlement Class has been adequately represented at all times. Thus, the Court hereby fully and **FINALLY APPROVES** the Stipulation, and directs the settling parties and members of the Settlement Class to implement and consummate the Stipulation upon the Effective Date, according to its terms and provisions.

4.    The terms of the Stipulation, including the Release set forth in Exhibit C thereto, and

57

this Final Order shall forever be binding on, and shall have *res judicata* and preclusive effect in all pending and future lawsuits maintained by or on behalf of Plaintiffs or any other members of the Settlement Class, as well as their heirs, executors and administrators, successors and assigns, or anyone on their behalf.

5.    The Court finds that the simultaneous or future prosecution of other actions or proceedings based upon the solicitations and practices at issue in this action, whether in federal or state court, jeopardizes this Court's continuing jurisdiction over and Orders concerning the Settlement, substantially increases the cost of litigation, creates a risk of conflicting results, unduly burdens Defendants, distracts resources from the expeditious provision of benefits to Settlement Class Members, and contravenes the interests of all litigants in the finality of the settlement process. Thus, any such actions or proceedings pose a significant threat of irreparable harm to the parties hereto and to this Court's jurisdiction. The Court finds that the requested injunction is necessary, in part, to preserve its jurisdiction and to protect and effectuate its rulings. Therefore, the Court grants in part Defendants' motion for a permanent antisuit injunction and, thereby, makes its preliminary antisuit injunction permanent. The permanent antisuit injunction shall bar and enjoin (1) any and all members of the Settlement Class who did not exclude themselves from the Settlement, or anyone on their behalf, and all other persons with actual knowledge of the injunction from commencing, continuing or prosecuting any actions or proceedings of any kind, in which any of the Settled Claims against PCH or any other Settling Defendant are asserted and (2) any and all members of the Settlement Class, or anyone acting on their behalf, and all other persons with actual knowledge of the injunction from commencing, continuing, or prosecuting any actions or proceedings of any kind which seek injunctive relief relating to the matters set out in the "Remedial Undertakings." Nothing in this Final

58

Order shall bar any claims arising outside of the Class Period involved in this Settlement. As set forth above, the State Attorneys General and other government entities are not enjoined from commencing, continuing, or prosecuting any actions or proceedings which assert any of the Settled Claims against PCH or any other Settling Defendant. However, to the extent that such claims sound in restitution for Settlement Class Members, the Court believes that those claims are barred by this Settlement.

6.    The Court finds that Class Counsel's application for attorneys' fees and expenses is fair and reasonable and hereby **AWARDS** attorneys' fees and costs in the amount of $3 million to compensate Class Counsel for their work and expenses in this case, from which $1,500.00 shall be distributed to each of the Named Plaintiffs for their time and expense in this matter.

7.    Without in any way affecting the finality of this Final Order, this Court hereby retains exclusive jurisdiction for a period of five years after the Effective Date as to all matters relating to administration, consummation, and enforcement of the Settlement Agreement and of this Final Order. Nothing in this Final Order shall preclude any action in this Court to enforce the terms of the Stipulation, nor shall anything in this Final Order preclude Plaintiffs or members of the Settlement Class from recovering based on the claims process described in the Stipulation.

8.    Neither this Final Order nor the Stipulation is an admission or concession by Defendants or Plaintiffs of any actual or potential fault, liability, or wrongdoing or any other matter.

9.    This action, including all individual claims and class claims presented thereby, is hereby **DISMISSED with prejudice.**

**IT IS SO ORDERED.**

DATED: 02/ 18/ 00

G. Pat M~

**DISTRICT JUDGE**

59

Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

THOMAS G. VOLLMER,                        )
PEGGY R. POSPESHIL,                       )
MARY KENNAH,                              )
PHILLIP INGRAM,                           )
ALBERT F. DIX,                            )
STEVE MALLIA,                             )
MICHELLE COLLINS,                         )
BARBARA BUCHANAN,                         )
H. DUANE KUNDERT, and                     )
DR. ROBERT ROSENTHAL                      )
Individually, and On Behalf of            )
All Others Similarly Situated,            )
                                          )
        Plaintiffs,                       )
                                          )
v.                                        )        Cause No. 99-434-GPM
                                          )
PUBLISHERS CLEARING HOUSE,                )
a New York Limited Partnership,           )
and                                       )
CAMPUS SUBSCRIPTIONS, INC.                )
a New York Corporation,                   )
                                          )
        Defendants.                       )

```
FILED

JAN 18 2000

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE
```

## SECOND AMENDED CLASS ACTION STIPULATION OF SETTLEMENT

Subject to Court approval pursuant to Fed. R. Civ. P. 23(e), it is hereby stipulated and

agreed by the parties to this Second Amended Class Action Stipulation of Settlement as follows:

## RECITALS

A.      This Second Amended Class Action Stipulation of Settlement (the "Second Amended

Stipulation") is entered into by and among (1) Publishers Clearing House ("PCH") and Campus

Subscriptions, Inc. ("Campus"), on behalf of themselves and the other Settling Defendants (as

defined below); (2) Plaintiffs Thomas G. Vollmer, Peggy R. Pospeshil, Mary Kennah, Phillip

Ingram, Albert F. Dix, Steve Mallia, Michelle Collins, Barbara Buchanan, H. Duane Kundert, and

EXHIBIT 5

Dr. Robert R  nthal, for themselves and their heirs, s ccessors and assigns (the "Named Plaintiffs"); and (3) all other members of the Settlement Class (as defined below). PCH, Campus, the Named Plaintiffs, and the other Settlement Class members are hereinafter sometimes referred to collectively as the "Parties."

B.    On February 3, 1998, Thomas G. Vollmer ("Vollmer"), a customer of PCH, commenced a lawsuit styled *Thomas G. Vollmer v. Publishers Clearing House and American Family Publishers,* Cause No. 98-L-100B, in the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois. The action against American Family Publishers was severed by court order from the *Vollmer* action against PCH, and on June 18, 1999, the complaint in the *Vollmer* action was amended to add additional Named Plaintiffs Peggy R. Pospeshil, Mary Kennah, Phillip Ingram, Albert F. Dix, Steve Mallia, Michelle Collins, Barbara Buchanan, H. Duane Kundert, and Dr. Robert Rosenthal, to add Campus as an additional defendant, and to assert additional causes of action (the "Second Amended *Vollmer* Complaint"). As a result of the foregoing, the Second Amended *Vollmer* Complaint now asserts claims by the Named Plaintiffs individually and as class representatives of all persons in the United States who, since February 1992 "received solicitations" from defendants, and some of whom allegedly "justifiably relied" on "misrepresentations" and who "would not have ordered except for their belief that their odds of winning cash or other prizes were enhanced." The *Vollmer* action was subsequently removed to the United States District Court for the Southern District of Illinois, and is now captioned *Thomas G. Vollmer et al. v. Publishers Clearing House and Campus Subscriptions, Inc.,* Cause No. 99-434-GPM (the "*Vollmer* Action").

C.    The Second Amended *Vollmer* Complaint, attached hereto as Exhibit A, alleges claims against PCH and Campus Subscriptions, Inc. for violations of federal racketeering laws and

2

state consume~ ~aud and deceptive practices acts. The  nplaint seeks general and special compensatory damages, statutory damages, punitive damages, attorneys' fees and costs.

    D.    PCH and Campus Subscriptions, Inc. deny the material allegations in the complaint, and to that end filed an answer to the Second Amended *Vollmer* Complaint which contains a general denial and asserts numerous affirmative defenses.

    E.    On June 23, 1999, the Parties entered into a Class Action Stipulation of Settlement (the "Stipulation"), which was subsequently preliminarily approved by the Court by way of Memorandum and Order dated June 30, 1999 (Doc. 23). On July 29, 1999, the Parties entered into a First Amended Class Action Stipulation of Settlement ("First Amended Stipulation"), which was subsequently preliminarily approved by the Court by way of Order dated August 3, 1999 (Doc. 32). On November 9, 1999, after further negotiation, Defendants agreed to waive its rights under the First Amended Stipulation in order to increase the size of the settlement fund to ensure that all Settlement Class Members who have made a claim that was accepted will receive a 100% refund for the amount of their accepted claim (Doc. 120), making this Second Amended Class Action Stipulation of Settlement ("Second Amended Stipulation") necessary to clarify the financial aspects of the settlement as it now stands.

    F.    In addition to the *Vollmer* Action, there also exist separate purported class action and individual lawsuits pending in various courts around the country that challenge the legality of PCH's solicitations on essentially the same grounds. Class Counsel is counsel of record in some of such actions.[1]/

---

[1]/    Class actions in which Class Counsel is counsel of record, as well as all other private actions that PCH is aware of that were pending as of the date of the Stipulation are listed

G.    ...e Named Plaintiffs and the Settlement Class, through Class Counsel, have conducted a thorough investigation and evaluation of the facts and law relating to the matters set forth in the Second Amended *Vollmer* Complaint, and in connection therewith PCH has provided and is continuing to provide Class Counsel, under and in all respects subject to the respective Stipulated Protective Orders issued by Judge Robert P. LeChien of the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois, and Judge G. Patrick Murphy of this Court, access to and an opportunity to review, among other things, numerous PCH solicitation mailings, reports on many aspects of PCH's business and practices, advertising materials, documents pertaining to PCH's policies and procedures, information concerning PCH's consumer assistance and education policies and programs, and other documents relevant to the Settled Claims (as defined below), as well as interviews with officers and employees of PCH who are knowledgeable regarding the information contained in the aforementioned documents and materials, all or many of which are or include confidential, proprietary and non-public information and documents.

H.    Arm's length settlement negotiations have taken place between Class Counsel and counsel for defendants and have resulted in the Stipulation, the First Amended Stipulation and this Second Amended Stipulation, including their exhibits, which embodies all of the terms and conditions of the settlement between Defendants and the Named Plaintiffs, both individually and on behalf of the Class, subject to the final approval of the Court.

I.    Class Counsel have concluded, after extensive discovery and investigation of the facts and in light of the substantial benefits of the settlement balanced against the costs, risks and delay

---

in Exhibit E.

4

of continued litigation, that it would be in the best interests of the Class to enter into the Stipulation, the First Amended Stipulation, and this Second Amended Stipulation, in order to avoid the uncertainties of litigation, and to assure a benefit to the Class, and further, that Class Counsel consider the settlement set forth herein to be a fair, reasonable, and adequate resolution of the *Vollmer* Action in the best interest of plaintiffs, including all members of the Class.

J.      Defendants deny that they have committed or threatened to commit any violations of law or breaches of duty to the Named Plaintiffs or the members of the Settlement Class, and are entering into this Second Amended Stipulation solely because the proposed settlement would eliminate the burden and expense of further litigation. As described more fully in paragraph II.1 below,  defendants do not contest the certification of a Settlement Class under the terms of this Settlement, but reserve the right to contest class certification if this Second Amended Stipulation is terminated for any reason.

K.      It is agreed by the undersigned, on behalf of defendants and the Class, that the *Vollmer* Action and all claims of the plaintiffs (both individually and on behalf of the Class), be settled, compromised and dismissed on the merits and with prejudice and, except as hereinafter provided, without costs as to plaintiffs or defendants, subject to the approval of the Court, on the following terms and conditions.

## TERMS AND CONDITIONS

### I.    CERTAIN DEFINITIONS

The following terms, as used in this Second Amended Stipulation and Exhibits A-E hereto, are used with the meanings, respectively, set forth below:

(a)    **"Effective Date of Settlement"**: the date following the entry of a Final Judgment.

(b)    **"Fees and Expenses"**: all fees and expenses awarded by the Court in connection with this settlement to the Named Plaintiffs, any member of the Settlement Class or their counsel.

(c)    **"Final Judgment"** a judgment no longer subject to review by reason of: (a) the exhaustion of all appeals and/or petitions for certiorari from any order providing final approval of the Second Amended Class Action Stipulation of Settlement in the *Vollmer* Action; or (b) the expiration of the time for the filing of the last of such appeals and petitions.

(d)    **"Named Plaintiffs"** the Named Plaintiffs in the Second Amended *Vollmer* Complaint.

(e)    **"No Purchase Necessary Message"** a statement to the effect that no purchase is necessary as a condition to entering a promotional sweepstakes.

(f)    **"Official Rules"** the formal printed statement, however designated, of the rules for a promotional sweepstakes appearing in solicitation materials offering that promotional sweepstakes.

(g)    **"Prominent"** when used with reference to any statement or message, shall mean that such statement or message is of such size, contrast, color and placement as to be readily

noticed and read by the recipient.

(h)    "**Promotional Sweepstakes**" a promotional giveaway conducted by PCH in which something of value is awarded to one or more participating consumers who are selected on the basis of chance.

(i)    "**Qualified Refunds**" all amounts, other than amounts refunded pursuant to this Second Amended Stipulation, refunded by PCH to or for the benefit of members of the Subclass in respect of transactions canceled or rescinded by or for such persons during the Class Period and after the last date or period allowed therefor by the solicitation materials from which the order in question was placed; plus, any provision for rescission of purchases from PCH and refunds for or on behalf of members of the Settlement Class or the Subclass included in any final judgment, order or decree in, or provided for in the settlement of, any actions, investigations or other proceedings by or on behalf of any governmental authority or regulatory agency, through the date of the Final Fairness Hearing referenced in the Memorandum and Order attached hereto as Exhibit B, and that relate in whole or in part to the business practices and solicitations of defendants that are the subject matter of this Second Amended Stipulation; provided that PCH shall not claim Qualified Refunds in excess of $1.5 million.

(j)    "**Readily Understandable Terms**" when used with reference to any statement or message, shall mean that such statement or message is expressed in such words, phrases or expressions, or in such symbolic or graphic form, as to be understood without difficulty by reasonable persons.

(k)    "**Remedial Undertakings**" the remedial undertakings relating to PCH's business and promotional practices and customer service policies and procedures set forth in Exhibit

7

D to this Second Amended Stipulation.

(l)    **"Settled Claims"** all claims, rights, causes of action, suits, matters, issues, controversies or other bases for liability, whether known or unknown, that have been, could have been or hereafter may be asserted in the *Vollmer* Action, or in any other court or proceeding (including but not limited to any claims arising under federal, state or local law) by or on behalf of the Named Plaintiffs or any members of the Settlement Class, whether individual, derivative, representative, legal, equitable or of any other type or in any other capacity, against the Settling Defendants which have arisen, arise now or hereafter may arise out of or relate in any way to defendants' direct mail solicitations, their promotional sweepstakes or their marketing or business practices or policies, including but not limited to their billing practices, advertising campaigns and telemarketing efforts, from the beginning of time until the conclusion of the Class Period.

(m)    **"Settlement Class"** and **"Subclass"** all persons who received Solicitation Materials by mail from defendants during the period from February 3, 1992 through the date of preliminary class certification (the "Class Period"). The "Settlement Class" shall include a "Subclass" consisting of all members of the Settlement Class who responded by mail to Solicitation Materials received by mail from defendants during the period from February 3, 1992 through the date of preliminary class certification by ordering and paying for magazines and/or merchandise from defendants. Excluded from the Settlement Class and the Subclass are any parent, subsidiary, affiliate or controlled person of defendants, as well as the officers, directors, agents, or employees of defendants, and the immediate family members of such persons. Also excluded are any judge assigned to handle this matter, and employees of any judge assigned to handle this matter.

(n)    **"Settling Defendants"** PCH, Campus Subscriptions, Inc., and their

8

respective predecessors and successors, and past, present and future assigns, representatives, subsidiaries, divisions, affiliates, parents, partnerships and partners, and all of their respective stockholders, partners, principals, controlling entities or persons, joint venturers, officers, directors, agents, employees, heirs, executors, trustees, personal representatives, estates, administrators, insurers, indemnitees, attorneys, accountants, financial advisers or other advisers, both past and present (in each case, in each and every capacity).

(o)    "Solicitation Materials" direct mail or other marketing materials containing sweepstakes entry materials that prominently feature solicitations for the sale of magazine subscriptions or consumer products, other than billing efforts or customer service correspondence and the like containing only incidental opportunities to order or references to future order activity.

(p)    "You Are Not Yet a Winner Message" with respect to any prize, a statement to the effect that the recipient must first be selected as the winner of the prize in the winner selection process before the recipient is or will be a winner of that prize.

(q)    "You Don't Have to Be Home to Win Message" a statement to the effect that the winner in a promotional sweepstakes does not have to be at home when the Prize Patrol calls in order to receive his or her prize.


II.    **CERTIFICATION OF SETTLEMENT CLASS AND PRELIMINARY ORDER**

1.    The class certification contemplated by the Stipulation, the First Amended Stipulation, and this Second Amended Stipulation is for purposes of settlement only and nothing in this Second Amended Stipulation shall constitute, in this or in any other action or proceeding, an admission by defendants, or a finding or evidence that any claims that either were brought or could

9

have been brought in the *Vollmer* Action are appropriate for class treatment or that any requirement for class certification is otherwise satisfied, nor shall the fact that the Second Amended Stipulation contemplates that the *Vollmer* Action may be certified for settlement purposes only be deemed an admission for any other purpose. By entering into this Second Amended Stipulation, Defendants in no way waive their rights to challenge or contest the continued maintenance of the *Vollmer* Action or any other lawsuits as class actions, and to oppose certification of any class or otherwise oppose the claims of the class for litigation purposes, nor shall the fact that it was entered into be offered, received or construed as an admission, a finding or evidence for any purpose, including the appropriateness of class certification. If this Second Amended Stipulation is terminated for any reason, or is disapproved in whole or part by the Court or by an appellate court, neither this Second Amended Stipulation that the *Vollmer* Action may be certified as a settlement class only, nor the fact that it was entered into shall be offered, received or construed as an admission, a finding or evidence for any purpose, including the appropriateness of class certification.

      2.     The Parties have submitted the First Amended Stipulation to the Court after its execution, and moved the Court for entry of an order approving the Notice to the Class as more fully described in paragraph III.6.-7. below, and extending the Court's Memorandum and Order dated June 30, 1999 to apply to the First Amended Stipulation. Pursuant to the June 23, 1999 Stipulation, Named Plaintiffs did move the Court for entry of an order seeking conditional class certification (the "Conditional Class Certification Order"), which motion was granted by Order of the Court dated June 30, 1999.

      3.     The Conditional Class Certification Order provides that the conditional class certification is premised upon the Court's issuance of a Final Judgment approving the settlement.

The Conditional Class Certification Order further provides that, if for any reason the Court fails to issue a Final Judgment approving the settlement, then the conditional class certification shall become null and void and of no further force and effect and shall not be used or referred to by any party for any purpose whatsoever. In the case of a failure by the Court to finally approve the settlement, the June 30, 1999 Memorandum and Order preliminarily approving the settlement, the Conditional Class Certification Order, the Order approving Notice, and all negotiations and proceedings relating thereto shall be withdrawn without prejudice as to the rights of any and all parties thereto, who shall be restored to their respective positions prior to the filing of the Second Amended Complaint, inclusive of any jurisdictional or other defenses. Nothing contained in the June 30, 1999 Memorandum and Order preliminarily approving the settlement, the Order approving Notice, the Conditional Class Certification Order, or any related motions or briefing, nor information disclosed during the provisional certification period, shall be admissible by or against any party in this or any other proceedings for any purpose.

### III.    TERMS OF THE SETTLEMENT, CONSIDERATION AND BENEFITS

In consideration of a full, complete and final settlement of the *Vollmer* Action, dismissal with prejudice, and the Release And Covenant Not To Sue, the form of which is set forth in Exhibit C hereto, PCH, on its behalf and on behalf of Campus Subscriptions, Inc. and the other Settling Defendants, agrees to provide the following benefits for the Settlement Class and Subclass:

1.    PCH shall provide all members of the Settlement Class with the benefits of the Remedial Undertakings described in Exhibit D hereto for a period of five (5) years after the Effective Date; provided that, in the event PCH enters into an agreement with any governmental or regulatory authority to provide benefits whose terms and conditions vary from those in Exhibit D,

11

or if such authorities impose legislation or regulation whose terms and conditions so vary, PCH shall have the right, on notice to Class Counsel, to conform the terms and conditions in Exhibit D to those agreed upon with or required by such governmental or regulatory authority, and such terms and conditions shall become a part of this Second Amended Stipulation of Settlement.

2.    In addition to the Remedial Undertakings provided to all members of the Settlement Class as set forth in paragraph III.1. and in Exhibit D, PCH shall also provide, within two years of the Final Judgment, all members of the Subclass that can be identified with reasonable diligence by defendants from their records with not fewer than 3 automatic entries into selected nationally promoted cash sweepstakes offered by PCH in the ordinary course of its business, until the sum of the prizes awarded in the aggregate in such sweepstakes equals or exceeds $30 million (which is three times the amount of the largest prize customarily offered by PCH). Such automatic entries shall be over and above any entries that such persons may already have in such Promotional Sweepstakes by virtue of entries submitted in the ordinary course by such persons. PCH will be solely responsible for assuring that each such person is entered with the requisite number of chances in such promotional sweepstakes, without requiring any action on the part of the persons in question. The procedures by which such persons are entered in such Promotional Sweepstakes, and the winner selection process for each such sweepstakes, will be reviewed by PCH's independent auditors and Class Counsel will be provided with a copy of the auditors' report not less than ninety (90) days after the prizes have been awarded.

3.    In addition to the Remedial Undertakings provided to all members of the Settlement Class set forth in paragraph III.1. and in Exhibit D hereof, and the additional entries contemplated by paragraph III.2., each member of the Subclass shall have the option to rescind any

12

purchase from defendants made during the Class Period and thereupon to obtain restitution of monies paid to defendants with respect thereto under the conditions and pursuant to the procedures set forth in paragraphs III.3(a), (b) or both, as follows:

(a)    Any member of the Subclass electing to rescind a purchase must provide PCH with a notice of rescission which must include a statement with the person's name and address, the correct Control Number assigned to the claimant pursuant to paragraph III.7. below, and a description of the item(s) purchased, the approximate date of each purchase and the approximate amount paid for each item. In the case of merchandise orders, the notice of rescission must be accompanied by the return of the item in question. In the case of magazine subscription orders, the notice must request cancellation.

(b)    Any member of the Subclass who is unable for any reason to return the item in question (in the case of merchandise orders) or in respect of whom the subscription has expired (in the case of magazine orders), may nevertheless seek to rescind the purchase and obtain a refund by complying with the procedures set forth in paragraph III.3.(a) and by also including a statement sworn before a notary under penalty of perjury representing (i) that he or she made the purchase because he or she believed that the purchase would increase his or her chances of winning a prize in a PCH Promotional Sweepstakes, and (ii) in the case of merchandise purchases, an explanation of why an item or items can no longer be returned and, in the case of both merchandise and magazine orders, representing that the person in question did not realize all or any material part of the value of the item through use, subsequent resale or the giving of the item as a gift to a third party.

(c)    All notices of rescission sent to PCH under paragraphs III.3.(a) and III.3.(b)

13

must be postmarked by regular or certified mail within 45 days after notice is deemed completed as described in paragraphs III.6.-7. (the "Claims Made Period," which shall be coextensive with the Opt Out Period, as defined in paragraph III.9. below), and received by PCH within 15 days of the postmark date. After the Claims Made Period, PCH shall provide refunds to those members of the Subclass who have made claims under one or both of paragraphs III.3(a) or (b), as follows:

(i)    Subject to paragraphs III.3.(c)(iii) & (iv), upon receipt and acceptance by PCH of any notice of rescission under paragraph III.3.(a), PCH shall provide a full and complete refund to any member of the Subclass returning an item of merchandise and a pro rata refund for all unserved issues of a magazine subscription canceled by any member of the Subclass.

(ii)    Subject to paragraphs III.3.(c)(iii) & (iv), upon receipt and acceptance by PCH of any notice of rescission under paragraph III.3.(b), PCH shall provide a full and complete refund to any member of the Subclass without requiring the return of an item of merchandise or a served issue on a canceled or expired magazine subscription.

(iii)    PCH may, in its sole discretion, decline to accept any notice of rescission that (a) does not contain a statement of the person's name and address, the correct Control Number, or a description of the item(s) purchased corresponding sufficiently closely in form to that which appears on PCH's records to enable PCH with reasonable diligence to locate such person's records and to confirm the nature and amount of the purchase(s); or (b) with respect to any notice of rescission submitted pursuant to paragraph III.3.(b), was not accompanied by a statement satisfying any of the requisites of that section. In the event that

14

PCH declines to accept any particular notice of rescission under either paragraph III.3.(a) or (b), or both, PCH shall notify the claimant thereof within 90 days of the conclusion of the Claims Made Period and provide the claimant with an explanation of why the notice of rescission was not accepted and a statement of the following rights: within 30 days after the date of such notice, the claimant may opt out of the portion of the settlement provided for in this paragraph III.3. and that part (and that part only) of the Release And Covenant Not To Sue (the form of which is attached hereto as Exhibit C), providing for a release of claims for monetary damages (the "Secondary Opt Out Period"). Nothing herein shall prevent PCH from sending notification to claimants that their claims are rejected prior to the end of the aforesaid 90 day period. Any right to opt out pursuant to this paragraph III.3(c)(iii) shall be personal to the individual claimant and shall not be assignable, and in no event shall any class of persons be permitted to opt out.

(iv)    [Deleted].

(v)    Throughout the Claims Made Period, the Court has entered five orders with regard to the administration of the claims. (See Order Regarding Administration of Claims and Other Class Communications, entered September 9, 1999 (Doc. 38); Second Order Regarding Administration of Claims and Other Class Communications, entered October 6, 1999 (Doc. 90); Third Order Regarding Administration of Claims and Other Class Communications, entered October 15, 1999 (Doc. 98); Fourth Order Regarding Administration of Claims and Other Class Communications, entered November 1, 1999 (Doc. 109); Fifth Order Regarding Administration of Claims and Other Class Communications, entered November 23, 1999 (Doc. 130)). Those orders are hereby incorporated to the agreement as if fully stated herein.

15

(d)    PCH reserves the right to engage third party suppliers to assist in the administration of the claims provided in this paragraph III.3. PCH will provide reports on the progress of the claims administration process upon reasonable request from Class Counsel.

(e)    PCH shall cause its independent auditors to provide a report to Class Counsel, within 120 days after the Effective Date, confirming the amount refunded pursuant to this paragraph III.3.

4.    After such time that the Court may approve this Second Amended Stipulation, then the parties hereto will jointly and promptly seek entry of an Order and Final Judgment which shall:

(a)    Approve finally this settlement and its terms as being fair, reasonable and adequate and as having been entered into in good faith, and that the class members' due process rights to adequate representation at all times have been satisfied as to both the Settlement Class and Subclass; direct the parties to comply with and implement the terms of the settlement and declare the settlement binding on all Settlement Class members;

(b)    Direct that the *Vollmer* Action be dismissed on the merits and with prejudice and except as provided for herein, without costs;

(c)    Permanently bar and enjoin the Named Plaintiffs and all members of the Settlement Class, or any of them, or anyone on their behalf, upon notice of the Final Judgment, from commencing or prosecuting any actions asserting any of the Settled Claims, either directly, representatively, derivatively or in any other capacity against the Settling Defendants herein; and

16

(d)     Provide that the Court shall retain continuing and exclusive jurisdiction over the Parties for a period of five years after the Effective Date for the purpose of enforcing, implementing and interpreting this Second Amended Stipulation, including jurisdiction over all members of the Settlement Class and the Subclass, and over the administration and enforcement of the Settlement and benefits to members of the Settlement Class and the Subclass, and provide that any disputes or controversies arising out of or related to the interpretation, enforcement or implementation of the Settlement shall be made by motion to the Court.

5.     This Second Amended Stipulation shall become Final upon the occurrence of all of the following three events:

(a)     it is approved in all respects by the Court as required by Rule 23(e) of the Federal Rules of Civil Procedure;

(b)     entry, as provided for in paragraph III.4. herein, is made of the Final Judgment of dismissal with prejudice as to defendants against all Named Plaintiffs and members of the Settlement Class and Subclass who have not timely excluded themselves from the *Vollmer* Action; and

(c)     if an objection is made to the Court, the time for appeal or to seek permission to appeal from the Court's approval of this Second Amended Stipulation as described in paragraph III.5(a) hereof and entry of a Final Judgment as described in paragraph III.5(b) hereof has expired or, if appealed, approval of this Second Amended Stipulation and the Final Judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal

17

or review. If, however, there is no objection to the settlement in the Court and/or, if no party is finally determined to have standing to appeal, the Second Amended Stipulation of Settlement will be final upon the happening of paragraphs III.5(a) and (b) hereof.

6.    At Defendants' expense, the Parties and the Court have notified members of the Settlement Class and Subclass of the terms of the proposed settlement by publication notice pursuant to the Court's August 3, 1999 Order.

7.    At Defendants' expense, the Parties and the Court have also provided written notice describing the settlement to all members of the Subclass whose names and addresses could be identified by reasonable means.

8.    [Deleted].

9.    Settlement Class or Subclass members had the right to opt out of the portion of the settlement relating to monetary claims and that part (and that part only) of the Release And Covenant Not To Sue (the form of which is attached hereto as Exhibit C), providing for a release of claims for monetary damages, on notice to Class Counsel and counsel for defendants within 45 days after notice was deemed completed (the "Opt Out Period"). All such correspondence must include the Class Members' Control Number, if any. Any correspondence through which a Settlement Class or Subclass member attempts to opt out postmarked more than 45 days after such date shall be invalid. Any right to opt out pursuant to this paragraph III.9. shall be personal to the individual and shall not be assignable, and in no event shall any class of persons be permitted to opt out. Members of the Settlement Class or Subclass who have not timely excluded themselves from the *Vollmer* Action shall look solely to the relief set forth in paragraph III.3., for settlement and satisfaction against the Settling Defendants of all claims that are released hereunder. Except as provided by

18

order of the Court, no member of the Settlement Class shall have any interest in any particular part or portion of such relief.

10.    At or prior to the Final Fairness Hearing provided for in the June 30, 1999 Memorandum and Order attached hereto as Exhibit B, PCH shall serve on Class Counsel and file with the Court proof, by affidavit, of such mailing and publication.

11.    Members of the Settlement Class who have not properly requested exclusion in the time and manner set forth in the notice shall be bound by all orders and judgments entered in this class action, whether favorable or unfavorable to the Settlement Class.

12.    Either Party's counsel may respond to written questions about the litigation sent by members of the Settlement Class. All written questions received and responses given must be served on opposing counsel.

13.    At or prior to the Final Fairness Hearing provided for in the June 30, 1999 Memorandum and Order attached hereto as Exhibit B, Class Counsel may apply to the Court for an aggregate award of Fees and Expenses in an amount not to exceed $3 million, which shall be paid upon the Second Amended Stipulation becoming final pursuant to this Second Amended Stipulation, and shall be paid out of a separate fund established by Defendants not to exceed $3 million dollars. Said separate fund shall not affect the rights of any member of the Settlement Class, nor shall any fee award reduce any Settlement Class member's recovery under this Second Amended Stipulation. Such application for Fees and Expenses shall include all fees and expenses awarded or to be awarded by the Court in the *Vollmer* Action in connection with this Settlement to any Settlement Class member or their counsel; the Settling Defendants and their attorneys, agents, predecessors and affiliates shall not be liable for any further claims, costs, damages or attorneys' fees or any other

19

as or similar to the California Civil Code § 1542.

## VI.    USE OF THIS SECOND AMENDED STIPULATION OF SETTLEMENT

1.    This Second Amended Stipulation, the settlement provided for herein (whether or not consummated), and any proceedings, or papers pursuant to this Second Amended Stipulation shall not be:

(a)    construed by anyone for any purpose whatsoever as, or deemed to be, evidence of a presumption, concession or admission by defendants of the truth of any fact alleged or the validity of any claims, or of the deficiency of any defense which has been or could have been asserted in the *Vollmer* Action, or of any liability, fault or wrongdoing on the part of defendants; or

(b)    offered or received as evidence of a presumption, concession or an admission of any liability, fault or wrongdoing, or referred to for any other reason by any party or by any person not party to this Second Amended Stipulation in any other action or proceeding other than in such proceedings as may be necessary to effectuate the provisions of this Second Amended Stipulation.

## VII.    WARRANTIES

1.    Named Plaintiffs and Class Counsel hereby warrant that this Second Amended Stipulation is entered into in good faith, that no conflicts of interest exist on their part, and that in their opinion the benefits provided herein to members of the Settlement Class and Subclass represent fair consideration for the Settled Claims.

2.    The undersigned counsel represent and warrant that they have taken all actions and have secured the consents of all persons necessary to authorize the execution of this Second

21

Amended Stipulation, the Exhibits hereto and all related documents, that they have performed the acts necessary to fulfill the terms and conditions of this Second Amended Stipulation, and that they are fully authorized to enter into and execute this Second Amended Stipulation on behalf of the respective Parties.

## VIII.  BINDING EFFECT

1.    The Parties deem this Second Amended Stipulation to be fair and reasonable and have arrived at the terms and conditions set forth in this Second Amended Stipulation in arm's-length negotiations taking into account all relevant factors, present or potential.

2.    This Second Amended Stipulation shall be binding upon and inure to the benefit of each of the Parties, their predecessors and successors, and their past, present and future assigns, representatives, subsidiaries, divisions, affiliates, parents and subsidiaries thereof, partners, partnerships, and all of the respective officers, directors, agents, employees and attorneys of each of them.

3.    All of the Exhibits attached hereto are hereby incorporated by reference as though fully set forth herein.

4.    This Second Amended Stipulation, with its Exhibits, sets forth the entire understanding of the Parties. Any previous discussions, agreement, or understandings between or among the Parties regarding the subject matter hereof or any part thereof are hereby merged into and superseded by this Second Amended Stipulation.

5.    If any clause, provision or section of this Second Amended Stipulation shall, for any reason, be held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not effect any other clause, provision or section of this Second Amended

22

Stipulation, and this Second Amended Stipulation shall be construed and enforced as if such illegal, invalid or unenforceable clause, provision or section had not been contained herein.

## IX.    MODIFICATION, INTERPRETATION, AND EXECUTION

1.    This Second Amended Stipulation may be amended and any of its provisions may be waived only by a writing executed by all signatories hereto.

2.    This Second Amended Stipulation may be executed in counterparts, all of which constitute a single, entire agreement.

3.    This Second Amended Stipulation shall in all respects be governed by and interpreted in accordance with the laws of the State of New York.

4.    This Second Amended Stipulation shall become effective and binding, subject to all of its terms and conditions, upon the Parties and their counsel when it has been fully executed by the undersigned counsel for the Parties.

23

manner of liability regarding the allegations that form the basis of the *Vollmer* Action or any of the Settled Claims, and shall not be obligated to pay more than such amount in total for all such Fees and Expenses.

## IV.    TERMINATION OF THE SETTLEMENT

1.    If the Court refuses to approve this Second Amended Stipulation or any part hereof, or if such approval is modified or set aside on appeal, or if the Court does not enter the Final Judgment provided for above, or if the Court enters the Final Judgment and appellate review is sought, and on such review, such Final Judgment is not affirmed in its entirety, then this Second Amended Stipulation shall be canceled and terminated at the election of defendants or Class Counsel (acting on behalf of the Class), and shall become null and void, and shall not be deemed, used or offered to prejudice in any way the positions of the parties with respect to the *Vollmer* Action, or otherwise.

2.    [Deleted].

## V.    RELEASE AND DISMISSAL OF CLAIMS

1.    On the Effective Date of Settlement, each member of the Settlement Class shall be deemed to have released all Settled Claims against the Settling Defendants as if he or she had individually executed a Release and Covenant Not to Sue in the form of Exhibit C attached hereto.

2.    The Named Plaintiffs and the Settlement Class shall be further deemed, on the Effective Date of Settlement, to have knowingly and expressly waived any and all claims of fraudulent inducement or of rights and benefits conferred upon them under provisions of law such

20

IN WITNESS WHEREOF, each of the Parties has executed this Second Amended Stipulation of Settlement through its duly authorized representative as of the 14th day of January, 2000.

MORGAN, LEWIS & BOCKIUS LLP

By: _____ [For Richard Mescon]
    Richard A. Mescon
    101 Park Avenue
    New York, New York 10178-0060

Attorneys for Publishers Clearing House and Campus Subscriptions, Inc.

CARR, KOREIN, TILLERY, KUNIN, MONTROY, CATES, KATZ & GLASS

By: _____
    Steven A. Katz
    #10 Executive Woods Court
    Belleville, IL 62226

Attorneys for Named Plaintiffs and the Settlement Class

24

IN THE CIRCUIT COURT
TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS

THOMAS G. VOLLMER,                          )
PEGGY R. POSPESHIL,                          )
MARY KENNAH,                                )
PHILLIP INGRAM,                             )
ALBERT F. DIX,                              )
STEVE MALLIA,                               )
MICHELLE COLLINS,                           )
BARBARA BUCHANAN                            )
H. DUANE KUNDERT, and                       )
DR. ROBERT ROSENTHAL,                       )
Individually, and On Behalf of              )
All Others Similarly Situated,              )
                                            )
        Plaintiffs,                         )
                                            )
v.                                          )   Cause No: 98-L-100B
                                            )
PUBLISHERS CLEARING HOUSE,                  )
a New York Limited Partnership,             )
                                            )
and                                         )
                                            )
CAMPUS SUBSCRIPTIONS, INC.,                 )   CLASS ACTION COMPLAINT
a New York Corporation,                     )
                                            )
        Defendants.                         )

### SECOND AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs on behalf of themselves, and all others similarly situated, and for

their Second Amended Class Action Complaint state as follows:



EXHIBIT

A

## Parties, Jurisdiction and Venue

1.    Defendant Publishers Clearing House ("PCH") is a New York limited partnership. PCH is doing business in St. Clair County, Illinois.

2.    Defendant Campus Subscriptions, Inc. ("Campus"), is a New York corporation wholly-owned by PCH.

3.    Plaintiff Thomas G. Vollmer is an individual residing in St. Clair County, Illinois, and at all relevant times has been a customer of PCH.

4.    Plaintiff Peggy R. Pospeshil is an individual residing in St. Clair County, Illinois, and at all relevant times has been a customer of PCH.

5.    Plaintiff Mary Kennah is an individual residing in St. Louis County, Missouri, and at all relevant times has been a customer of PCH.

6.    Plaintiff Phillip Ingram is a resident of Bernalillo County, New Mexico, and at all relevant times has been a customer of PCH.

7.    Plaintiff Albert F. Dix is an individual residing in Los Angeles County, California, and at all relevant times has been a customer of PCH.

8.    Plaintiff Steve Mallia is an individual residing in Houston, Texas, and at all relevant times has been a customer of PCH.

9.    Plaintiffs Michelle Collins and Barbara Buchanan are individuals residing in Evansville and Indianapolis, Indiana, respectively, and at all relevant times have been customers of PCH.

10.    Plaintiff H. Duane Kundert is an individual residing in Monroe, Wisconsin, and at all relevant times has been a customer of PCH.

2

11.    Plaintiff Dr. Robert Rosenthal is an individual residing in Morris County, New Jersey, and at all relevant times had been a customer of PCH.

12.    All activities complained of with respect to Plaintiffs Vollmer and Pospeshil occurred in St. Clair County, Illinois.

3

## Factual Allegations

13.    In millions of mailings and advertisements since February 1992, Defendants employed a pattern of deceptive practices by using sweepstakes solicitations to entice and/or mislead Plaintiffs and Class members into purchasing magazines and merchandise. The mailings are too voluminous to attach to this Complaint, but among other things, the mailings set out the identity of the representatives at Defendants making the representations upon which this lawsuit is premised; the time, place and content of the representation; and the method by which the representation was communicated to Plaintiffs and Class members (as defined in Paragraph 30).

14.    Defendant Campus is a wholly owned subsidiary of Defendant PCH which sends out similar mailings and advertisements.

15.    Defendants intentionally designed and distributed the mailings to mislead Plaintiffs and Class members into believing, among other things, that:

(a)    they have won, or are on the verge of winning, large cash and other valuable prizes;

(b)    Defendants' personnel are personally aware of Class members' status in the sweepstakes and are taking measures to ensure that Class members will win;

(c)    purchasing either a magazine or merchandise will improve their status and/or relationship with Defendants and, therefore, their odds of winning a prize; and

4

      (d)    by ordering, they will gain admittance into special clubs or select and/or limited groups of other participants who have a better chance of winning prizes when, in fact, they do not.

16.    Such deceit is furthered by Defendants' acts of:

      (a)    failing to inform members of the Class in sufficient language and type size that could be understood by a reasonable person that no purchase was necessary to enter and/or win the sweepstakes;

      (b)    misinforming members of the Class that a purchase was necessary to continue receiving offers to enter the sweepstakes;

      (c)    informing Class members they were "finalists" or in the "final round" of a sweepstakes when, in fact, they were not;

      (d)    inundating Class members with up to hundreds of solicitations per year;

      (e)    using graphic and copy-writing techniques designed to minimize the effect of any disclaimers and maximize the effect of the misleading statements;

      (f)    using fictitious individuals as signatories and/or spokespersons;

      (g)    making it more onerous to enter the sweepstakes without ordering than it is when placing an order;

      (h)    failing to adequately disclose the odds each person has of winning a prize;

      (i)    creating false and/or unnecessary deadlines for entry into the sweepstakes; and

      (j)    having non-order entries mailed to different addresses and on different media and/or formats than order entries.

5

17.    The mailings were also designed to convince Plaintiffs and Class members that by continuing to purchase magazines and merchandise, they were surviving a series of "winnowing down" processes and were moving towards winning millions of dollars.

18.    Although the mailings were designed and distributed in such a way as to deceive all putative Class members, the elderly were specifically targeted by Defendants as evidenced by use of the devices and methods described above. Moreover, a substantial portion of PCH's customer base is known by PCH to be elderly, and PCH's use of recency, frequency and money value formulae to select mailings resulted in a disproportionate number of solicitations being sent to elderly Class members, despite the fact that PCH knew or should have known that a substantial portion of these Class members were unable to discern qualifying language in the solicitations.

19.    In fact, Plaintiffs and Class members had no greater odds of winning than persons who did not order materials.

20.    Plaintiffs and Class members justifiably relied on the foregoing misrepresentations, would not have ordered except for their belief that their odds of winning cash or other prizes were enhanced, and were thereby injured and/or damaged by the conduct described herein.

21.    Defendants have reaped enormous profits by the aforesaid conduct.

6

## Class Action Allegations

22.     Plaintiffs bring this action as a class action against Defendants pursuant to Section 735 ILCS 5/2-801, *et seq.*, of the Illinois Code of Civil Procedure on their own behalf and on behalf of a Class consisting of all persons who received solicitation materials by mail from PCH from February 1992 to the present.  The Class shall include a subclass consisting of all members of the Class who ordered and paid for magazines and/or merchandise.  Excluded from the Class are all employees of Defendants (and any subsidiaries and divisions thereof), their officers and agents, and the immediate family of those persons.  Also excluded is any judge that may preside over this matter.

23.     Plaintiffs are members of the Class and will fairly and adequately assert and protect the interests of the Class members.  The claims of Plaintiffs are typical of the Class members, and the interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiffs have retained attorneys who are experienced in class action litigation.

24.     The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are millions of members of the Class, whose identities can be ascertained from the records and files of PCH and from other sources.  Plaintiffs and their counsel do not anticipate any difficulties in the management of the action as a class action.

25.    Common questions of law and fact predominate over any question affecting only individual members of the Class. Common questions include, but are not limited to, whether and for what years Defendants made material omissions or misstatements of facts to Class members fraudulently inducing them to buy materials that they otherwise would not have purchased, and whether the Defendants committed wire and/or mail fraud.

26.    The prosecution of separate actions by individual members of the Class would create a risk of:

      (a)    inconsistent or varying adjudications with respect to individual members of the Class; and

      (b)    adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

27.    Defendants have generally acted or refused to act on grounds applicable to the entire Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

28.    A class action is superior to other available methods for the fair and efficient prosecution of this action.

29.    The certification of a Class would allow litigation of claims that, in view of the expense of litigation, may be insufficient in amount to support separate actions.

30.   Accordingly, Plaintiffs bring this action on behalf of themselves and all members

of the Class defined as follows:

> From February 1, 1992 to the present, all persons who received solicitations by mail from PCH. The Class shall include a subclass consisting of Class members who ordered and paid for materials from PCH. Excluded from the Class are employees, officers and agents of Defendants (including subsidiaries and divisions thereof), their immediate family members, and any judge that may preside over this matter.

<u>Count I</u>
(Violations of § 1962(c)-(d) of RICO Against PCH and Campus)

31.    Paragraphs 1-30 are incorporated by reference as if fully set forth in this Count.

32.    This claim for relief arises under 18 U.S.C. § 1962(c) and (d).

33.    PCH and Campus are "persons" within the meaning of 18 U.S.C. § 1961(3).

34.    PCH is a direct marketer of magazines that are published by numerous publishers around the country. PCH is also a direct marketer of merchandise that is manufactured by various manufacturers around the country. PCH has contractual relationships with all of these publishers and manufacturers, including royalty, licensing and product endorsement arrangements and the like.

35.    PCH contractually engages numerous third party contractors to perform business functions, including printing and lettershop functions, and in some cases to supplement PCH's internal resources.

36.    PCH utilizes Campus in furtherance of the association described above and in furtherance of the enterprise and/or conspiracy set forth herein.

37.    PCH, Campus, and the aforesaid third parties are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

38.    The association-in-fact between PCH, Campus, and the aforesaid third parties is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). This "enterprise" is hereafter referred to as the "Sweepstakes Enterprise."

39.    Each of the Defendants was employed by or associated with the above described association-in-fact within the meaning of 18 U.S.C. § 1962(c).

10

40.    The Sweepstakes Enterprise has been continuously engaged in since February 1, 1992, and its activities affect interstate commerce in a number of ways, including without limitation:

(a)    PCH, Campus, and their third party contractors prepare or direct the preparation of written solicitation materials at Defendants' offices in New York. These solicitations are mailed to millions of persons residing in different states around the country;

(b)    Persons respond to Defendants' solicitations by mail to PCH's addresses in New York and/or Connecticut;

(c)    Defendants transmit the orders they receive for magazines in response to its solicitations to the magazines' respective third parties in states other than New York. These third parties, in turn, mail magazines and merchandise to the persons who have ordered them in different states around the country; and

(d)    PCH, through its agents, conducts telephone sales, marketing and services across the country.

41.    The members of the Sweepstakes Enterprise conducted and participated, directly or indirectly, in the conduct of each other's affairs through a pattern of racketeering activity that comprised PCH's efforts to induce Plaintiffs and the Class members to purchase magazines and merchandise by creating the false impression that such purchases would increase their chances of winning PCH's sweepstakes. This pattern of activity is referred to herein as the "Sweepstakes Scheme."

11

42.    The Sweepstakes Scheme is described generally in the Factual Allegations of this Complaint, and consists of repeated acts of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

43.    Throughout the Class period, for the purpose of executing and attempting to execute the Sweepstakes Scheme, and in furtherance of the Sweepstakes Enterprise, Defendants placed and/or received thousands of interstate mailings to and/or from Plaintiffs and the Class members concerning PCH's Sweepstakes, orders for magazines and merchandise, and the collection of monies.  Each of these interstate mailings constituted a violation of 18 U.S.C. § 1341, and were committed somewhat closely in time, involved the same victim(s), and/or involve the same type of misconduct.

44.    Throughout the Class period, for the purpose of executing and attempting to execute the Sweepstakes Scheme, and in furtherance of the Sweepstakes Enterprise, PCH and Campus, or their agents, placed and/or received thousands of interstate phone calls to and/or from Plaintiffs and Class members concerning PCH's Sweepstakes, orders for magazines and merchandise, and the collection of monies.  Each of these interstate phone calls constituted a violation of 18 U.S.C. § 1343, and were committed somewhat closely in time, involved the same victim(s), and/or involve the same type of misconduct.

45.    Throughout the Class period, for the purpose of executing and attempting to execute the Sweepstakes Scheme, and in furtherance of the Sweepstakes Enterprise, Defendants caused the interstate transmission of television commercials which promoted PCH's sweepstakes.  Each of these interstate commercials constituted a violation of 18 U.S.C. § 1343,

12

and were committed somewhat closely in time, involved the same victim(s), and/or involve the same type of misconduct.

46.    Each of the above described acts were interrelated, and were part of a common and continuous pattern of fraudulent activity, perpetrated for the same or similar purposes that involved the same or similarly situated participants and methods of commission, and had similar results impacting similar victims, Plaintiffs and members of the Class.  These acts constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), and were committed somewhat closely in time, involved the same victim(s), and/or involve the same type of misconduct, and are likely to continue in the future.

47.    On various occasions during the Class period, the members of the Sweepstakes Enterprise, including PCH and Campus, agreed, and conspired with one another to do the things heretofore alleged and to participate and further the Sweepstakes Scheme.  PCH and/or Campus committed the wrongful, overt acts in furtherance of the conspiracy as described above.  In doing so, PCH, Campus, and the aforementioned third parties, conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

48.    As a direct and proximate result of PCH's and/or Campus' misconduct, and their participation in the conspiracy and their agreement to commit and further those acts, Plaintiffs and Class members have suffered damage to their property in the form of millions of dollars of payments to Defendants for magazine subscriptions and merchandise.  Under the provisions of 18 U.S.C. § 1964(c), Plaintiffs and Class members are entitled to bring this action and to recover compensatory damages, treble damages, the costs of bringing this suit, and attorneys' fees.

13

49.    Under the provisions of 18 U.S.C. § 1964(a), Plaintiffs and Class members seek an order prohibiting PCH and Campus from conducting or participating in the conducting of any sweepstakes or contest in connection with the sale of any magazine, merchandise or service that is in violation of the law.

14

<u>Count II</u>
(Consumer Protection Act Violations Against PCH and Campus)

50.    The allegations of paragraphs 1-49 are incorporated by reference as if fully set forth in this Count.

51.    The New York Consumer Protection From Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, *et seq.*, prohibits "Deceptive acts or practices in the conduct of any business, trade or commerce."

52.    Defendants' deceptive acts and/or practices have included, but are not limited to intentionally failing to disclose to Plaintiffs and Class members that their odds of winning are not enhanced in any way by ordering from PCH.

53.    Plaintiffs and Class members justifiably relied on the foregoing misrepresentations and/or omissions, and would not have ordered except for their belief that their odds of winning cash or other prizes were enhanced.

54.    Plaintiffs and Class members have been injured and/or damaged by the misrepresentations and/or omissions of Defendants in that they have purchased materials that they otherwise would not have bought.

55.    PCH is a New York partnership, and Campus is a New York corporation, and the solicitations complained of emanated from New York, so that Class members residing in states other than New York are entitled to seek relief pursuant to the New York Consumer Protection Act.

15

56.    Other states have Consumer Protection Acts that are sufficiently similar to the New York Consumer Protection Act such that separate counts under such statutes would be duplicative.

## Prayer for Relief

WHEREFORE, Plaintiffs and the Class members pray that the Court enter judgment as follows:

(a)    Certifying the Class as described herein;

(b)    Awarding Plaintiffs and members of the Class money damages (including general and special compensatory damages, statutory damages, and/or enhancement of said damages) in an amount greater than $75,000 under either 18 U.S.C. § 1962, or the New York Consumer Protection Act, or both;

(c)    Awarding pre and post judgment interest, costs of this suit and attorneys' fees under the common benefit doctrine and any applicable statute;

(d)    Entering a permanent injunction against Defendants enjoining them from the conduct described above; and

(e)    Awarding all other relief the Court deems just and proper.

16

Respectfully submitted,

CARR, KOREIN, TILLERY, KUNIN,
MONTROY, CATES & GLASS

_____

Steven A. Katz #06204543
Judy L. Cates #00414743
Douglas R. Sprong #06202898
#10 Executive Woods Court
Belleville, Illinois 62226
(618) 277-1180
FAX: (618) 277-4676

Steven J. Stolze, #06203254
Rathman & Francis
1031 Lami
St. Louis, MO 63104
(314) 773-3456

Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

A copy of the foregoing was hand-delivered on June 18, 1999, to Counsel for Defendants.



_____

17

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THOMAS G. VOLLMER,<br>PEGGY R. POSPESHIL,<br>MARY KENNAH,<br>PHILLIP INGRAM,<br>ALBERT F. DIX,<br>STEVE MALLIA,<br>MICHELLE COLLINS,<br>BARBARA BUCHANAN,<br>H. DUANE KUNDERT, and<br>DR. ROBERT ROSENTHAL<br>Individually, and On Behalf of<br>All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PUBLISHERS CLEARING HOUSE,<br>a New York Limited Partnership, and<br>CAMPUS SUBSCRIPTIONS, INC.<br>a New York Corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO. 99-434-GPM |

*FILED*

*JUN 30 1999*

*G. PATRICK MURPHY,*
*DISTRICT JUDGE*
*SOUTHERN DISTRICT OF ILLINOIS*
*EAST ST. LOUIS, ILLINOIS*

## MEMORANDUM AND ORDER

**MURPHY, District Judge:**

This matter is before the Court on Plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 23, for an order approving the settlement of this matter in accordance with a Class Action Stipulation of Settlement dated June 23, 1999 (the "Settlement") (Doc. 15) and Defendants' motion for an antisuit injunction pending final approval of Settlement (Doc. 18). The Settlement and exhibits attached thereto set forth the terms and conditions for a proposed settlement and dismissal with prejudice of this lawsuit on a class-wide basis. Having read and

**EXHIBIT**

**B**

considered the Settlement and exhibits attached thereto, and having heard the parties' arguments and given them due consideration, the Court grants Plaintiffs' motion for preliminary approval of the Settlement (Doc. 15) and Defendants' motion for an antisuit injunction pending final approval of Settlement (Doc. 18).

**IT IS THEREFORE ORDERED:**

1.     For purposes of this Order, the Court adopts and incorporates the definitions attached hereto as Exhibit A.

2.     As more fully set forth in the separate Conditional Class Certification Order entered this same date, for settlement purposes only and pursuant to Federal Rules of Civil Procedure 23(b)(1)(a), 23(b)(2), and 23(b)(3), the Court has certified a Settlement Class consisting of all persons who received Solicitation Materials by mail from Defendants during the period from February 3, 1992, through the date of conditional class certification (the "Class Period"). The Court has further certified, pursuant to Federal Rules of Civil Procedure 23 (b)(1)(a), 23(b)(2), and 23(b)(3), a Subclass consisting of all members of the Settlement Class who responded by mail to Solicitation Materials received by mail from Defendants during the Class Period by ordering and paying for magazines and/or merchandise from Defendants. Excluded from the Settlement Class and the Subclass are any parents, subsidiaries, affiliates or controlled persons of Defendants, as well as the officers, directors, agents, or employees of Defendants, and the immediate family members of such persons. Also excluded from the Settlement Class are any judges assigned to handle this matter, and their employees.

3.     The Court finds that the Settlement filed by the parties falls within the range of reasonableness contemplated by the Seventh Circuit Court of Appeals (*see, e.g., Mars*

2

*Steel Corp. v. ɔntinental Bank N.A.*, 834 F.2d 677 (7th ꞏꞏ. 1987); *Gautreaux v. Pierce*, 690 F.2d 616 (7th Cir. 1982); *Armstrong v. Board of School Directors*, 616 F.2d 305 (7th Cir. 1980)). The Court further finds that there is sufficient basis for notifying the class of the proposal and for enjoining the class members from proceeding in any other actions pending the opt-out period and Final Fairness Hearing as set forth below.

    4. The Court hereby preliminarily approves the Settlement, subject to the Final Fairness Hearing after notice to the Settlement Class.

    5. Provided that the Court approves the form of notice to the class as more fully discussed in paragraph 6 below, at the time of such approval, the Court shall set a date for the Final Fairness Hearing to determine (1) whether the proposed settlement of this action on the terms and conditions provided for in the Settlement is fair, reasonable, and adequate and should be approved by the Court and whether a judgment approving the Settlement should be entered; (2) whether the members of the Settlement Class and Subclass have been adequately represented at all times by both the Named Plaintiffs and the law firm of Carr, Korein, Tillery, Kunin, Montroy, Cates & Glass ("Class Counsel") such as to satisfy the requirements of due process; (3) whether fees and expenses should be awarded to Class Counsel in the amount sought; (4) whether the Court should issue a permanent injunction continuing the preliminary injunction contained herein barring members of the Settlement Class, or anyone acting on their behalf, from commencing, continuing, or prosecuting similar actions; and (5) such other matters as the Court may deem necessary and appropriate.

    6. The Court shall hold a conference no later than August 24, 1999, for the purpose of consideration of approval, as to form and content, the forms of Notice of Proposed

3

Class Action Settlement to be agreed upon by Class Counsel and Defendants (the "Notice") and for setting a date upon which notice shall be deemed completed, as contemplated by the Settlement.

7.    The Court finds that it has subject matter jurisdiction over this matter pursuant to Article III of the Constitution of the United States and 28 U.S.C. §§ 1331 and 1367 and 18 U.S.C. § 1965.

8.    The Court finds that it has personal jurisdiction over all of the Named Plaintiffs and, upon dissemination of the Notice and commencement of the right of class members to opt-out, as more fully set forth in the Settlement, all class members in the Settlement Class.

9.    The Court finds that it has personal jurisdiction over Settling Defendants by consent, for purposes of the approval and administration of the Settlement only, provided that if the Settlement is not made final, Settling Defendants shall have the right to raise all defenses, including defenses relating to personal jurisdiction.

10.    The Court finds that the simultaneous or future prosecution of other actions based upon the solicitations and practices at issue in this action, whether in federal or state court, jeopardize this Court's jurisdiction and its ability to rule on the Settlement, substantially increase the cost of litigation, create a risk of conflicting results, and could prevent class members from benefiting from any settlement already negotiated. Thus any such actions pose a significant threat of irreparable harm to the parties hereto and to the Court's jurisdiction. The Court finds that the requested injunction is necessary in aid of preserving the Court's jurisdiction and to protect and effectuate this Court's rulings and judgments. Therefore, the

4

Court grants Defendants' motion for a preliminary injunction and hereby bars and enjoins the Named Plaintiffs, any and all members of the Settlement Class, or anyone acting on their behalf, and all other persons with actual knowledge of this Order from commencing, continuing, or prosecuting any actions or proceedings of any kind, including any federal or state court actions, asserting any of the Settled Claims either directly, representatively, derivatively, or in any other capacity against the Settling Defendants herein, pending the final determination regarding Settlement approval, regardless of the form of said actions; provided that this injunction shall not become effective against any person sought to be so enjoined until such person receives notice of this Memorandum and Order and of such person's personal and individual right to opt-out of the Settlement.  Whether the injunction should be made permanent will be considered at the Final Fairness Hearing.

11.    Settlement Class members shall have no more than 45 days after the date on which notice is deemed completed, as such date may be determined pursuant to paragraph 6 above, to opt-out of the portion of the Settlement relating to monetary claims and that part (and that part only) of a Release And Covenant Not To Sue providing for a release of claims for monetary damages.  Any correspondence through which a Settlement Class member attempts to opt-out postmarked more than 45 days after such date shall be invalid.  Class Counsel shall maintain an address to receive requests for exclusion and other communications, and shall further send copies of all such materials to counsel for Defendants on an ongoing basis, but in no event shall Class Counsel send copies of those materials received later than 5 days after the expiration of the opt-out period.

5

12.    Members of the Settlement Class who have not requested exclusion in the time and manner set forth in the Notice shall be bound by all orders and judgments entered in this lawsuit, regardless of whether those orders and judgments are favorable or unfavorable to the Settlement Class.

13.    Members of the Settlement Class may enter an appearance in this litigation through counsel of their own choice and at their own expense.   If they do not enter an appearance, they are members of the Settlement Class, which is represented by Class Counsel.

14.    Any member of the Settlement Class who has not requested exclusion may appear at the Final Fairness Hearing and show cause why the proposed Settlement should not be approved as fair, reasonable, and adequate; why the Settlement Class or Subclass has not been adequately represented at all times such as to satisfy the requirements of due process by either the Named Plaintiffs, Class Counsel, or both; why a judgment should not be entered dismissing this matter with prejudice in accordance with the terms of the Settlement; or why attorneys' fees and expense reimbursement should not be awarded to Class Counsel in the amounts sought; provided, however, that no Settlement Class member or any other person shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement or, if approved, the judgment to be entered thereon approving the same, or the attorneys' fees and expense reimbursement to be awarded to Class Counsel, unless, on or before 20 days prior to the Final Fairness Hearing that person has served upon Class Counsel, Steven A. Katz, Judy L. Cates and Douglas R. Sprong of Carr, Korein, Tillery, Kunin, Montroy, Cates & Glass, #10 Executive Woods Court, Belleville, Illinois 62226, and Defendants' counsel, Joseph P. Cyr, Morgan, Lewis & Bockius, LLP, 101 Park Avenue, New York, New York, 10178-0060, by hand or by first class

6

mail, notice of his or her intention to appear, which shall set forth each objection and the basis therefor; copies of any papers in support of that position; and proof that such person is a member of the Settlement Class and has not opted-out, and has filed with the Clerk of the United States District Court for the Southern District of Illinois, 750 Missouri Avenue, East St. Louis, Illinois 62202, his or her notice of intention to appear and supporting papers, with proof of service on the above attorneys.

15.    Any member of the Settlement Class who does not make an objection in the time and manner provided herein shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness or adequacy of the proposed Settlement and to any award of attorneys' fees and expense reimbursement to Class Counsel, unless the Court orders otherwise.

16.    If the Court grants final approval of the Settlement, all Settlement Class members who have not timely requested exclusion from the Settlement Class, whether or not they seek a refund and whether or not they participate in the benefits of the settlement, shall be barred from asserting any Settled Claims against any Settling Defendants, and shall be conclusively deemed to have released any and all such Settled Claims against all of the Settling Defendants.

17.    All papers in support of this Settlement shall be filed at least five days prior to the Final Fairness Hearing.

18.    Costs incurred in identifying and notifying members of the Settlement Class shall be paid as provided and as set forth in the Settlement.

7

19.    The Final Fairness Hearing may, without further notice to the Settlement Class, be continued or adjourned by order of this Court.

20.    The Settlement shall remain under seal, pursuant to the Court's Order entered June 23, 1999 (Doc. 8), until further order of this Court.

**IT IS SO ORDERED.**

DATED: ___6 / 30 / 99___

_____
**DISTRICT JUDGE**

8

**EXHIBIT A**

**DEFINITIONS**

(a)    "**Effective Date of Settlement**":  the date following the entry of a Final Judgment.

(b)    "**Fees and Expenses**":  all fees and expenses awarded by the Court in connection with this settlement to the Named Plaintiffs, any member of the Settlement Class or their counsel.

(c)    "**Final Judgment**":  a judgment no longer subject to review by reason of: (1) the exhaustion of all appeals and/or petitions for certiorari from any order providing final approval of the Stipulation of Settlement in the *Vollmer* Action; or (2) the expiration of the time for the filing of the last of such appeals and petitions.

(d)    "**Named Plaintiffs**":  the Named Plaintiffs in the Second Amended *Vollmer* Complaint.

(e)    "**Settled Claims**":  all claims, rights, causes of action, suits, matters, issues, controversies or other bases for liability, whether known or unknown, that have been, could have been or hereafter may be asserted in the *Vollmer* Action, or in any other court or proceeding (including but not limited to any claims arising under federal, state or local law) by or on behalf of the Named Plaintiffs or any members of the Settlement Class, whether individual, derivative, representative, legal, equitable or of any other type or in any other capacity, against the Settling Defendants which have arisen, arise now or hereafter may arise out of or relate in

9

any way to PCH's direct mail solicitations, its promotional sweepstakes or its marketing or business practices or policies, including but not limited to its billing practices, advertising campaigns and telemarketing efforts, from the beginning of time until the conclusion of the Class Period.

(f) **"Settling Defendants"**: Publishers Clearing House, Campus Subscriptions, Inc., and their respective predecessors and successors, and past, present and future assigns, representatives, subsidiaries, divisions, affiliates, parents, partnerships and partners, and all of their respective stockholders, partners, principals, controlling entities or persons, joint venturers, officers, directors, agents, employees, heirs, executors, trustees, personal representatives, estates, administrators, insurers, indemnitees, attorneys, accountants, financial advisers or other advisers, both past and present (in each case, in each and every capacity).

(g) **"Solicitation Materials"**: direct mail or other marketing materials containing sweepstakes entry materials that prominently feature solicitations for the sale of magazine subscriptions or consumer products, other than billing efforts or customer service correspondence and the like containing only incidental opportunities to order or references to future order activity.

10

## EXHIBIT C — RELEASE AND COVENANT NOT TO SUE

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THOMAS G. VOLLMER, | ) | |
| PEGGY R. POSPESHIL, | ) | |
| MARY KENNAH, | ) | |
| PHILLIP INGRAM, | ) | |
| ALBERT F. DIX, | ) | |
| STEVE MALLIA, | ) | |
| MICHELLE COLLINS, | ) | |
| BARBARA BUCHANAN, | ) | |
| H. DUANE KUNDERT, and | ) | |
| DR. ROBERT ROSENTHAL | ) | |
| Individually, and On Behalf of | ) | |
| All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Cause No. 99-434-GPM |
| | ) | |
| PUBLISHERS CLEARING HOUSE, | ) | |
| a New York Limited Partnership, | ) | |
| and | ) | |
| CAMPUS SUBSCRIPTIONS, INC. | ) | |
| a New York Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

KNOW ALL PERSONS BY THESE PRESENTS, that the Named Plaintiffs in

the litigation entitled *Thomas G. Vollmer et al. v. Publishers Clearing House and Campus*

*Subscriptions, Inc.*, Cause No. 99-434-GPM, and all other members, individually and

collectively of the Settlement Class, in consideration of the relief provided in the First Amended

Class Action Stipulation of Settlement dated July 29, 1999 and the Second Amended Class

Action Stipulation of Settlement dated January 14, 2000 (collectively, the "Stipulation of

Settlement"), do hereby absolutely, fully and forever release, relieve, remise, acquit and forever

1

EXHIBIT

C

discharge PCH, Campus Subscriptions, Inc., and their respective predecessors and successors, and past, present and future assigns, representatives, subsidiaries, divisions, affiliates, parents, partnerships and partners, and all of their respective stockholders, partners, principals, controlling entities or persons, joint venturers, officers, directors, agents, employees, heirs, executors, trustees, personal representatives, estates, administrators, insurers, indemnitees, attorneys, accountants, financial advisers or other advisers, both past and present (in each case, in each and every capacity) (the "Released Parties"), of and from any and all claims, demands, actions, suits, promises, cause of action, judgments, charges, complaints, sums of money, damages whenever and however incurred and of any type, liabilities of any nature whatsoever, including costs, expenses, penalties and attorney's fees, known or unknown, suspected or unsuspected, in law or equity, whether class, individual, or otherwise in nature, that any class plaintiff or plaintiffs or any member or members of the Class who has or have not timely excluded themselves from the *Vollmer* Action (including any of their past, present, or future agents, legal representatives, trustees, parents, children, relatives, associates, affiliates, partners, heirs, executors, administrators, predecessors, successors and assigns) (the "Releasing Parties"), and whether or not they object to the Stipulation of Settlement and whether or not they make a claim upon or participate in the relief provided for in the Stipulation of Settlement, whether directly, representatively, derivatively, or in any other capacity, ever had, now has, or hereafter can, shall or may have, based upon or relating in any way to or arising from any claims under any federal, state or local statute or regulation, or any statutory or common law tort or contract claims (including all claims for compensatory, special, statutory or punitive damages, costs,

2

expenses or fees),^1/ past, present or future, known or unknown, which the Releasing Parties, or

---

^1/    Such released claims shall include at least the following state law consumer fraud statutes:

Ala. Code § 8-19-1 et seq.; Ala. Code § 6-5-100 et seq.; Alaska Stat. § 45.50.471 et seq.; Alaska Stat § 45.50.531 et seq.; Ariz. Rev. Stat. Ann. § 44-1521, et seq.; Ark. Code Ann. § 4-88-101, et seq.; Ark. Code Ann. § 5-37-515 et seq.; Cal. Civ. Code § 1750 et seq.; Cal. Bus. & Prof. Code §§ 17200 et. seq. and 17500 et seq.; Colo. Rev. Stat. § 6-1-101 et seq.; Conn. Gen. Stat. § 42-110a et seq.;
Del. Code Ann. Tit. 6 § 2511 et seq.; Del. Code Ann. Tit. 6 § 2531 et seq.; D.C. Code Ann. § 28-3901 et seq.; Fla. Stat. Ann. § 501.201 et seq.; Fla. Stat. Ann. § 817.41 et seq.; Ga. Code Ann. § 10-1-370 et seq.; Ga. Code Ann. § 10-1-390 et seq.; Haw. Rev. Stat. § 480 et seq.; Haw. Rev. Stat. § 481A et seq.; Haw. Rev. Stat. § 487-1 et seq.; Idaho Code § 48-601 et seq.; 815 Ill. Comp. Stat. Ann. § 505/1 et seq.; 815 Ill. Comp. Stat. Ann. § 510/1 et seq.; Ind. Code Ann. § 24-5-0.5-1 et seq.; Iowa Code Ann. § 714.16 et seq.; Kan. Stat. Ann. § 50-623 et seq.; Ky. Rev. Stat. Ann. § 367.110 et seq.; Ky. Rev. Stat. Ann. § 367.220 et seq.; La. Rev. Stat. Ann. § 51:1401 et seq.; Me. Rev. Stat. Ann. tit. 5 § 206; Me. Rev. Stat. Ann. tit. 10 § 1211; Md. Com. Law Code Ann. § 13-101 et seq.; Md. Com. Law Code Ann. § 14-101 et seq.; Mass. Gen. Laws Ann. Ch. 93A § 1 et seq.; Mich. Comp. Laws Ann. § 445.901 et seq.; Minn. Stat. Ann. § 8.31 et seq; Minn. Stat. Ann. § 325D.43 et seq.; Minn. Stat. Ann. § 325F.67 et seq.; Miss. Code Ann. § 75-24-1 et seq.; Mo. Rev. Stat. § 407.010 et seq.; Mont. Code Ann. § 30-14-101 et seq.; Neb. Rev. Stat. § 59-1601 et seq.; Neb. Rev. Stat. § 87-301 et seq.; Nev. Rev. Stat. § 41.600 et seq.; Nev. Rev. Stat. § 598.0903 et seq.; N.H. Rev. Stat. Ann. § 358-A:1 et seq.; N.J. Stat. Ann. § 56:8-1 et seq.; N.M. Stat. Ann. § 57-12-1 et seq.; N.Y. Gen Bus Law. §§ 349 & 350-a et seq.; N.Y. Exec. Law § 63(12); N.C. Gen. Stat. § 75-1.1 et seq.; N.D. Gen. Stat. § 51-10-01 et seq.; Ohio Rev. Code Ann. § 1345.01 et seq.; Ohio Rev. Code Ann. § 4165 et seq.; Okla. Stat. Ann. tit. 15 § 751 et seq.; Okla. Stat. Ann. tit. 78 § 51 et seq.; Or. Rev. Stat. § 646.605 et seq.; Pa. Stat. Ann. tit. 73 § 201-1 et seq.; P.R. Laws Ann. tit. 3 § 341 et seq.; R.I. Gen. Law § 6-13.1-1 et seq.; R.I. Gen. Law § 11-18-10 et seq.; R.I. Gen. Law § 41-61.1 et seq.; S.C. Code Ann. § 39-5-10 et seq.; S.C. Code Ann. § 37-15-10 et seq.; S.D. Codified Laws Ann. § 37-24-1 et seq.; Tenn. Code Ann. § 47-18-101 et seq.; Tex. Bus. & Com. Code § 17.41 et seq.; Utah Code Ann. § 13-2-1 et seq.; Utah Code Ann. § 13-5-1 et seq.; Utah Code Ann. § 13-11-1 et seq.; Vt. Stat. Ann. tit. 9 § 2451 et seq.; Va. Code Ann. § 59.1-196 et seq.; Wash. Rev. Code Ann. § 19.86 et seq.;

any of them, individually and collectively, had, now have or hereinafter can, shall or may have against the Released Parties, from the beginning of the world to the date of preliminary court approval of the Stipulation of Settlement, in connection with, arising out of, based in whole or in part on or in any way related to the Released Parties' direct mail solicitations, its promotional sweepstakes or its marketing or business practices or policies, including but not limited to its billing practices, advertising campaigns and telemarketing efforts (the "Released Claims").

Each of the Releasing Parties knowingly and expressly waive any and all rights and benefits conferred upon them under the provisions of California Civil Code § 1542 (or by similar legal provisions in other states), which provides as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Each of the Releasing Parties covenants and agrees not to institute, maintain, collect, proceed against or seek to establish liability against any Released Party in any other federal, state or local court or forum, in or before any administrative agency, or in any other proceeding, based upon, arising out of, or related to, in whole or in part, any of the Released Claims, except as provided in the Stipulation of Settlement.

Each of the Releasing Parties accepts and assumes the risk that if any fact or circumstance is found, suspected or claimed hereafter to be other than or different from the facts or circumstances now believed to be true, the Release and Covenant Not to Sue contained herein

---

W. Va. Code § 46A-6-101 et seq.; Wis. Stat. Ann. § 100.18 et seq.;
Wyo. Stat. § 40-12-101 et seq.

4

shall be and remain effective notwithstanding any such difference in any such facts or circumstances.

The interpretation and legal effect of this Release and Covenant Not To Sue shall in all respects be governed by and interpreted in accordance with the laws of the State of New York.

This Release is delivered pursuant to the Final Judgment and Order dated _____, the First Amended Class Action Stipulation of Settlement dated July 29, 1999, and the Second Amended Class Action Stipulation of Settlement dated January 14, 2000, by and among Publishers Clearing House, Campus Subscriptions, Inc., Plaintiffs Thomas G. Vollmer, Peggy R. Pospeshil, Mary Kennah, Phillip Ingram, Albert F. Dix, Steve Mallia, Michelle Collins, Barbara Buchanan, H. Duane Kundert, and Dr. Robert Rosenthal, for themselves and their heirs, successors and assigns, and all other Releasing Parties and members of the Settlement Class, and all capitalized terms used herein that are not otherwise defined herein are used with the meanings, respectively, set forth in the First Amended Class Action Stipulation of Settlement and the Second Amended Class Action Stipulation of Settlement.

IN WITNESS WHEREOF, the Releasing Parties have caused this Release and Covenant Not To Sue to be executed by their duly authorized representatives, on _____.

CARR, KOREIN, TILLERY, KUNIN, MONTROY, CATES, KATZ & GLASS

By: _____
      Steven A. Katz
      #10 Executive Woods Court
      Belleville, IL 62226

Attorneys for Named Plaintiffs and the Settlement Class

5

## EXHIBIT D

## REMEDIAL UNDERTAKINGS

In consideration of a full, complete and final settlement of the *Vollmer* Action, and for dismissal with prejudice, and for execution of the Release And Covenant Not To Sue, the form of which is set forth in Exhibit C, PCH agrees to provide the following benefits to all members of the Settlement Class:

1.    **Ironclad Guarantee.**  PCH will provide, in the Official Rules included in solicitation materials containing sweepstakes entry materials mailed to residents of any state of the United States, a prominent statement in readily understandable terms of the following:

(a)    A No Purchase Necessary Message, set out in a separate paragraph and printed in capital letters in contrasting typeface not smaller than the largest typeface used in the text of the Official Rules.

(b)    A statement to the effect that many of PCH's promotional sweepstakes are ongoing and that consumers may receive multiple entry opportunities for ongoing sweepstakes included in such materials.

(c)    A statement to the effect that consumers may obtain future sweepstakes entry opportunities simply by writing to PCH or by some comparable or equally simple method.

(d)    An estimate of the average entrant's odds of winning each prize offered in such sweepstakes, expressed in Arabic numerals as a ratio in which the numerator equals the actual number of each prize to be distributed and the denominator equals the total number of entrants that, based upon its prior experience, PCH anticipates for such promotional sweepstakes.

1

EXHIBIT
D

(e)    A statement to the effect that consumers may cancel any magazine subscription ordered through PCH and receive a pro rata refund on unserved issues, or receive a full refund for any merchandise item returned undamaged to PCH, and the period allowed for the exercise of such privileges.

(f)    A statement to the effect that consumers may enter current ongoing sweepstakes as often as they like simply by writing to PCH or by some comparable or equally simple method.

(g)    The address to which consumers may write for a list of winners of prizes of more than $25.00, and the address to which consumers may write if they have any other questions about the sweepstakes or problems with their orders.

2.    **Business Practices and Procedures.**  For a period of five years after the Effective Date of the Settlement:

(a)    Solicitation materials mailed by PCH to consumers will not state that the recipient is a winner unless it is true.

(b)    Solicitation materials mailed by PCH to consumers will not contain a statement that the recipient may have the winning entry or may be holding the winning number or otherwise state that the recipient is the potential winner of any prize (a "potential winner" statement) unless:

(i)    the context in which such "potential winner" statement appears conveys clearly and unambiguously that the recipient has not yet won the prize, and

(ii)    all relevant and material conditions to winning the prize are set forth in the Official Rules, and, with respect to the condition of returning the winning entry on

2

time, such condition, if applicable, is prominently set forth in readily understandable terms in conjunction with the most prominent "potential winner" statement.

(c)     Solicitation materials mailed by PCH to consumers that state that a person is a winner will include an accurate description of the prize that the person has won or, if the prize is to be selected from a number of prizes, is likely to win, and a statement of when the prize is likely to be received.

(d)     Solicitation materials mailed by PCH to consumers will not state that an entry in such promotional sweepstakes accompanied by an order will be eligible to receive additional prizes or be more likely to win than an entry not accompanied by an order, or that an entry not accompanied by an order will have a reduced chance of winning a prize in such promotional sweepstakes.

(e)     Solicitation materials mailed by PCH to consumers will include or permit a separate non-order entry postcard (or other separate entry device or method, such as a toll-free telephone number or internet website entry option) for the sweepstakes included therein or, if the same form is used for entering the sweepstakes regardless of whether or not the recipient is placing an order with his or her entry, will include a prominent No Purchase Necessary Message in readily understandable terms in the Official Rules and, if the Official Rules do not appear thereon, on the combined order-entry form.

(f)     The Official Rules included in any such solicitation materials mailed by PCH to consumers will contain, in any case in which the method for entering with an order differs materially from the method for entering without an order, non-order entry instructions in readily understandable terms identified with a caption in a contrasting typeface not smaller than

3

the surrounding type to the effect that "If you are not ordering this time, to enter our sweepstakes you must [describe entry requirements]."

      (g)    Solicitation materials mailed by PCH to consumers will not state that entries from such materials must be received by a particular deadline date in order to be eligible for any sweepstakes included in such materials unless PCH has in place, as it now does, procedures and policies that identify and record the date entries are received and in fact treats, as it now does, entries received after the stated entry deadline date as ineligible.

      (h)    Solicitation materials mailed by PCH to consumers that promote a promotional sweepstakes in which each timely entrant is guaranteed to win a prize, and in which prizes of differing values are allocated among timely entrants on the basis of chance, will identify the prizes offered in the promotional sweepstakes and their value and, if such is the case, will include a statement in readily understandable terms in the text of the promotion to the effect that "most people will win [describe prize and its value]."

      (i)    Solicitation materials mailed by PCH to consumers that address the recipient as a member of a particular group based on that recipient's customer status (such as "President's Club" and the like) will not state that a purchase will improve the recipient's chances of winning in any sweepstakes and any letter included in such materials that requests an order or otherwise makes any substantial reference to ordering or order activity addresses the recipient as a member of any such group will include a prominent statement of the No Purchase Necessary Message in readily understandable terms.

4

(d)    ·PCH shall maintain an anti-scam database to record reports of sweepstakes frauds which it receives from consumer contacts. PCH will upon request provide access to data in the anti-scam database to law enforcement and consumer protection authorities regarding the location, identity and activities of current scam operations. Consumers who contact PCH with reports of fraudulent sweepstakes shall be advised to contact the National Fraud Information Center Hotline or a comparable consumer protection or law enforcement agency.

(e)    In cases where it appears that a consumer may have been victimized by or lost money to criminal scam operations, PCH will upon request directly contact appropriate consumer affairs and/or law enforcement agencies on behalf of the consumer.

6

**EXHIBIT E**

## PENDING ACTIONS AGAINST PCH AND OTHER SETTLING DEFENDANTS
### (AS OF JUNE 21, 1999)

|  | Plaintiff(s) | Forum | Docket Number | Date of Most Recently Filed Amended Complaint | Type Of Case | Claims Asserted |
|---|---|---|---|---|---|---|
| 1. | Albert F. Dix* | U.S.D.C., C.D. Cal. | CV 98-1818 CM (AJWx) | 2/5/98 | Class Action | Violations of California Business and Professional Code |
| 2. | Nora L. Fozard | U.S.D.C., M.D.N.C. | 1:98-CV 100149 | 1/22/98 | Individual | Breach of Contract; Fraudulent Representations; Negligent Misrepresentation; Violations of North Carolina Unfair & Deception Trade Practices Act |
| 3. | Michael Hoy | Circuit Court of Jackson County, MO | 99CV204620 | 3/24/99 | Class Action | Violations of Missouri Merchandising Practices Act; Aiding & Abetting |
| 4. | Phill Ingram and Nancy Ingram* | U.S.D.C., D. N.M. | CV 98-0350-MV/JHG | 2/6/98 | Class Action | Violations of New Mexico Unfair Trade Practices Act |
| 5. | Billy R. Landers and Phylisa Jewel Edwards | U.S.D.C., N.D. Ala. | CV-98-HGD-2223-W | 11/16/98 | Class Action | Fraud; Violations of Lanham Act |
| 6. | Travis L. LeWary | U.S.D.C., E.D. Wis. | Case No. 98-C-0065 | 8/13/98 | Individual | Misrepresentation |
| 7. | Raymond Mains | U.S.D.C., E.D. Ky. | Case No. 98-158 | 7/20/98 | Individual | Violations of Kentucky Consumer Protection Act Breach of Contract |

*\*    Cases with an asterisk indicate cases where Class Counsel is Counsel of Record.*

1

**EXHIBIT**

E

| | Plaintiff(s) | Forum | Docket Number | Date of Most Recently Filed Amended Complaint | Type Of Case | Claims Asserted |
|---|---|---|---|---|---|---|
| 8. | Anna McCurdy | Circuit Court of Montgomery County, AL | CV 1999 1206 GR | 4/13/99 | Class Action | Fraud |
| 9. | Joyce McGaha | County of Pickens, S.C., Court of Common Pleas | C/A No.: 99-CP-39-127 | 2/11/99 | Individual | Violations of South Carolina Unfair Trade Practices Act |
| 10. | Pam Moorer* | U.S.D.C., N.D. TX | C.A. No. H-98-831 | 2/5/98 | Class Action | Violation of Texas Deceptive Trade Practices - Consumer Protection |
| 11. | Peggy R. Pospeshil* | Twentieth Judicial Circuit, St. Clair County, IL.; | 98 L 270 B | 4/1/98 | Individual | Violation of Illinois Deceptive Trade Practices Act |
| 12. | Lori J. Pyatt, Barbara Downing, Mary Kennah* | U.S.D.C., E.D. Mo. | No. 4:98 CV 00490 CAS | 2/10/98 | Class Action | Fraud |
| 13. | Dolores Rast | U.S.D.C., N.D. Ind. | Cause No. 3:98-CV-587-RM | 5/7/99 | Individual | Fraud; Intentional Infliction of Emotional Distress; Criminal Deception |
| 14. | Michael J. Rich | U.S.D.C., W.D.N.C. | 4:98-CV-178C | 7/13/98 | Individual | Breach of Contract; Fraud; Violations of North Carolina Unfair & Deceptive Trade Practices Act |
| 15. | Dan Thomas | U.S. D.C., N.D. Ohio | 5:99CV 1185 | 5/18/99 | Individual | Breach of Contract; Fraud |

Exhibit F

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
)
COUNTY OF HORRY ) C/A No.: 00-CP-26-289

Edwin T. Stahl, )
)
Plaintiff, )
)
vs. ) ORDER
)
Publishers Clearing House and )
Campus Subscriptions, Inc., )
)
Defendants. )

This matter came before the Court on Defendants' Motion for summary judgment. For the

reasons set forth below, Defendants' Motion is granted.

## I. PROCEDURAL BACKGROUND

A.    Plaintiff's Complaint and Defendants' Motion

This matter arises out of Plaintiff's belief that he won a Publishers Clearing House (hereinafter

"PCH") sweepstakes contest. In his Complaint, Plaintiff alleges that Defendants committed various

wrongful acts against him while soliciting business in this state by obtaining contracts from citizens to

supply magazine subscriptions. (Complaint ¶2) More specifically, Plaintiff alleges that on or about

November 15, 1996, he received an offer of $10 million cash from Defendants by way of a

correspondence which included a "Winner ID Card" bearing Plaintiff's name and address; that

Defendants mailed the correspondence to him; and that said correspondence directed him to call a toll-

free telephone number listed on the Winner ID Card if he planned to be away from home on Super

Bowl Sunday. (Complaint ¶4) Plaintiff further alleges that he accepted Defendants' offer, and told them

EXHIBIT 3

as much when he called the toll-free telephone number as instructed. (Complaint ¶6)  Furthermore, he alleges that upon placing the call, he was told by Defendants' agent that she "had never assisted a winner before" whereupon she placed Plaintiff on hold, went to the "Winners' Circle" to get a manager for assistance and thereafter returned to the phone telling him that his name did not match the list of winners and that it was "impossible for him to have the card in his possession." (Complaint ¶7)  Plaintiff further alleges that he has made several attempts to have the Defendants make payment according to the terms of the alleged offer he claims to have accepted, but that Defendants refused to make such payment. (Complaint ¶8)

Relying upon those allegations, Plaintiff has asserted seven separate causes of action against Defendants.  Specifically, Plaintiff has pled claims for breach of contract, violation of the South Carolina Unfair Practices Act, violation of the South Carolina Consumer Protection Code, as well as, common law tort claims for fraud, negligent misrepresentation, gross negligence and outrage. (Complaint ¶¶9-33) Beyond his pleadings, in opposition to Defendants' Motion for Summary Judgment, Plaintiff previously submitted unto the Court a duplicate copy of the Winner ID Card sent to him by Defendants.  For purposes of opposing Defendants' Motion, the Court accepts said evidentiary submission as timely made.

In support of their Motion for Summary Judgment, PCH and Campus Subscriptions, Inc. (hereinafter "Campus") Defendants contend Plaintiff's action is barred by the settlement of a federal class action lawsuit approved by the United States District Court for the Southern District of Illinois entitled *Vollmer, et al. vs. Publishers Clearing House and Campus Subscriptions, Inc.*, Civil Action No. 99-CV-0434-GPM.  Specifically, Defendants contend each of Plaintiff's claims are barred by the

defenses of: (a) *res judicata*; (b) lack of subject matter jurisdiction due to the entry of an anti-suit injunction; and (c) release.[1]

B.    The *Vollmer* Class Action

The *Vollmer* Class Action was commenced on February 3, 1998 in state court in Illinois, and was later removed to the United States District Court for the District of Illinois.  As certified, members of the Class were defined as "all persons in the United States who received a PCH solicitation between February 3, 1992 and June 30, 1999." (Final Order, ¶3, p.3)[2]

Claims asserted in the *Vollmer* Action on behalf of all Class Members included recovery of monetary damages allegedly resulting from:

(1)    misstatements by PCH and Campus which, it was claimed, misled Class Members into believing that they had won large cash or other valuable prizes (see Second Amended Class Action Complaint ¶15(a)); and

(2)    misstatements by PCH and Campus which, it was alleged, misled Class Members into believing that Defendants' personnel had taken measures to insure that Class Members would win, and that Defendants' personnel were personally aware of the Class Members' status in the sweepstakes. (see Second Amended Class Action Complaint ¶15(b)).

In addition to the Class identified above, a Subclass was defined consisting of Class Members who had actually ordered and paid for materials from PCH. (see Second Amended Class Action Complaint ¶30). As pled, the Subclass covered those sweepstakes' participants who, it was claimed, were misled:

---

[1]    In support of their Motion, Defendants timely filed and served an Affidavit made by Carolyn W. Jaffe with several pleadings, Orders and settlement documents issued in the *Vollmer* Class Action attached thereto which includes the *Vollmer* Second Amended Class Action Complaint, the *Vollmer* Memorandum and Order (hereinafter "Final Order"), the *Vollmer* Judgment, the *Vollmer* Second Amended Class Action Stipulation of Settlement, and the *Vollmer* Release.

[2]    Based upon the allegations of his own Complaint and Plaintiff's acknowledged receipt of the document he terms a "Winner ID Card," the Court finds that Plaintiff was a member of the Settlement Class. Furthermore, it is undisputed that Plaintiff failed to opt out of the *Vollmer* Class. (Jaffe Affidavit ¶6)

3

(1)   into believing that purchasing a magazine or merchandise would improve their chances and/or relationship with Defendants and, therefore, improve their odds of winning a prize (see Second Amended Class Action Complaint ¶15(c)); and

(2)   into believing that by ordering, they would gain admittance to special clubs or select and/or limited groups of other participants who had a better chance of winning prizes when, it is alleged, they did not. (see Second Amended Class Action Complaint ¶15(d))

Consequently, it is abundantly clear that the *Vollmer* Class Action intentionally sought to recover monetary damages on behalf of all Class Members who had received PCH and Campus sweepstake materials and believed they had won cash prizes exactly as Plaintiff has asserted in this action.[3]

As approved by the District Court, all claims of the Class Members who failed to opt out of the Class Action in a timely manner were settled.  In connection therewith, all Class Members released PCH and Campus from all past, then present and future monetary and equitable claims arising out of, based in whole or in part on or in any way related to their direct mail solicitations, its promotional sweepstakes or marketing or business practices or policies, including but not limited to their billing practices, advertising campaigns and telemarketing efforts. (see Exhibit C to Second Amended Class Action Stipulation of Settlement -- Release and Covenant Not to Sue)

Furthermore, it is of import to this Court's decision that the District Court ordered that its "Final Order" "shall forever be binding on and shall have *res judicata* and preclusive effect in all pending and future lawsuits maintained by or on behalf of" Plaintiffs therein or any other Members of the Settlement Class. (Final Order ¶4, pp. 57-58)  Additionally, the District Court entered a permanent anti-suit

---

[3]      Equally clear, the *Vollmer* Class Action sought to recover monetary damages on behalf of Subclass Members who actually purchased merchandise thinking it would increase their chances of winning cash prizes.  However, as framed by the pleadings in the case at bar, Subclass issues need not be addressed in this Order.

injunction judicially prohibiting all Class Members from pursuing any additional claims.  (Final Order ¶¶116-119, pp. 52-53)[4]

## II. LEGAL ANALYSIS

### A.    SUMMARY JUDGMENT STANDARD

As the United States Supreme Court observed in *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1988) one of the primary functions of summary judgment is "to isolate and dispose of factually unsupported claims."  It is appropriate when it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Summer v. Carpenter*, 328 S.C. 36, 492 S.E.2d 55 (1977).  Summary judgment must be granted when plain, palpable and indisputable facts exist on which reasonable minds cannot differ. *Trico Surveying, Inc. v. Godley Auction Company*, 314 S.C. 542, 431 S.E.2d 565 (1993).  It is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of procedure as a whole, designed "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327.  As such, it must be construed with due regard not only for the rights of persons asserting claims, but also for the rights of persons opposing such claims. *Id.* At p. 327.

### B.    PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE DOCTRINE OF *RES JUDICATA*

The *Vollmer* Action and that Court's Final Order and Judgment preclude the claims Plaintiff has pled in this action under the doctrine of *res judicata*. *Res judicata* bars subsequent actions by the same parties when the claims arise out of the same transaction or occurrence that was the subject of a

---

[4]    To that end, the *Vollmer* Court also retained "exclusive jurisdiction for a period of five years after the effective date as to all matters relating to administration, consummation and enforcement of the settlement agreement and of the Final Order. (Final Order ¶7, p59)

prior action between the same parties. It defines the effect a valid judgment may have on subsequent litigation between the same parties and privies. Its purpose is to end litigation, promote judicial economy and avoid the harassment of relitigation of the same issues. See *J. Flanagan*, South Carolina Civil Procedure, p. 642 (1996).

In analyzing the *res judicata* effect of a judgment, this Court must look to the law of the forum which rendered it. See *Manji v. New York Life Insurance Co.*, 945 F.Supp. 919 (D.S.C. 1996) The *Vollmer* Final Order and Judgment were rendered in the United States District Court for the Southern District of Illinois. As such, for purposes of this Court's *res judicata* analysis, the law of the Seventh Circuit applies. As required in the Seventh Circuit, to establish *res judicata*, the Defendant must prove the following three elements: (1) identity of the parties; (2) identity of the subject matter; and (3) final judgment in a former suit. See *People Who Care v. Rockford Board of Education*, 68 F.3d 172, 177 (7th Cir. 1995).

1.     The *Vollmer* Action involved the same parties as in this case.

As determined above, Plaintiff was a Class Member in the *Vollmer* Action, and he failed to opt out. He is, therefore, a member of the *Vollmer* Class as certified for settlement purposes and is subject to the stipulated Settlement as outlined in the Final Order in *Vollmer*. Because PCH and Campus were also parties to the *Vollmer* Action, the parties in this litigation are, in fact, identical and the first prong of the *res judicata* test is satisfied.[5]

---

[5]     It is axiomatic that a dismissal with prejudice approving a class action settlement is a final judgment on the merit for res judicata purposes. See, generally, *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996); *Rasheed-Bey v. Aiken*, 1 F.3d 1244, 1993 WL 299358 at *3 (7th Cir. 1993) (unpublished disposition); *Conley v. Treasurer of Missouri*, 999 S.W.2d 269, 274 (Mo. App. 1999) (court-approved settlement is final for purpose of *res judicata*.)

2.    The *Vollmer* Action involved the same claims as Plaintiff raises here.

The second prong of the test for application of *res judicata*, whether the same claims are involved in the previous as well as the subsequent litigation, is also satisfied here. Plaintiff's Complaint alleges that the Defendants solicited business in South Carolina to contract to supply magazine subscriptions for profit, and that Plaintiff was sent correspondence by Defendants which included a "Winner's ID Card" from which caused him to believe he had won a $10 million cash prize. The actual mailing of that "Winner's ID Card", coupled with Defendants' telemarketing information located thereon which Plaintiff readily admits caused him to call and speak with Defendants' personnel, comprise the sum total of all allegations upon which Plaintiff bases his seven causes of action. Such allegations are precisely the allegations that were pled, pursued and settled in the *Vollmer* Action. The *Vollmer* Class Members clearly alleged in paragraph 15 of the Second Amended Class Action Complaint that PCH and Campus misled persons into believing they had won large cash prizes just as Plaintiff contends here. (See also Second Amended Stipulation of Settlement at Ex. C (Release) and at 8, ¶(L) (definition of "Settled Claims") Accordingly, Plaintiff's claims don't just "arise out of, based in whole or in part on, or in any way related to" the alleged wrongful conduct which formed the gravamen of the *Vollmer* litigation, they fall squarely within the scope of the claims alleged, pursued and dismissed by way of final judgment in the *Vollmer* Class Action Settlement, thus satisfying the second prong for establishing application of *res judicata*.

3.    The *Vollmer* Action was a final judgment on the merits.

The Final Order in the *Vollmer* Action was accompanied by Final Judgment dismissing the *Vollmer* Action with prejudice. (Exhibit 1 to Jaffe Affidavit) Under the doctrine of *res judicata*, all Class Members are bound by a final judgment in a Class Action, including a judgment following

settlement, assuming the action met the necessary procedural due process requirements. *Matsushita Electric Industrial Co., Ltd. v. Epstein*, 516 U.S. 367, 379 (1996) ("There is, of course, no dispute that under elementary principles of prior adjudication a judgment in a properly entertained Class Action is binding on Class Members in any subsequent litigation.") (citation omitted); *Manji v. New York Life Insurance Company*, 945 F. Supp. 919 (D.S.C. 1996) (holding that Plaintiff's claims in State Court Class Action were identical to claims in subsequent federal action and, therefore, federal court would give full faith and credit to state court judgment). As determined and approved by the District Court in its Final Order, necessary procedural due process requirements were met and exceeded in *Vollmer* Class Action. (*Vollmer* Final Order ¶¶22-38)

In the case at bar, the Court has been presented with a final judgment following settlement of all claims in the *Vollmer* Action, including the very claims which Plaintiff is now attempting to relitigate. Accordingly, the third prong of the *res judicata* analysis is satisfied as well.

Because each of the three elements of *res judicata* are satisfied, as applied to the case at bar, the Judgment and Final Order preclude Plaintiff from bringing the claims alleged in this litigation. Indeed, the Final Order issued by the District Court specifically stated that the judgment "shall have *res judicata* and preclusive effect in all pending and future lawsuits maintained by or on behalf of Plaintiffs or any other members of the Settlement Class." Such preclusive effect was clearly the intent of the *Vollmer* Court, and is clearly the correct legal result as dictated by utilizing the Seventh Circuit's *res*

8

*judicata* analysis. As such, Defendants are entitled to summary judgment on their defense of *res judicata.* Accordingly, Defendants' Motion for Summary Judgment is granted.[6]

AND IT IS SO ORDERED

The Honorable John L. Breeden, Jr.
Judge, Fifteenth Judicial Circuit

_____, 2000

---

[6]    In light of the Court's disposition of Defendants' first ground for summary judgment, the Court has determined it need not address Defendants' remaining grounds.

Exhibit G

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. 25                 HON. ROBERT A. DUKES, JUDGE

LILLIAN R. HONEKMAN,          )
                              )
            Plaintiff,        )
                              )
    vs.                       )   No. BC 229959
                              )
PUBLISHERS CLEARING HOUSE,    )
                              )
            Defendant.        )
_____ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Wednesday, August 28, 2000

APPEARANCES:

For the Plaintiff:        AXTELL & SHIN
                          BY:  CHRISTIAN H. SHIN, ESQ.
                          23505 Crenshaw Boulevard
                          Suite 214
                          Torrance, California  90505
                          (310)325-7636

For the Defendants:       MORGAN, LEWIS & BOCKIUS, LLP
                          BY:  RANDI PERRY SPALLINA
                                    ATTORNEY AT LAW
                          333 South Grand Avenue
                          22nd Floor
                          Los Angeles, California  90071
                          (213) 612-1132

LINDA L. COMSTOCK, CSR NO. 3741
Official Reporter

ORIGINAL

EXHIBIT 4

LOS ANGELES, CALIFORNIA; WEDNESDAY, AUGUST 28, 2000; 9:10 A.M.

DEPARTMENT NO. 25            HON. ROBERT A. DUKES, JUDGE

THE COURT:  Honekman versus Publishers Clearing House.

Counsel's appearances, please.

MR. SHIN:  Chris Shin on behalf of plaintiff.

MS. SPALLINA:  Good morning, Your Honor.

Randi Perry Spallina on behalf of defendant,
Publishers Clearing House.

THE COURT:  This is a demurrer filed by Publishers
Clearing House.  The Court has taken the judicial notice as
requested.  I think it's proper, and I've overruled the
objection.

And based upon the previous class action and the
notice in the class action, the Court's tentative is to
sustain the demurrer without leave to amend.

And the plaintiff may be heard.

MR. SHIN:  You do want me to be heard?

THE COURT:  If you'd like to be, yes.

MR. SHIN:  The problem -- well, there's a couple of
issues before we get to that and that was missing in
plaintiff's opposition.

Number one, under C.C.P. section 452, the policy of
the Court should be construed liberally.  Under Goodman
versus Kennedy, 134 Cal.Rptr. 375, it is an abuse of
discretion for the Court to deny leave to amend where there
is any reasonable possibility that the plaintiff can state a
cause of action.

2

1        THE COURT:  What's your reasonable possibility?

2        MR. SHIN:  The defendants here have failed to show that

3   the claims as alleged in the complaint are identical or even

4   similar to the class action Vollmer claims.  The plaintiff's

5   causes of action, all of them are based on California

6   Business and Professions Code.  Specifically, it's based on

7   section 17537(b), which prohibits a party from representing

8   any person has won money, property, or anything of value when

9   that certainly isn't the case.

10       THE COURT:  How does that at all differ from what the

11  class action was about?

12       MR. SHIN:  The class action -- specifically, what I

13  understood from them, from the defendants, is that the class

14  action had to do with sending of solicitations and mass

15  mailings of that sort to millions of their potential clients

16  in the United States.  And that specifically here, we allege

17  that our specific facts --

18       THE COURT:  Just a second.  The class action wasn't the

19  basis that they were soliciting to their -- to people on the

20  mailing list.  There's nothing that prohibited that.  It's a

21  little bit deeper than that.

22       MR. SHIN:  I don't believe so, Your Honor.  I mean here,

23  I mean plaintiff concedes that, yes, the complaint does

24  contain similar facts to the Vollmer class action claims, but

25  there are unique facts that are alleged in the complaint that

26  is completely different, and they have failed to make a

27  showing that plaintiff's claims alleged in the complaint are

28  even identical to the Vollmer claims.  All they've said thus

1   far is that plaintiff -- "We believe that the plaintiff is a

2   member of the Vollmer class action," and that's it.  And I

3   think they need -- they have the burden of showing that the

4   allegations in the complaint are similar or identical to the

5   class action claims.

6          THE COURT:  You want to address that?

7          MS. SPALLINA:  Your Honor, I disagree.  The subject

8   matter of the Vollmer class action was Publishers Clearing

9   House direct mail solicitations, promotional sweepstakes, its

10  marketing and business practices.  The settlement class

11  encompassed consumers who received direct mailing

12  solicitations and sweepstakes entry forms and also the

13  subclass consisted of members who purchased merchandise, of

14  which Mrs. Honekman was certainly a member.  The causes of

15  action in the Vollmer national class action were based on

16  fraud in various states, unfair competition laws, which

17  Mr. Shin has cited to in California.

18          I think the subject matter of the Vollmer action

19  certainly encompasses plaintiff's claims, which arise from

20  her complaints regarding Publishers Clearing House

21  sweepstakes promotions, and I would submit that those claims

22  are substantially similar to the claims in the Vollmer action

23  and are barred by the doctrine of res judicata.

24          MR. SHIN:  Well, Your Honor, the problem is that they

25  are not similar.

26          THE COURT:  You keep saying that.  I'm trying to figure

27  out why they're not.

28          MR. SHIN:  Defendant keeps pointing to the fact that she

1   received sweepstakes forms and had previously purchased items

2   from PCH.  All that may be true, but what plaintiff alleges

3   in this lawsuit is she received an unsolicited, unsolicited

4   sign, and some items indicating that she was, indeed, a

5   winner.  And I think that is factually different from the

6   Vollmer class action claims.  It has to be because they don't

7   allege that class action plaintiffs did, in fact, receive

8   sweepstakes signs indicating that they were, in fact,

9   winners.  I mean this happened on the eve of when the award,

10  the actual millions, were supposed to be awarded.

11       MS. SPALLINA:  Your Honor, Mrs. Honekman's receipt of a

12  sweepstakes sign is related to Publishers Clearing House

13  sweepstakes promotions, which is exactly what was alleged in

14  the Vollmer action.  It's certainly related for purposes of

15  res judicata.  The claims do not have to be identical.  The

16  issues just have to be similar.

17       THE COURT:  The finding of the Court is that the

18  settlement class is defined as all persons who received

19  solicitations from Publishers Clearing House during the class

20  period.  Whether or not they made purchases, they will

21  receive benefit of a number of remedial undertakings as

22  described.  The penumbra of the action or the penumbra of the

23  claims of the action was the solicitation from elderly

24  persons to entice them to respond and/or purchase magazines.

25  I don't see that she's other than a member of the class; so

26  I'm going to adopt my tentative.

27            I will sustain the demurrer without leave.  I think

28  she's precluded under the doctrine of res judicata and

5

1   collateral estoppel.

2             Moving party to give notice.

3             Thank you.

4        MS. SPALLINA:   Thank you, Your Honor.

5             (Proceedings in the above-entitled

6             matter were concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. 25                  HON. ROBERT A. DUKES, JUDGE


LILLIAN R. HONEKMAN,              )
                                  )
            Plaintiff,            )
                                  )
     vs.                          )     No. BC 229959
                                  )
PUBLISHERS CLEARING HOUSE,        )     REPORTER'S CERTIFICATE
                                  )
            Defendant.            )
                                  )


STATE OF CALIFORNIA    )
                       )  ss
COUNTY OF LOS ANGELES  )

          I, LINDA L. COMSTOCK, Official Reporter of the

Superior Court of the State of California, County of Los

Angeles, do hereby certify that the foregoing pages, 1

through 5, inclusive, comprise a full, true and correct

transcript of the proceedings held in the above-entitled

matter on August 28, 2000.

          Dated this 30th day of August, 2000.




                         _____ CSR NO. 3741
                              OFFICIAL REPORTER

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel. 212.309.6000
Fax: 212.309.6273

**Morgan Lewis**
COUNSELORS AT LAW

MORGAN LEWIS E-MAIL ADDRESSES HAVE CHANGED
THE MORGAN LEWIS E-MAIL DOMAIN NAME HAS BEEN
CHANGED TO "MORGANLEWIS.COM." MOST E-MAIL
ADDRESSES ARE NOW FIRST INITIAL AND LAST NAME
@MORGANLEWIS.COM. FOR INDIVIDUAL E-MAIL
ADDRESSES, PLEASE REFER TO
WWW.MORGANLEWIS.COM, OR SEND AN E-MAIL TO
INFO@MORGANLEWIS.COM. PLEASE UPDATE YOUR
RECORDS ACCORDINGLY. TOLL FREE HOTLINE FOR
TECHNICAL PROBLEMS: 877-963-4652

**FAX MESSAGE**

Send to:

(1)  Name: Rita Marsh

FAX Number:  314-259-2020

Firm:  Bryan Cave

Telephone Number:  314-259-2217

(2)  Name:

FAX Number:

Firm:

Telephone Number:

From:

Name:  Cora M. Jones

Floor: 43          Operator Sending:

Telephone Number:  212.309.6939

Time Sent:        Date Sent:

Number of Pages (INCLUDING COVER PAGE):

Note:

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE.  THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL.  THANK YOU.

Comments:      Sorry it took so long.

A-9-30

Exhibit H

(Cite as: 1 F.3d 1244, 1993 WL 299358 (7th Cir.(Ind.)))
<KeyCite History>

NOTICE:   THIS IS AN UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table
of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI
CTA7 Rule 53 for rules regarding the citation
of unpublished opinions.)

United States Court of Appeals, Seventh
Circuit.

**Taajwar K. RASHEED-BEY, Plaintiff/
Appellant,**
v.
**James E. AIKEN, [FN1] Jack Duckworth,
and Indiana Attorney General,
Defendants/Appellees.**

No. 91-3769.

Submitted July 9, 1993. [FN*]
Decided Aug. 3, 1993.

Appeal from the United States District Court
for the Northern District of Indiana, South
Bend Division, No. 84 C 569, Allen Sharp,
Chief Judge.

N.D.Ind.

AFFIRMED.

Before BAUER, Chief Judge, and CUDAHY,
and KANNE, Circuit Judges.

ORDER

**1 Taajwar K. Rasheed-Bey, an inmate of
the Indiana State Prison, appeals the district
court's grant of defendants' motion for
summary judgment in this civil rights action.
Rasheed-Bey alleges that as a member of the
Moorish Science Temple of America, a Muslim
sect, he was denied his First Amendment right
to freely practice his religion while
incarcerated.   Rasheed-Bey further alleges
that the defendants discriminated against this
sect while according proper recognition to a

different Muslim sect within the prison.   We
affirm the district court.

I. BACKGROUND

Taajwar K. Rasheed-Bey is a member of the
Moorish Science Temple of America ("MST").
On September 4, 1984, he filed a civil rights
complaint pursuant to 42 U.S.C. § 1983,
alleging that the defendants, officials of the
Indiana Department of Correction, had
deprived him of his First and Fourteenth
Amendment right to exercise his religious
beliefs in accordance with the mandates of the
particular Muslim sect to which he belongs.
[FN2] He claimed that he and other members
of MST had in 1981 petitioned Jack R.
Duckworth, then Superintendent of the
Indiana State Prison, for recognition as a
separate    Muslim    sect,    appropriate
accommodation of its particular rituals, and
recognition of their right to possess religious
artifacts and receive religious literature.
Rasheed-Bey alleged that at the time he filed
his complaint, Superintendent Duckworth and
Gordon H. Faulkner, acting under the advice
of the Indiana Attorney General, had persisted
in refusing their requests.   He also claimed
that the defendants had improperly grouped
MST with another Muslim sect, the American
Muslim Mission, in a consent decree that had
been part of the settlement in another lawsuit,
[FN3] contending that the prison officials'
decision to grant recognition to the American
Muslim Mission while denying recognition to
the MST was discriminatory.   Rasheed-Bey
sought declaratory and injunctive relief and
damages.

In their answer to Rasheed-Bey's complaint,
the defendants asserted the affirmative
defense of res judicata on the ground that
Rasheed-Bey was complaining about the
outcome of the previous lawsuit, James v.
Lash, despite the fact that he was a member of
the plaintiff class in that action and had
participated in drafting a procedure for
accommodating the religious practices of all
Mulsims in the Indiana State Prison.   That

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



EXHIBIT 6

procedure, known as Standard Operating Procedure # 605, became a central part of the consent decree in the settlement of the James case. Counsel was appointed to represent Rasheed-Bey, and Rasheed-Bey's deposition was taken. The defendants then moved for summary judgment pursuant to Fed.R.Civ.P. 56.

In its order of April 11, 1988, the district court dismissed the claims against the defendants in their official capacities as being precluded by the Eleventh Amendment. Reluctant to base its holding solely on res judicata, the court went on to say that if indeed Rasheed-Bey has been granted his First Amendment right to freely exercise his religion as defined in two Supreme Court cases that had been decided subsequent to the filing of Rasheed-Bey's complaint, [FN4] then his request for injunctive relief was moot. The district court dismissed the complaint without prejudice, [FN5] allowing Rasheed-Bey to amend it in light of the current standards governing the right to freely exercise one's religion while incarcerated. Rasheed-Bey then filed a verified petition for rehearing, contending that he was not a member of the plaintiff class in James v. Lash, and that he had been denied his right to freely worship as a member of the MST on the same basis as had been granted to members of other Muslim sects. The district court granted Rasheed-Bey's petition on August 31, 1988, effectively reinstating his original complaint, and directed the parties to brief the court on the effect of recent case law on Rasheed-Bey's claims. [FN6]

**2 On February 27, 1990, after noting that Rasheed-Bey had taken no further action in prosecuting this case for nearly a year, the district court ordered Rasheed-Bey to show cause why the case should not be dismissed for want of prosecution. Rasheed-Bey responded, alleging that since the time he had been without counsel, the defendants had been unwilling to speak with him directly concerning a possible resolution of the case. He then moved the court to appoint a new attorney to represent him. After further briefing, the defendants renewed their motion

for summary judgment. [FN7] Finding no basis upon which Rasheed-Bey's action should be maintained, the district court directed entry of final judgment in favor of the defendants on November 8, 1991. Rasheed-Bey filed a timely appeal. [FN8]

## II. ANALYSIS

In evaluating a district court's grant of summary judgment, we review de novo the record and the controlling law. See Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir.1990). "[W]e determine anew whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law." Lulich v. Sherwin Williams Co., No. 92-2380, slip op. at 3-4 (7th Cir. April 30, 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52 (1986)). In doing so, we draw all permissible inferences from the record in favor of the nonmoving party. See id. When confronted with a motion for summary judgment, the party bearing the burden of proof on an issue may not, however, merely rest on his pleadings; instead, he must affirmatively demonstrate by specific factual allegations that there is a genuine issue of material fact entitling him to a trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson, 477 U.S. at 250.

## A. The res judicata effect of James v. Lash.

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94 (1980). Res judicata applies to assure the finality of the judicial decision in the earlier action when the following three elements are present: (1) a final judgment on the merits; (2) identity of the cause of action; and (3) identity of the parties or their privies. See Prochotsky v. Baker & McKenzie, 966 F.2d 333, 334 (7th Cir.1992) (citations omitted); Smith v. City of Chicago, 820 F.2d 916, 917 (7th Cir.1987) (citations omitted).

It is well-established that "a judgment in a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Westlaw

properly entertained class action is binding on class members in any subsequent litigation." Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 874 (1984) (citations omitted); Fed.R.Civ.P. 23(c)(3).    For purposes of applying res judicata, an issue which "could have been raised" in the earlier action is one that was in existence at the time the original complaint was filed.    See Spiegel v. Continental Illinois Nat'l Bank, 790 F.2d 638, 645-46 (7th Cir.), cert. denied, 479 U.S. 987 (1986);  see also Manning v. City of Auburn, 953 F.2d 1355, 1360 (11th Cir.1992); Young-Henderson v. Spartanburg Area Mental Health Center, 945 F.2d 770, 773-75 (4th Cir.1991).    Thus, res judicata does not apply to bar a lawsuit brought to vindicate rights that were allegedly violated after the filing of the complaint in the earlier action.    See Spiegel, 790 F.2d at 645 (citations omitted); Los Angeles Branch NAACP v. Los Angeles Unified School Dist., 750 F.2d 731, 739 (9th Cir.1984), cert. denied, 474 U.S. 919 (1985); see also Prochotsky, 966 F.2d at 335 (identity of cause of action exists when "a single core of operative facts forms the basis of both lawsuits") (internal quotations, citations omitted). [FN9]

**3 Insofar as Rasheed-Bey attempts to relitigate issues which were or could have been raised in James v. Lash, his claim is precluded by res judicata.    It is undisputed that the consent decree entered in that case operates as a final judgment on the merits for purposes of res judicata.  See, e.g., Young-Henderson, 945 F.2d at 773.    Furthermore, the plaintiff class in James was defined so as to embrace all Muslims incarcerated in the Indiana State Prison, including those belonging to MST.    In his deposition, Rasheed-Bey admits that he himself participated in the drafting of Standard Operating Procedure # 605 ("SOP # 605"), which was incorporated in the consent decree forming the basis of the settlement of the James case. (Rasheed-Bey Dep. at 50-52). Although Rasheed-Bey does not state that he was a member of the MST at the time of the drafting SOP # 605, he does admit that members of the MST worked on the document. (Rasheed-Bey Dep. at 52).    He and other

Muslims were notified of the proposed settlement of James and were afforded an opportunity to submit objections to that settlement, but failed to do so.    Rasheed-Bey's specific challenge to the consent decree in James, and his claim that it does not adequately accommodate the special needs, concerns, and practices of MST members, is therefore foreclosed by res judicata.

B. Claims arising after James v. Lash.

Rasheed-Bey's pro se complaint, read liberally, makes two claims concerning violations of his First Amendment rights which were alleged to have occurred after the filing of the complaint in James v. Lash.  He contends that (1) prison officials have not been implementing the procedures agreed upon in SOP # 605 to accommodate the religious practices of Muslims, and that (2) prison officials have discriminated against MST adherents in favor of other Muslims, notably the American Muslim Mission, by refusing to honor their special requests to be allowed to display certain religious artifacts and to receive MST literature in prison, and by excluding the MST "from administrative and departmental recognition."

With respect to the claim that SOP # 605 is not being followed, Rasheed-Bey has brought forward no evidence tending to show that prison officials have failed to implement SOP # 605 or that they have ignored the needs of Muslim inmates.  See Celotex Corp., 477 U.S. at 322-23.    Despite being given proper notice by the defendants of the effect of their motion for summary judgment, see Lewis v. Faulkner, 689 F.2d 100, 101-03 (7th Cir.1982), and ample time and opportunity to meet his burden, Rasheed-Bey has failed to show either that the Indiana State Prison officials are not following SOP # 605, or that the needs of MST adherents or of any other Muslim inmates are being systematically ignored.    At most, Rasheed-Bey's deposition reveals occasional lapses by the staff at the Indiana State Prison, such as failing to process a grievance (Rasheed-Bey Dep. at 53-54), or mislabeling a meal as pork-free (Rasheed-Bey Dep. at 62-64), or not providing MST adherents with sack

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Westlaw

lunches for a brief period during the fast of Ramadan. (Rasheed-Bey Dep. at 22). It is well-established that occasional lapses such as these do not state a constitutional violation. See Hadi v. Horn, 830 F.2d 779, 784, 787-88 (7th Cir.1987) (occasional and sporadic cancellation of religious services, where other opportunities for religious observance were provided, did not unreasonably impinge on inmates' First Amendment rights); see also Al- Alamin v. Gramley, 926 F.2d 680, 688-89 (7th Cir.1991).

**4 Rasheed-Bey's claims of discrimination are likewise unsupported. His deposition testimony, viewed in the light most favorable to him, again reveals only occasional lapses on the part of prison officials such as may evince a lack of knowledge of the nature of his religious observances, rather than any systematic exclusion or discrimination, or failure to provide a reasonable accommodation of his practices. [FN10] We have found nothing in the record beyond Rasheed-Bey's bare allegation that would indicate that MST adherents have been deprived of "all means of expression" of the unique beliefs of their sect, see Woods v. O'Leary, 890 F.2d 883, 887 (7th Cir:1989) (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 352 (1987)), or that they have been denied a reasonable opportunity to follow the tenets of their faith comparable to the opportunity afforded inmates who are members of the American Muslim Mission, or of any other religious denomination. See id. (quoting Cruz v. Beto, 405 U.S. 319, 322 (1972)); see also Al-Alamin, 926 F.2d at 687-88; Young v. Lane, 922 F.2d 370, 377-78 (7th Cir.1991); Johnson-Bey v. Lane, 863 F.2d 1308, 1312 (7th Cir.1988). Finally, Rasheed-Bey complains that the American Muslim Mission has been granted the "administrative recognition" denied his own group because it is cited in SOP # 605 as representing Muslims in the Indiana State Prison. This claim constitutes a challenge to the consent decree in James v. Lash, and is therefore foreclosed by res judicata, as we have already discussed.

Rasheed-Bey's claims that MST has been denied the right to display certain religious artifacts and to receive religious publications

suffers from a more serious flaw. Although incarcerated persons retain the right to freely exercise their religion, this right may be circumscribed where necessary to serve valid penological objectives. Valid penological objectives include crime deterrence, rehabilitation, prison security, and the proper allocation of limited prison resources. O'Lone, 482 U.S. at 348, 352; Al-Alamin, 926 F.2d at 686. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." O'Lone, 482 U.S. at 349 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

Thus, prison regulations prohibiting nonstandard headgear, see Young, 922 F.2d at 377, restricting mailing privileges, see Woods, 890 F.2d at 885-87, requiring careful screening of religious leaders prior to their being allowed access inmates, see Siddigi v. Leak, 880 F.2d 904, 907, 909-10 (7th Cir.1989) , and prohibiting the possession of rosaries and scapulars in prison cells, see Friend v. Kolodzieczak, 923 F.2d 126, 127-28 (9th Cir.1991), have been upheld as reasonably related to legitimate interests of prison security. In particular, the regulation in Young prohibiting Jewish inmates from wearing yarmulkes was upheld in part because of the need to avoid the perception of favoritism among inmates. 922 F.2d at 377 (citations omitted). The regulations Rasheed-Bey complains of, which restrict the possession and display of certain flags and the wearing of the fez and other clothing having religious significance to MST members, are reasonably related to the need to maintain prison security. [FN11]

**5 Prison regulations that affect the receipt of outside publications by inmates are subject to the same standard of review as are other prison regulations, and are upheld if they are "reasonably related to legitimate penological interests." Thornburgh v. Abbott, 490 U.S. 401, 409, 413 (1989) (quoting Turner, 482 U.S. at 89). The regulation challenged by Rasheed-Bey allows inmates "to possess one (1) copy of any religious book or publication providing that the book or publication does not

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Westlaw

incite violence toward others or is disruptive to the security and operation of the facility/institution."    Inmates are not, however, permitted to possess "multiple copies of the same religious book or publication." (Indiana Department of Correction Manual of Policies and Procedures, R. at 56, Exh. C). On its face, this regulation does not deny MST adherents the right to possess religious literature that is not disruptive of prison security, [FN12] but only restricts the number of copies of a particular publication that an inmate may possess.

The documents supplied by Rasheed-Bey show that as applied to him, the regulation did not prohibit him from receiving MST literature, but only from possessing multiple copies of the same publication.    This regulation may create a minor impediment to Rasheed-Bey's exercise of his First Amendment rights.    But because the regulation allows inmates to possess one copy of a religious publication, Rasheed-Bey is not deprived of all means of expressing his beliefs or of communicating with those outside the prison who share his faith.  See Young, 922 F.2d at 376 (citations omitted). Furthermore, the restriction to one copy of a publication per inmate appears on its face to be reasonably related to legitimate sanitation and security concerns.    Under these circumstances, the district court's dismissal of Rasheed-Bey's action was proper. [FN13]

## CONCLUSION

The district court's dismissal with prejudice of Rasheed-Bey's civil rights action is

## AFFIRMED.

FN* After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case.   The notice provided that any party might file a "Statement as to Need of Oral Argument."  See Fed.R.App.P. 34(a);  Cir.R. 34(f). No such statement having been filed, the appeal has been submitted on the briefs and record.

FN1. Pursuant to Fed.R.App.P. 43(c), James E. Aiken, the present Commissioner of the Indiana

Department of Correction, has been substituted for his predecessor, John T. Shettle.

FN2. The complaint indicates that Rasheed was suing the defendants in their official and individual capacities.

FN3. The consent decree was part of the settlement of the consolidated cases of James v. Lash, No. S73-5, and Walker v. Lane, No. 3687, a class action brought to adjudicate the rights of Muslim inmates. The district court in that case certified the class of "inmates of the Indiana State Prison who are followers of the Honorable Elijah Muhammad" as the plaintiff class.

FN4. O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987), and Turner v. Safley, 482 U.S. 78 (1987).

FN5. Rasheed's premature appeal of this ruling was dismissed by this court.  (Order of June 29, 1988).

FN6. In the meantime, the district court had granted counsel's motion to withdraw from representing Rasheed-Bey in this action, and had substituted John T. Shettle for Gordon Faulkner as defendant.    As noted above, Mr. Shettle has since been succeeded by Mr. James E. Aiken, the current Commissioner of the Indiana Department of Correction.

FN7. In its order of September 4, 1991, the district court indicated that Rasheed-Bey's action may be moot due to the fact that he was no longer an inmate of the Indiana State Prison, having been transferred to the Indiana Reformatory.    The court directed briefing on this threshold issue as well as on the merits.    Rasheed-Bey has since been returned to the Indiana State Prison.

FN8. While his appeal was pending, Rasheed-Bey filed three motions requesting that this court take "judicial notice" of certain facts.    These motions were, in substance, requests to supplement the record on appeal. His motion of December 4, 1992, in which he asked the court to take notice of the fact that the Indiana State Prison had persisted in denying the MST's request to receive certain religious publications, was granted. (Order of Dec. 10, 1992). The other two motions were denied.  (Orders of Jan. 8, 1993 and March 5, 1993).

FN9. But cf. Young-Henderson, 945 F.2d at 774-75

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Westlaw

(preclusive effect of consent decree is determined by the intent of the parties, and thus may even extend to bar litigation of claims arising after the original complaint was filed, provided the consent decree clearly expresses this intent).

FN10. One example was the failure of prison officials to provide Rasheed-Bey with sack lunches during the month of Ramadan in 1986, due to simple ignorance of the fact that MST adherents are Muslims. Within two days after this was clarified, Rasheed-Bey was provided with sack lunches. (Rasheed-Bey Dep. at 22).

FN11. In support of their motion for summary judgment, defendants presented the affidavit of Sheldon Grame, the Central Office Supervisor of the Indiana Department of Correction in charge of religious services. In his affidavit, Grame stated that "the Indiana Department of Correction has strong evidence the MST acts as a front for Black Dragon gang activity." (Grame Aff. at 2). Rasheed-Bey's motion to strike that affidavit was denied. (Order of October 21, 1987). Rasheed-Bey's response to defendants' motion and attached exhibits was merely to insist that MST is a bona fide religion and that his beliefs are sincerely held. We assume that this is true, and observe that Rasheed-Bey's response fails to address the defendants' legitimate need to maintain institutional security and to avoid the appearance of condoning gang activity.

FN12. A similar restriction on receipt of literature in federal prisons was upheld as facially valid in Abbott, 490 U.S. at 403 & n. 1, 418-19.

FN13. Rasheed-Bey has no constitutional or statutory right to have counsel appointed for him in this civil matter. See DiAngelo v. Illinois Dept. of Public Aid, 891 F.2d 1260, 1262 (7th Cir.1989); Wolfolk v. Rivera, 729 F.2d 1114, 1119 (7th Cir.1984). Moreover, the district court gave Rasheed-Bey every opportunity to present his case; there is nothing in the record to indicate that Rasheed-Bey's due process rights were infringed. The district court's decision not to request new counsel after Rasheed-Bey's counsel withdrew was not an abuse of discretion. See Jackson v. County of McLean, 953 F.2d 1070, 1071-72 (7th Cir.1992); Howland v. Kilquist, 833 F.2d 639, 646 (7th Cir.1987).

**END OF DOCUMENT**

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

